## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## WICHITA FALLS DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | |
| STATE OF KANSAS | § | |
| | § | |
| STATE OF LOUISIANA, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| UNITED STATES OF AMERICA, | § | |
| UNITED STATES DEPARTMENT | § | |
| OF HEALTH AND HUMAN | § | |
| SERVICES, SYLVIA BURWELL, | § | |
| in her Official Capacity as | § | |
| SECRETARY OF HEALTH AND | § | |
| HUMAN SERVICES, UNITED | § | |
| STATES INTERNAL REVENUE | § | |
| SERVICE, and JOHN KOSKINEN, | § | |
| in his Official Capacity as | § | |
| COMMISSIONER OF INTERNAL | § | |
| REVENUE, | § | |
| Defendants. | § | |

---

## COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF

---

TO THE HONORABLE JUDGE OF SAID COURT:

The State of Texas, the State of Kansas, and the State of Louisiana (collectively "Plaintiffs" or "Plaintiff States") seek declaratory and injunctive relief against the United States of America, United States Department of Health and Human Services ("Department"), Sylvia Burwell in her official capacity as Secretary of Health and Human Services, United States Internal Revenue Service, and John Koskinen in his official capacity as Commissioner of Internal Revenue, regarding Defendants' actions

implementing the portions of the Patient Protection and Affordable Care Act known as the Health Insurance Providers Fee. The Plaintiff States also seek monetary relief against the United States in the form of a return of the Health Insurance Providers Fees previously made.

## I. PARTIES

1.     Plaintiffs are the State of Texas, the State of Kansas, and the State of Louisiana.

2.     Defendants are the United States of America, the United States Department of Health and Human Services ("Department"), Sylvia Burwell in her official capacity as Secretary of Health and Human Services, the United States Internal Revenue Service ("Service"), and John Koskinen in his official capacity as Commissioner of Internal Revenue.

## II. JURISDICTION AND VENUE

3.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this suit concerns the constitutionality of the Health Insurance Provider Fee in the Patient Protection and Affordable Care Act. This Court also has jurisdiction to compel the Secretary of Health and Human Services and Commissioner of Internal Revenue to perform their duties pursuant to 28 U.S.C. § 1361.

4.     The Plaintiff States' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

5.     Venue is proper under 28 U.S.C. § 1391(e)(1)(B) because the United States, two of its agencies, and two of its officers in their official capacity are Defendants; and a substantial part of the events giving rise to the Plaintiff States' claims occurred in this District.

### III.  FACTUAL BACKGROUND

6.     This dispute arises primarily from the March 2015 publication of Actuarial Standard of Practice Number 49, which for the first time notified the several States that, functionally, they were being assessed or taxed the Health Insurance Providers Fee (imposed as a collective lump sum on all covered health insurance providers) as part of the Affordable Care Act.  Plaintiff States have now paid the fee and herein contend that this new regulatory framework poses myriad statutory and constitutional problems.

### A. The Medicaid Program

7.     The United States Congress created the Medicaid program in 1965.  *See* Social Security Amendments Act of 1965, Pub. L. 89-97, 79 Stat. 286 (1965).  The Medicaid program is jointly funded by the United States and the States to provide healthcare to individuals with insufficient income and resources.  *See generally* 42 U.S.C. § 1396-1396w.

8.     To participate in Medicaid, States must provide coverage to a federally-mandated category of individuals and according to a federally-approved State plan.  *See* 42 U.S.C. § 1396a; 42 C.F.R. § 430.10-430.12.  All 50 States participate in the Medicaid program.  *Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares for Medicaid, the Children's Health Insurance Program, and Aid to Needy Aged, Blind, or Disabled Persons for October 1, 2014 to September 30, 2015*, 79 Fed. Reg. 3385 (Jan. 21, 2014).

9.     Texas, Kansas, and Louisiana have been participating in the Medicaid program since shortly after its creation.  *United States Advisory Commission on Intergovernmental Relations* at 91, *"Intergovernmental problems in Medicaid,"* September 1968, *available at* http://digital.library.unt.edu/ark:/67531/metadc1397/. Because Medicaid is an entitlement program, States cannot limit the number of

eligible people who can enroll, and Medicaid must pay for all services covered under the program. Generally, Medicaid pays for acute and other health care primarily for low income families, children, related caretakers of dependent children, pregnant women, people age 65 or older, and adults and children with disabilities. *See, e.g.,* *Texas Health and Human Services Commission, Texas Medicaid and CHIP in Perspective: 10th Ed.*, 2-2 (2015), *available at* https://www.hhsc.state.tx.us/medicaid/about/PB/PinkBook.pdf at 1-1 to 1-2.

10.    Providing health care to individuals with insufficient income or resources through the Medicaid program is a significant function of the Plaintiff States' governments. For example, Texas provides Medicaid services to around one in seven of Texas's total population (3.7 million of the 26.4 million total population) and Medicaid spending accounted for around 26% of Texas's total budget in fiscal year 2013 (and 28% of the 2015 budget). *Id.* at 1-1. Louisiana provides Medicaid services to approximately 3 in 10 of Louisiana's population (1.37 million Louisianans). *Louisiana Medicaid Annual Report*, *State Fiscal Year 2012/13* at 3, *available at* http://new.dhh.louisiana.gov/assets/medicaid/AnnualReports/Medicaid_12_13_WEB.pdf. And Kansas, in its 2015 fiscal year, provided Medicaid services to more than 350,000 citizens, well more than 10% of its population.

**B. The Children's Health Insurance Program**

11.    The United States Congress created the Children's Health Insurance Program ("CHIP") in 1997. *See* Balanced Budget Act of 1997, Pub. L. 105-33, Title IV, Subtitle J, 111 Stat. 251 (Aug. 5, 1997). The federal government and the States jointly fund CHIP to provide healthcare for uninsured children that do not qualify for Medicaid. *See* 42 U.S.C. § 1397aa; *Eligibility-Medicaid.gov*, http://www.medicaid.gov/chip/eligibility-standards/chip-eligibility-standards.html (last visited Oct. 22, 2015).

12.     CHIP covers children in families who have too much income to qualify for Medicaid, but cannot afford to buy private insurance. CHIP provides basic primary health care services to children as well as other medically necessary services, including dental care. CHIP services are generally delivered by managed care organizations selected by the States through a competitive bidding process. The Plaintiff States began participating in CHIP sometime after its creation in 1997.

13.     Providing health care services to uninsured children through CHIP is a significant function of the Plaintiff States' governments. For example, there were around 368,000 Texas children in CHIP as of March 2015. And there were around 123,350 Louisiana children and pregnant women in CHIP as of June 30, 2014. *Louisiana Department of Health and Hospitals*, *Status Report on Louisiana Children's Health Insurance Program*, Aug. 19, 2014, *available at* http://new.dhh.louisiana.gov/assets/medicaid/lachip/2014LaCHIPLegisReport.pdf. As of September 2015, Kansas had approximately 53,651 children enrolled in its CHIP program.

### C. Plaintiff States' Use of Managed Care Organizations To Participate in Medicaid and CHIP

14.     Plaintiff States provide a significant portion of Medicaid, and a substantial majority of CHIP health care services, through managed care arrangements. *See, e.g.*, *Managed Care State Profiles and State Data Collections-Medicaid.gov*, at http://www.medicaid.gov/medicaid-chip-program-information/by-topics/delivery-systems/managed-care/managed-care-profiles.html (last visited Oct. 22, 2015); *Texas Health and Human Services Commission, Texas Medicaid Program: Managed Care Medical and Dental Plans*, at http://www.hhsc.state.tx.us/medicaid/managed-care/plans.shtml (last visited Oct. 22, 2015); *see also Texas Health and Human Services Commission, Texas Medicaid and*

*CHIP in Perspective: 10th Edition*, 7-1 to 7-34 (2015) (providing an overview of the use, history, and success of managed care utilization in Texas).

15.    In a managed care arrangement, States enter into contracts with managed care organizations, whereby the organizations agree to deliver healthcare services in exchange for a fixed monthly payment, known as a "capitation payment" or "capitation rate." *See Centers for Medicare & Medicaid Services, Managed Care, at* http://www.medicaid.gov/medicaid-chip-program-information/by-topics/delivery-systems/managed-care/managed-care-site.html (last visited Oct. 22, 2015).

16.    For example, in Texas, managed care organizations provided Medicaid services to around 87% of Texas's full benefit Medicaid population in fiscal year 2015, and payments to managed care organizations for Medicaid health care services totaled approximately $16.6 billion and accounted for around 17% of Texas's budget. In Louisiana, managed care organizations provided Medicaid services to around 43% of Louisiana's full benefit Medicaid population, and federal Medicaid funds account for around 22% of the appropriated budget for fiscal year 2016. In Kansas, managed care organizations provide Medicaid services to around 94% of Kansas's Medicaid population, and Kansas spent approximately 18% of its total state budget in fiscal year 2015 on Medicaid.

17.    Additionally, managed care organizations provide the substantial majority of health care services provided to children in the Plaintiff States' CHIP programs. For example, in Texas, managed care organizations provide all CHIP health care services and accounted for around 1% of Texas's budget in fiscal year 2015.

**D. The Health Insurance Providers Fee**

18.    In 2010, the United States created a sweeping new regulatory framework for the nation's healthcare system by passing what is commonly referred

to as the "Affordable Care Act." *See Patient Protection and Affordable Care Act*, Pub. L. 111-148, 124 Stat. 119-1025 (Mar. 23, 2010). One portion of this legislation imposed a "Health Insurance Providers Fee" on all covered health insurance providers. *See* Pub. L. 111-148, 124 Stat. 865-866. The purpose of the fee was to generate revenue from a windfall Congress expected insurers to receive by increasing enrollment. *See, e.g.*, Insurance & Financial Advisor, *$13 billion in Obamacare Taxes Passed Along to States*, May 20, 2015, at http://ifawebnews.com/2015/05/20/13-billion-in-obamacare-taxes-passed-along-to-states/.

19.    The Health Insurance Providers Fee is imposed as a lump sum on all covered health insurance providers collectively, starting at $8 billion total in 2014 and increasing to $14.3 billion by 2018. *See* Pub. L. 111-148, § 9010(b), 124 Stat. 865-866; 26 C.F.R. § 57.4(a)(3).

20.    By statute and rule, the amount owed by any individual managed care organization is determined by the net premiums written for health insurance of United States health risks. Pub. L. 111-148, § 9010(b), 124 Stat. 865-866; 26 C.F.R. § 57.4(a)(2).

21.    Nothing in the language of the Affordable Care Act provides clear notice to the States that a condition of the federal funding for their Medicaid and CHIP managed care organizations was paying the Health Insurance Providers Fee and associated costs to the managed care organizations to pay to the federal government. As explained below, this notice was not even provided by rule but was ultimately provided by a private entity wielding legislative authority.

22.    The statute and regulations governing the Health Insurance Providers Fee include no specific language excluding the activities of for-profit managed care organizations providing Medicaid or CHIP services from being included in the fee

calculations. Pub. L. 111-148, § 9010(c), 124 Stat. 865-866; 26 C.F.R. § 57.2(b). Nonprofit managed care organizations that receive more than 80% of their gross revenues from government programs serving low income, elderly, and disabled populations are exempt from the fee. 26 C.F.R. § 57.2(b)(2)(iii). And nonprofit managed care organizations not qualifying for exclusion can deduct 50% of their premium revenue from the fee calculation.

23.    Because the Internal Revenue Service considers the Health Insurance Providers Fee a federal excise tax, amounts paid under the fee are not deductible as business expenses for purposes of federal income taxes. 26 C.F.R. § 57.8.

### E. The Delegation of Rulemaking Authority To a Private Entity Under the Actuarial Soundness Requirements

24.    "Federal lawmakers cannot delegate regulatory authority to a private entity. To do so would be 'legislative delegation in its most obnoxious form.'" *Ass'n of Am. Railroads v. Dep't of Transp.*, 721 F.3d 666, 670 (D.C. Cir. 2013), *rev'd on other grounds* 135 S. Ct. 1225 (2015) (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)); *see also A. L. A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (U.S. 1935) ("Could trade or industrial associations or groups be constituted legislative bodies for that purpose because such associations or groups are familiar with the problems of their enterprises? . . . The answer is obvious. Such a delegation of legislative power is unknown to our law, and is utterly inconsistent with the constitutional prerogatives and duties of Congress.").

25.    Federal law requires that the negotiated capitation rates be "actuarially sound." 42 U.S.C. § 1396b(m).

26.    To be deemed "actuarially sound" for purposes of Medicaid or CHIP, federal regulations require an actuary's certification that, under the standards established by the American Academy of Actuaries, capitation rates are sufficient to

cover the insurance providers' expected costs and insurance risks for the coming year. 42 C.F.R. § 438.6.

27.    The American Academy of Actuaries is a private, membership-based professional organization.  *See American Academy of Actuaries, About Us*, *at* http://www.actuary.org/content/about-us (last visited Oct. 22, 2015).

28.    Among other things, the American Academy of Actuaries "sets qualification, practice, and professionalism standards for actuaries credentialed by one or more of the five U.S.-based actuarial organizations of the United States." *Id.*

29.    To set practice standards for actuaries, the American Academy of Actuaries has created and works with an independent, private organization known as the Actuarial Standards Board.  *See American Academy of Actuaries*, *How Does The Academy Maintain Standards of Professionalism for Actuaries?*, *at* http://www.actuary.org/content/how-does-academy-maintain-standards-professionalism-actuaries (last visited Oct. 22, 2015); *Actuarial Standards Board*, *About ASB*, *at* http://www.actuarialstandardsboard.org/about-asb/ (last visited Oct. 22, 2015).

30.    The Actuarial Standards Board "establishes and improves standards of actuarial practice.  These Actuarial Standards of Practice ('ASOPs') identify what the actuary should consider, document, and disclose when performing an actuarial assignment.  The [Actuarial Standards Board]'s goal is to set standards for appropriate practice for the U.S." *Actuarial Standards Board, About ASB*, *at* http://www.actuarialstandardsboard.org/about-asb/ (last visited Oct. 22, 2015).

31.    In March 2015, the Actuarial Standards Board adopted a standard for setting actuarially sound capitation rates in managed care organization agreements. *Actuarial Standards Board, Actuarial Standard of Practice No. 49* (Mar. 2015), *available at*  http://www.actuarialstandardsboard.org/wp-content/uploads/2015/03/

asop049_179.pdf.

32.     Actuarial Standard of Practice Number 49 requires capitation rates to recover from States the amount of all taxes managed care organizations are required to pay. *Id.*

33.     Actuarial Standard of Practice Number 49 further requires that, if such taxes are not deductible as expenses for corporate income tax purposes, as is the case for the Health Insurance Providers Fee, the rate must be adjusted to compensate for additional tax liability. *See id.*

34.     Generally, if a capitation rate for a managed care organization agreement does not comply with Actuarial Standard of Practice Number 49, an actuary will be unable to certify that such capitation rate is actuarially sound. *See Actuarial Standards Board, Actuarial Standard of Practice No. 1* (Mar. 2013), *available at* http://www.actuarialstandardsboard.org/asops/introductory actuarialstandardpractice/ (indicating that Actuarial Standards of Practice are generally mandatory); *Actuarial Standard of Practice No. 49* (Mar. 2015) (providing that actuaries "should include an adjustment for any taxes, assessment, or fees that the [managed care organizations] are required to pay out of the capitation rates").

35.     Without such certification of an actuary, a managed care organization agreement will not be eligible for participation in Medicaid and CHIP. *See* 42 U.S.C. § 396b(m)(2)(A)(iii); 42 C.F.R. § 438.6(c)(1)(i)(C).

36.     In conjunction with applicable law and regulations, Actuarial Standard of Practice Number 49 requires States to pay managed care organizations an amount sufficient to cover the Health Insurance Providers Fee and any amount of additional taxes that the managed care organizations incur as a result of those payments.

37.     This fee is substantial. For example, in August 2015, the State of Texas's funded portion of the amount paid to the Medicaid and CHIP managed care

organizations was approximately $84,637,710.00 to cover costs associated with the Health Insurance Provider Fee for the 2013 calendar year (including the taxes managed care organizations must pay regarding payments to cover the fee but not including the portion of the fee the federal government funds). Additionally, Texas has appropriated over $241 million in state funds to cover the Health Insurance Providers Fee for the next biennium. The State of Louisiana's funded portion of the amount paid to the Medicaid and CHIP managed care organizations was approximately $31,342,739.00 to cover costs associated with the Health Insurance Provider Fee for the 2014 payments (including the taxes managed care organizations must pay regarding payments to cover the fee but not including the portion of the fee the federal government funds). In 2014, Kansas's funded portion of the amount paid to the Medicaid and CHIP managed care organizations was approximately $32,837,960.00 to cover costs associated with the Health Insurance Provider Fee for 2013 (including the taxes managed care organizations must pay regarding payments to cover the fee but not including the portion of the fee the federal government funds).

38.    In the next decade, the Health Insurance Providers Fee is projected to allow the federal government to collect between $13 and $15 billion from the States. *Milliman, Inc., PPACA Health Insurer Fee Estimated Impact on State Medicaid Programs and Medicaid Health Plans*, at 2 (Jan. 31, 2012), *available at* http://www.mhpa.org/_upload/PPACAHealthInsurerFee-EstimatedImpacton Medicaid_931372.pdf.

39.    By functionally requiring that the Plaintiff States reimburse managed care organizations for payment of tax liabilities, the United States has imposed those taxes on the States.

### F. Coercion of the Plaintiff States into Paying the Costs of the United States' Preferred Policy

40.     The Centers for Medicare & Medicaid Services, under the Department of Health and Human Services, must approve all of the States' proposed capitation rates.  The Centers for Medicare & Medicaid Services have thus specifically approved the amount of the Health Insurance Providers Fee that the Plaintiff States must pay the federal government through their Medicaid and CHIP managed care organizations.

41.     If capitation rates for any managed care organization agreement under Medicaid or CHIP are not actuarially sound, then payments pursuant to such plans would be legally ineligible for federal matching funds under Medicaid or CHIP.  *See* 42 U.S.C. § 1396b(m)(2)(A)(iii).

42.     As stated above, Medicaid spending accounts for a substantial percentage of the Plaintiff States' total budgets.  For example, in Texas, the federal portion of the state Medicaid budget is $17.3 billion, or approximately 17% of the total state budget for fiscal year 2015.  In Kansas, the federal portion of the state Medicaid budget for fiscal year 2015 was approximately $1.6 billion, or nearly 11% of its total approved budget.  In Louisiana, federal Medicaid funds account for around 22% of the appropriated budget for fiscal year 2016.

43.     Thus, the federal government would be legally entitled to deny federal funds that comprise a substantial portion of the Plaintiff States' budgets if the Plaintiff States refuse to pay the unconstitutional Health Insurance Providers Fee.

44.     By placing in jeopardy a substantial percentage of the Plaintiff States' budgets if the Plaintiff States refuse to help pay the costs of the United States' preferred policy, the United States has left the Plaintiff States no real choice but to acquiesce in such policy.  *See NFIB v. Sebelius*, 132 S. Ct. 2566, 2605 (2012) ("The threatened loss of over 10 percent of a State's overall budget, in contrast, is economic

dragooning that leaves the States with no real option but to acquiesce in the Medicaid expansion.").

## IV.  CLAIMS FOR RELIEF

### COUNT I

**Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706
that the Health Insurance Providers Fee Violates
Constitutional Standards of Clear Notice**

45.    Plaintiff States incorporate the allegations contained in paragraphs 1 through 44 as if fully set forth herein.

46.    The Administrative Procedure Act requires this Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

47.    When Congress exercises its Spending Clause power against the States, the United States Supreme Court has held that principles of federalism require conditions on Congressional funds given to States must enable a state official to "clearly understand," from the language of the law itself, what conditions the State is agreeing to when accepting the federal funds.  *Arlington Cent. Sch. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

48.    The Affordable Care Act, and positive federal law as a whole, is completely silent as to whether States must pay the Health Insurance Providers Fee to the federal government through their Medicaid and CHIP managed care organizations or risk loss of their federal Medicaid and CHIP funds for managed care. Therefore, the Health Insurance Providers Fee is unconstitutional as applied to the Plaintiff States because it fails to provide the Plaintiff States clear notice on the conditions of accepting federal funding.  *See id.* (holding that a federal law failed to provide clear notice to the States even though the congressional record indicated the law meant to require States to pay expert fees to a prevailing party but the text of

the law "does not even hint" that States must pay the fees).

## COUNT II

**Declaratory Judgment Under 5 U.S.C. § 706 that the Rule Implementing the Health Insurance Providers Fee Is Arbitrary and Capricious**

49.    Plaintiff States incorporate the allegations contained in paragraphs 1 through 48 as if fully set forth herein.

50.    The Administrative Procedure Act requires this Court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

51.    The delegation by the Department of Health and Human Services (under the Centers for Medicare & Medicaid Services) of ultimate decision-making authority to the Actuarial Standards Board on whether States must pay their Medicaid and CHIP managed care organizations the Health Insurance Providers Fee is arbitrary and capricious and not otherwise in accordance with law.

## COUNT III

**Declaratory Judgment Under 5 U.S.C. § 706 that the Rule Implementing the Health Insurance Providers Fee Was Imposed Without Observance of Procedure Required by Law**

52.    Plaintiff States incorporate the allegations contained in paragraphs 1 through 51 as if fully set forth herein.

53.    The Administrative Procedures Act requires this Court to hold unlawful and set aside any agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

54.    The Department of Health and Human Services is an "agency" under the Administrative Procedures Act, 5 U.S.C. § 551(1), and the regulations and rules imposing the Health Insurance Providers Fee upon the States is a "rule" under the Administrative Procedures Act. 5 U.S.C. § 551(4).

55.     With exceptions that are not applicable here, agency rules must go through notice-and-comment rulemaking.  5 U.S.C. § 553.

56.     The Department of Health and Human Services failed to properly engage in notice-and-comment rulemaking by delegating final authority and discretion to the Actuarial Standards Board without observance of procedure required by law.

## COUNT IV

### Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706 that the Health Insurance Providers Fee Unconstitutionally Coerces a Sovereign

57.     Plaintiff States incorporate the allegations contained in paragraphs 1 through 56 as if fully set forth herein.

58.     The Health Insurance Providers Fee of the Affordable Care Act, Pub. L. 111-148, 124 Stat.865-66, is an unconstitutionally coercive exercise of Congressional authority.

## COUNT V

### Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706 that the Agency Action Is Contrary to Constitutional Right and in Excess of Statutory Authority

59.     Plaintiff States incorporate the allegations contained in paragraphs 1 through 58 as if fully set forth herein.

60.     The Administrative Procedure Act requires this Court to hold unlawful and set aside any agency action that is "contrary to constitutional right" or "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(B)-(C).

61.     The determination that the Plaintiff States must pay the Health Insurance Providers Fee to the United States through Medicaid and CHIP managed care organizations constitutes an unconstitutional delegation of Congress's

legislative power to a private entity in contravention of the United States Constitution, article 1, section 1.

62.    Additionally, the agency interpretation of the Affordable Care Act is beyond its lawful authority because it is not entitled to *Chevron* deference.  When analyzing an agency interpretation of a statute, courts apply the two-step framework of determining whether the statute is ambiguous and, if so, if the agency's interpretation is reasonable.  *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).  The theory is that a statutory ambiguity is an implicit delegation, but questions of "deep 'economic and political significance'" are exceptions to the delegation rule.  *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (quoting *Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2444 (2014)).

63.    First, the Affordable Care Act is not ambiguous as to whether States must pay the Health Insurance Providers Fee to the federal government through the Medicaid and CHIP managed care organizations.  Nothing in the language of the Act itself indicates or implies that States must pay the fee.

64.    Second, the decision to tax the States and put in legal jeopardy the States' legal entitlement to a significant portion of their budgets are questions of deep economic and political significance Congress would not have delegated to the Department of Health and Human Services.

## COUNT VI

**Declaratory Judgment Under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706
that the Health Insurance Providers Fee Unconstitutionally
Taxes a Sovereign**

65.    Plaintiff States incorporate the allegations contained in paragraphs 1 through 64 as if fully set forth herein.

66.    The Administrative Procedure Act requires this Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power,

privilege, or immunity." 5 U.S.C. § 706(2)(B).

67. The Health Insurance Providers Fee of the Affordable Care Act, Pub. L. 111-148, 124 Stat. 865-866, is an unconstitutional tax on the Plaintiff States in violation of the Tenth Amendment of the United States Constitution and the doctrine of intergovernmental tax immunity.

## COUNT VII

### Claim for Refund Against the United States Under 26 U.S.C. § 7422 for Previously Paid Health Insurance Providers Fees

68. Plaintiff States incorporate the allegations contained in paragraphs 1 through 67 as if fully set forth herein.

69. Plaintiff States have all paid the United States, through Medicaid and CHIP managed care organizations, the Health Insurance Providers Fee and associated federal income tax the organizations must pay due to the States' payment of the fee. For example, the State of Texas has paid the United States approximately $84,637,710.00 for costs associated with the Health Insurance Providers Fee. The State of Louisiana has paid the United States approximately $31,342,739 for costs associated with the Health Insurance Providers Fee. And the State of Kansas has paid the United States approximately $32,837,960 for costs associated with the Health Insurance Providers Fee.

70. Plaintiff States are entitled to a refund from the United States because the fee violates the clear notice rule, is arbitrary and capricious, failed to follow statutorily required procedures, is unconstitutionally coercive, exceeds constitutional and statutory authority, or constitutes an unconstitutional tax of a sovereign.

## V.  PRAYER FOR RELIEF

Plaintiff States respectfully request that the Court:

A.    Declare that the application of the Health Insurance Providers Fee to the Plaintiff States and their Medicaid and CHIP managed care organizations is unconstitutional in that it violates the clear notice rule;

B.    Declare that the federal rules applying the Health Insurance Providers Fee to the Plaintiff States and their Medicaid and CHIP managed care organizations are arbitrary and capricious;

C.    Declare that the federal rules applying the Health Insurance Providers Fee to the Plaintiff States and their Medicaid and CHIP managed care organizations are substantively and procedurally unlawful under the Administrative Procedures Act;

D.    Declare that the federal rules applying the Health Insurance Providers Fee to the Plaintiff States and their Medicaid and CHIP managed care organizations are unconstitutionally coercive;

E.    Declare that the delegation to a private entity to determine whether the Plaintiff States must pay the Health Insurance Providers Fee constitutes an unconstitutional delegation of Congress's legislative power and exceeds statutory authority;

F.    Declare that the federal rules applying the Health Insurance Providers Fee to the Plaintiff States and their Medicaid and CHIP managed care organizations are an unconstitutional tax on the Plaintiff States in violation of the Tenth Amendment of the United States Constitution and the doctrine of intergovernmental tax immunity;

G.    Permanently enjoin Defendants and their employees, agents, and successors in office from enforcing the Health Insurance Providers Fee

of the Affordable Care Act against the Plaintiff States or the Medicaid and CHIP managed care organizations with which they contract;

H.    Permanently enjoin Defendants and their employees, agents, and successors in office from denying federal Medicaid and CHIP funds to the Plaintiff States based in whole or in part on the refusal of the Plaintiff States or the Medicaid and CHIP managed care organizations with which they contract to pay the Health Insurance Providers Fee;

I.    Order a refund of the amounts the Plaintiff States have paid (or may pay during the course of this litigation) under the Health Insurance Providers Fee, including any prejudgment or post-judgment interest as allowed by law; and

J.    Grant the Plaintiff States such other and further relief to which they are justly entitled at law and in equity.

Dated:        October 22, 2015.

Respectfully submitted,

| | |
|---|---|
| DEREK SCHMIDT<br>Attorney General of Kansas | KEN PAXTON<br>Attorney General of Texas |
| | |
| JAMES D. "BUDDY" CALDWELL<br>Attorney General of Louisiana | CHARLES E. ROY<br>First Assistant Attorney General |
| | |
| | BRANTLEY STARR<br>Deputy Attorney General for Legal<br>  Counsel |
| | |
| | AUSTIN R. NIMOCKS<br>Associate Deputy Attorney General for<br>  Special Litigation<br>Texas Bar No. 24002695 |
| | |
| | ANGELA V. COLMENERO<br>Division Chief – General Litigation |
| | |
| | <u>/s/ Thomas A. Albright</u><br>THOMAS A. ALBRIGHT<br>Texas Bar No. 00974790<br>Assistant Attorney General<br>ANDREW B. STEPHENS<br>Assistant Attorney General |
| | |
| | General Litigation Division<br>P.O. Box 12548, Capitol Station<br>Austin, Texas 78711-2548 |
| | |
| | *ATTORNEYS FOR PLAINTIFF STATES* |