IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 7:15-cv-00151-O |
| | § | |
| UNITED STATES OF AMERICA et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Defendants' Motion to Dismiss Plaintiffs' Amended Complaint and

Brief in Support (ECF Nos. 26–27), filed April 1, 2016; Plaintiff States' Response to Defendants'

Motion to Dismiss (ECF No. 29), filed April 25, 2016; and Defendants' Reply Brief in Support of

Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 32), filed May 18, 2016.

Having considered the motion, related briefing, and applicable law, the Court finds that

Defendants' Motion should be and is hereby **GRANTED in part and DENIED in part.**

I.   **BACKGROUND**

This case arises from Defendants' alleged mandate that Plaintiffs (alternatively, the "Plaintiff

States") annually pay to managed care organizations ("MCOs") the full multi-million dollar Health

Insurance Providers Fee ("HIPF") the Patient Protection and Affordable Care Act ("ACA") imposes

on MCOs.  Am. Compl. ¶ 6, ECF No. 19.  The following factual recitation is primarily taken from

Plaintiffs' Amended Complaint.  *See generally id.*  Plaintiffs are the States of Texas, Indiana,

Kansas, Louisiana, Nebraska, and Wisconsin. *Id.* at 1.  Defendants are the United States of America

(hereinafter "the Government"), Sylvia Burwell ("Burwell"), in her official capacity as Secretary

of Health and Human Services ("HHS"), the United States Internal Revenue Service (the "IRS"), and John Koskinen ("Koskinen"), in his official capacity as Commissioner of Internal Revenue. *Id.* at 1–2. The Court provides factual background on each relevant program or agency action below as set out in Plaintiffs' Amended Complaint. *See generally id.*

### A.   Medicaid Program

The United States Congress created the Medicaid program in 1965. *See* Social Security Amendments Act of 1965, Pub. L. 89-97, 79 Stat. 286 (1965); *Id.* ¶ 7. Federal and state governments jointly fund Medicaid, which provides healthcare to low-income families, children, related caretakers of dependent children, pregnant women, people age 65 and older, and adults and children with disabilities. Am. Compl. ¶¶ 7, 9, ECF No. 19 (citing 42 U.S.C. §§ 1396–1396w). To participate in Medicaid, states provide coverage to a federally mandated category of individuals according to a federally approved state plan. Am. Compl. ¶ 8, ECF No. 19. All 50 states participate in the Medicaid program, and all Plaintiff States have participated in Medicaid since shortly after its creation. *Id.* ¶¶ 8–9. States may not limit the number of eligible people who can enroll. *Id.* ¶ 9.

The Plaintiff States spend a significant amount of money providing healthcare through the Medicaid program. *Id.* ¶ 10. For instance, Texas provides Medicaid services to around one in seven of Texas's total population, or 3.7 million of 26.4 million Texans, and Medicaid spending accounts for approximately 26% of Texas's total budget in fiscal year 2013 (and 28% of Texas's 2015 budget). *Id.* The remaining Plaintiffs also serve millions of individuals in their states and spend a considerable portion of their respective states' annual budgets on Medicaid. *See id.*

### B.   Children's Health Insurance Program ("CHIP")

The United States Congress created CHIP in 1997. *Id.* ¶ 11 (citing Balanced Budget Act of

1997, Pub. L. 105-33, 111 Stat. 251).  Federal and state governments jointly fund CHIP, which provides healthcare to uninsured children who do not qualify for Medicaid, but whose families cannot afford private insurance.  Am. Compl. ¶¶ 11–12, ECF No. 19 (citing 42 U.S.C. § 1397aa).  CHIP provides basic primary healthcare and other medically necessary services, such as dental care, to children, and certain services to pregnant women.  *Id*.  CHIP services are typically delivered by MCOs selected by the states through a competitive bidding process.  *Id*.  All of the Plaintiff States participate in CHIP.  *Id*.

Providing healthcare through CHIP is a significant function of the Plaintiff States' governments.  *Id*. ¶ 13.  For example, as of June 2015, 333,000 Texas children were enrolled in CHIP.  *Id*.  The remaining Plaintiff States similarly report having tens or hundreds of thousands of children and pregnant women who rely on CHIP services.  *See id.*

### C.    Plaintiff States' Use of MCOs to Participate in Medicaid and CHIP

Plaintiff States provide a significant portion of Medicaid and CHIP healthcare services through managed care arrangements.  In a managed care arrangement, states enter into contracts with MCOs, whereby the organizations agree to deliver healthcare services in exchange for a fixed monthly payment, known as a "capitation payment" or "capitation rate."  *Id*. ¶ 15.  For example, in Texas, MCOs provided Medicaid services to around 87% of Texas's Medicaid population in fiscal year 2015, and payments to MCOs for Medicaid services totaled over $16 billion, which constitutes 17% of Texas's budget.  *Id*. ¶ 16.  The remaining Plaintiff States also provide Medicaid services to a large portion of their respective Medicaid populations, with payments to MCOs totaling a significant amount of each Plaintiff State's budget.  *Id*.  In addition, MCOs provide the majority of healthcare services to children in the Plaintiff States' CHIP programs.  *Id*. ¶ 17.  For instance, in

3

Texas, MCOs provide all CHIP services, accounting for about one percent (1%) of Texas's budget in fiscal year 2015. *Id.* The remaining Plaintiff States also utilize MCOs for the majority of their CHIP services.

### D.   Health Insurance Providers Fee ("HIPF")

In 2010, the United States passed the ACA. *Id.* ¶ 18 (citing Pub. L. 111-148, 124 Stat. 119-1025 (Mar. 23, 2010)). One portion of the ACA imposed the HIPF on all covered health insurance providers for "United States health risks," defined as "the health risk of any individual who is" a United States citizen, a resident of the United States, or located in the United States. Am. Compl. ¶ 18, ECF No. 19 (citing Pub. L. 111-148, Stat. 865–66); Defs.' Br. Supp. Mot. 4, ECF No. 27 (quoting § 9010(d) of the ACA). The HIPF is imposed as a lump sum on all covered health insurance providers collectively; however, the portion each entity must pay is based on the ratio of the entity's net premiums to all net premiums written for United States health risks. Defs.' Br. Supp. Mot. 5, ECF No. 27 (quoting § 9010(b)(1) of the ACA); *see also* Am. Compl. ¶ 19, ECF No. 19. Congress enacted the HIPF in order to generate revenue from the expected windfall insurers would receive by individuals enrolling in the ACA. Am. Compl. ¶ 18, ECF No. 19.

The HIPF totaled $8 billion in 2014, and is projected to increase to a total of $14.3 billion by 2018. *Id.* ¶ 19. On December 18, 2015, Congress passed, and the President signed into law, a temporary, one-year moratorium on the HIPF for 2017. *Id.* (citing Consolidated Appropriations Act, 2016, Pub. L. No. 114-133, 129 Stat. 2242, 3037–38 (2015)). However, after 2017, the HIPF is scheduled to continue to increase. Am. Compl. ¶ 19, ECF No. 19.

Plaintiffs allege that the ACA does not provide clear notice to states that continuing to receive federal funding for Medicaid and CHIP MCOs is conditioned upon states reimbursing the

full of amount of the HIPF assessed against the MCOs.  *Id*. ¶ 21.  Plaintiffs may avoid the HIPF, however, by contracting with certain nonprofit MCOs.  Nonprofit MCOs that receive more than 80% of their gross revenues from government programs serving low-income, elderly, and disabled populations are exempt from paying the HIPF.  *Id*. ¶ 22.  In addition, nonprofit MCOs not qualifying for this exclusion can deduct 50% of their premium revenue from the fee calculation.  *Id*.  Plaintiffs, however, contract with for-profit MCOs.  *Id*.  They allege that contracting only with exempt MCOs is impossible because of: (1) the relative scarcity of such nonprofit organizations; and (2) that several currently exempt MCOs do not desire to contract with Plaintiffs.  *Id*.  For example, Texas currently contracts with all nonprofit Medicaid MCOs in Texas who desire to contract with Texas.  *Id*.  However, the nonprofit MCOs are not able to serve all of the eligible population, requiring Texas to contract with for-profit MCOs, and thus incur substantial liability under the HIPF.  *Id*.

E.      **The Role of the American Academy of Actuaries (the "Academy") in the ACA**

Title 42 U.S.C. § 1396b(m) requires that the negotiated capitation rates between states and MCOs be "actuarially sound."  *Id*. ¶ 25.  To be deemed "actuarially sound" for purposes of Medicaid and CHIP, federal regulations require an actuary's certification that, under the standards established by the Academy, capitation rates are sufficient to cover the insurance providers' expected costs and insurance risks for the coming year.  *Id*. ¶  26.

The Academy is a private, membership-based professional organization.  *Id*. ¶ 27.  The Academy sets qualification, practice, and professional standards for credentialed actuaries.  *Id*. ¶ 28.  To set these standards, the Academy created and works with an independent, private organization known as the Actuarial Standards Board ("ASB").  *Id*. ¶ 29.  The ASB establishes and improves standards of actuarial practice.  *Id*. ¶ 30.  These Actuarial Standards of Practice ("ASOPs") identify

what the actuary should consider, document, and disclose when performing an actuarial assignment. *Id*. In March 2015, the ASB adopted ASOP 49, which sets actuarially sound capitation rates for MCO agreements. *Id*. ¶ 31. ASOP 49 requires capitation rates that recover from states the full amount MCOs are taxed. *Id*. ¶ 32. ASOP 49 further requires that, if such taxes are not deductible as expenses for corporate income tax purposes, as is the case for the HIPF, the rate must be adjusted to compensate for additional tax liability. *Id*. ¶ 33.

Generally, if a capitation rate for a managed care agreement does not comply with ASOP 49, an actuary will be unable to certify that the rate is actuarially sound. *Id*. ¶ 34. Without such certification, a managed care agreement will be ineligible for Medicaid and CHIP funds. *Id*. ¶ 35. In conjunction with applicable law and regulations, ASOP 49 requires states to pay MCOs an amount sufficient to cover the HIPF and any additional taxes the MCOs incur from those payments. *Id*. ¶ 36. Therefore, Plaintiff States allege the ACA requires them to pay the HIPF to the for-profit MCOs or lose Medicaid funding for those contracts.

This requirement imposes a significant obligation on the Plaintiff States. For instance, in August 2015, Texas's funded portion of the amount paid to the Medicaid and CHIP MCOs to cover costs associated with the HIPF for the 2013 calendar year was approximately $84,637,710.00. *Id*. ¶ 37. Additionally, Texas has appropriated over $241,000,000.00 in state funds to cover the HIPF for the next biennium. *Id*. The other Plaintiffs have similarly apportioned funds to cover the fee paid to MCOs, which in turn pay the HIPF. *See id.*

In the next decade, the HIPF is projected to allow the federal government to collect between $13 and $15 billion from the states. *Id*. ¶ 38. Plaintiffs argue that by functionally requiring that the Plaintiff States pay MCOs who in turn pay tax liabilities, the United States has imposed those taxes

on the Plaintiff States.  *Id*. ¶ 39.

### F.      Role of HHS

The Centers for Medicare & Medicaid Services ("CMS"), a component of HHS, must approve all of the states' proposed capitation rates.  *Id*. ¶ 40.  CMS specifically approves the amount of the HIPF, which the Plaintiff States must pay to the MCOs.  For example, CMS worked directly with Texas in 2015 to confirm the precise amount Texas owed as a result of the HIPF.  *Id*.  If capitation rates for any MCO agreement under Medicaid or CHIP are not actuarially sound, then payments pursuant to such plans would be legally ineligible for federal matching funds under Medicaid or CHIP.  *Id*. ¶ 41 (citing 42 U.S.C. § 1396b(m)(2)(A)(iii)).  By placing in jeopardy a substantial percentage of the Plaintiff States' budgets if the Plaintiff States refuse to help defray the costs of the United States' chosen policy, the ACA, Plaintiffs allege that Defendants have left them no real choice but to acquiesce.  *Id*. ¶ 44.

### G.      Plaintiffs' Claims

Plaintiffs allege the following claims: (1) a declaration under 28 U.S.C. § 2201, the Declaratory Judgment Act ("DJA"), and 5 U.S.C. § 706 of the Administrative Procedure Act ("APA"), that the HIPF violates constitutional standards of clear notice; (2) a declaration under 5 U.S.C. § 706 that the rule implementing the HIPF is arbitrary and capricious; (3) a declaration under 5 U.S.C. § 706 that the rule implementing the HIPF was imposed without observance of necessary procedural requirements; (4) declaratory judgment under 28 U.S.C. § 2201 and 5 U.S.C. § 706 that the HIPF unconstitutionally coerces a sovereign; (5) declaratory judgment under 28 U.S.C. § 2201 and 5 U.S.C. § 706 that the agency action is contrary to constitutional right and in excess of statutory authority; (6) declaratory judgment under  28 U.S.C. § 2201 and 5 U.S.C. § 706 that the HIPF

unconstitutionally taxes a sovereign; (7) a claim for refund against the United States under 26 U.S.C. § 7422 for previously paid HIPFs; (8) declaratory judgment under 28 U.S.C. § 2201 and 5 U.S.C. § 706 that the HIPF, as applied to Plaintiff States' Medicaid programs, is insufficiently related to the ACA to be a legitimate exercise of Congress's spending power; (9) injunction against federal officials from collecting the unconstitutional HIPF; and (10) alternatively, declaratory judgment under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 706 that, if § 9010(f) of the ACA bars this claim for refund, § 9010(f) is unconstitutional as applied to the Plaintiff States.

## II.    LEGAL STANDARDS

### A.    FRCP 12(b)(1) - Subject-Matter Jurisdiction

Rule 12(h)(3) of the Federal Rules of Civil Procedure provides that "if the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3); s*ee Stafford v. Mobil Oil Corp.*, 945 F.2d 803, 805 (5th Cir. 1991) ("Failure adequately to allege the basis for diversity jurisdiction mandates dismissal."). Federal subject-matter jurisdiction is limited; federal courts may entertain only those cases involving a question of federal law or those where parties are of diverse citizenship. *See* 28 U.S.C. §§ 1331, 1332. Federal courts have original jurisdiction over claims when the complaint states claims arising under federal law. *Id.* § 1331; *Ky. Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 392 (5th Cir. 1977). Diversity jurisdiction requires that: (1) the amount in controversy must exceed $75,000; and (2) the citizenship of each plaintiff must be diverse from the citizenship of each defendant. *See* 28 U.S.C. § 1332(a); *see Stafford*, 945 F.2d at 804. "It is well-established that the diversity statute requires 'complete diversity' of citizenship: A district court cannot exercise diversity jurisdiction if one of the plaintiffs shares the same state citizenship as any one of the defendants." *Corfield v.*

8

*Dall. Glen Hills LP*, 355 F.3d 853, 857 (5th Cir. 2003). The party invoking federal jurisdiction has the burden of establishing it. *Id.*

"Every party that comes before a federal court must establish that it has standing to pursue its claims." *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013); *see also Barrett Comp. Servs., Inc. v. PDA, Inc.*, 884 F.2d 214, 218 (5th Cir. 1989). "The doctrine of standing asks 'whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'" *Cibolo Waste*, 718 F.3d at 473 (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004)).

Standing has both constitutional and prudential components. *See Cibolo Waste*, 718 F.3d at 473 (quoting *Elk Grove*, 542 U.S. at 11) (explaining that standing "contain[s] two strands: Article III standing . . . and prudential standing"). Constitutional standing requires a plaintiff to establish that she has suffered an injury in fact traceable to the defendant's actions that will be redressed by a favorable ruling. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The injury-in-fact must be "concrete and particularized" and "actual or imminent," as opposed to "conjectural" or "hypothetical." *Lujan*, 504 U.S. at 560. "Prudential standing requirements exist in addition to 'the immutable requirements of Article III,' . . . as an integral part of 'judicial self-government.'" *ACORN v. Fowler*, 178 F.3d 350, 362 (5th Cir.1999); *see also id*. "The goal of this self-governance is to determine whether the plaintiff 'is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial power.'" *Id.* (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 546 n.8 (1986)). The Supreme Court has observed that prudential standing encompasses "at least three broad principles," including "the general prohibition on a litigant's raising another person's legal rights . . . ." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*,

134 S. Ct. 1377, 1386 (2014); *Cibolo Waste*, 718 F.3d at 474 (quoting *Elk Grove*, 542 U.S. at 12); *see also Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 290 (2008) (discussing cases where third-parties sought "to assert not their own legal rights, but the legal rights of others"); *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 773 (2000) (noting "the assignee of a claim has standing to assert the injury in fact suffered by the assignor").

### B.      FRCP 12(b)(6) - Failure to State a Claim

Federal Rule of Civil Procedure 8(a) requires a claim for relief to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 does not require detailed factual allegations, but "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). If a plaintiff fails to satisfy Rule 8(a), the defendant may file a motion to dismiss the plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6).

To defeat a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to

relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

In reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff.  *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007).  The Court is not bound to accept legal conclusions as true, and only a complaint that states a plausible claim for relief survives a motion to dismiss.  *Iqbal*, 556 U.S. at 678–79. When there are well-pleaded factual allegations, the Court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.*

"Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (citations omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  A court may also consider documents that a defendant attaches to a motion to dismiss if they are referred to in the plaintiff's complaint and are central to the plaintiff's claims.  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).

"If it appears that a more carefully drafted pleading might state a claim upon which relief could be granted, the court should give the claimant an opportunity to amend his claim rather than dismiss it."  *Kennard v. Indianapolis Life Ins. Co.*, 420 F. Supp. 2d 601, 608–09 (N.D. Tex. 2006) (Fish, C.J.) (citing *Friedlander v. Nims*, 755 F.2d 810, 813 (11th Cir.1985); *accord Taylor v. Dall. Cty. Hosp. Dist.*, 976 F. Supp. 437, 438 (N.D. Tex. 1996) (Fish, J.).  Likewise, "leave to amend a pleading should be freely given and should be granted unless there is some justification for refusal." *Kennard*, 420 F. Supp. at 609 (quoting *U.S. ex rel Willard v. Humana Health Plan of Tex.*, 336 F.3d

375, 386 (5th Cir 2003)).

## III.   ANALYSIS

Defendants move to dismiss all of Plaintiffs' claims under Rules 12(b)(1) and 12(b)(6). Defs.' Br. Supp. Mot. 7, ECF No. 27.  The Court addresses each claim in turn, beginning its analysis with subject-matter jurisdiction under Rule 12(b)(1).   In addressing Plaintiffs' subject-matter jurisdiction, the Court first evaluates Plaintiffs' Article III standing.

### A.   Subject-Matter Jurisdiction Under 12(b)(1)

#### 1.   Standing

##### a.   Constitutional Standing

Defendants argue that "[a]t the outset, Plaintiffs face an especially high bar to demonstrate standing in this case," as Plaintiffs "challenge a congressional action whose object is not the States, but for-profit health insurers."  Defs.' Br. Supp. Mot. 8, ECF No. 27.  Defendants contend that Plaintiffs' alleged injury from the HIPF is not fairly traceable to them, and Plaintiffs have not suffered an injury from the actuarial-soundness requirement.  *Id*. at 9–10.

Plaintiffs respond that their "injuries are traceable to the challenged action, and are not attributable to the independent action of a third party not before the Court."  Pls.' Resp. 1, ECF No. 29.  Plaintiffs also argue that they "have undoubtedly suffered injuries in fact—invasions of their fiscs—that are concrete and particularized."  *Id*.

###### i.   Concrete and Particularized Injury

Constitutional standing requires a plaintiff to establish that she has suffered or is immediately in danger of suffering an injury-in-fact traceable to the defendant's actions that will be redressed by a favorable ruling.  *Lujan*, 504 U.S. at 560–61; *City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983).  The

12

injury-in-fact must be "concrete and particularized" and "actual or imminent," as opposed to "conjectural" or "hypothetical." *Lujan*, 504 U.S. at 560. "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Texas v. United States*, 809 F.3d 134, 150–51 (5th Cir. 2015) (quoting *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007)). "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Texas*, 809 F.3d at 151 (quoting *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)). The party invoking federal jurisdiction bears the burden of establishing standing. *Lujan*, 504 U.S. at 560–61. "Furthermore, because [the Plaintiff States] [are] bringing this action in [their] capacit[ies] as . . . sovereign state[s] being pressured to reevaluate state law or incur substantial costs," they are "'entitled to special solicitude in our standing analysis.'" *Texas v. EEOC*, No. 14-10949, 2016 WL 3524242, at *1 (5th Cir. June 27, 2016) (quoting *Massachusetts*, 549 U.S. at 520).

In *Texas v. United States*, the Fifth Circuit held that Texas had standing where it "challenge[d] DHS's affirmative decision to set guidelines for granting lawful presence to a broad class of illegal aliens." *Texas*, 809 F.3d at 152. In evaluating whether Texas asserted a concrete and particularized injury, the court reasoned that the statute "would have a major effect on the states' fiscs, causing millions of dollars of losses in Texas alone, and at least in Texas, the causal chain is especially direct: DAPA would enable beneficiaries to apply for driver's licenses, and many would do so, resulting in Texas's injury." *Id*. Therefore, the court conferred standing even though the relevant statute did not impose a direct duty on the state.

Here, similarly, the Court finds that Plaintiffs have sufficiently pleaded that the HIPF results

in a major effect on the Plaintiff States' fiscs, causing millions of dollars of losses in Texas alone. *See* Pls.' Resp. 1, ECF No. 29. Specifically, Plaintiffs allege the ACA imposes the actuarially sound requirement, which requires compliance with ASOP 49, resulting in their payment of the HIPF.[1] Therefore, if Plaintiffs allege that they wish to continue receiving federal Medicaid funding, they must pay the MCOs the full amount of the HIPF that the MCOs, in turn, pay to the federal government. Accordingly, the Court finds that Plaintiffs have pleaded a "concrete and particularized injury" by virtue of their having already paid, and their continuing obligation to pay in the future, the full HIPF amounts to MCOs.

## ii. Alleged Injury is Fairly Traceable

Defendants argue that the Plaintiff States' "theory of injury relies on the States' choice to engage entities subject to the fee, and it is hornbook law that a plaintiff 'cannot manufacture standing merely by inflicting harm on [itself].'" Defs.' Br. Supp. Mot. 9, ECF No. 27 (quoting *Clapper v. Amnesty Int'l USA*, 133 S.Ct. 1138, 1151 (2013)). Defendants further explain that "[n]o federal law requires the States to contract with MCOs subject to the fee," so "[i]f the States find the HIPF's effect on MCO pricing onerous, they can take their business elsewhere—to fee-for-service

---

[1] Defendants admit that under ASOP 49, "to be actuarially sound, MCO rates must account for any taxes and fees for which MCOs are liable," but argue it also allows actuaries to "exercise their professional judgment to deviate from the guidelines." Defs.' Br. Supp. Mot. 14, ECF No. 27 (internal citations omitted). In a corresponding footnote, Defendants state that HHS offered applicable guidance to actuaries and recently signaled in the Federal Register that the regulatory scheme may change in the future. *See id.* n. 3. The Court construes Defendants' Motion to Dismiss, which only cites to a Federal Register and HHS Guidance beyond the parties' pleadings, as a facial attack under Rule 12(b)(1). *See id.* However, the Court notes that at this stage, even if it were construed as a factual attack, Plaintiffs establish jurisdiction, by a preponderance of the evidence, by offering at least one sworn affidavit stating that their payments of the HIPF amount is required. S*ee infra* Part III (holding that Plaintiffs established Article III standing and subject-matter jurisdiction to all claims except their claims seeking a tax refund); Pls.' App. Supp. Resp. Ex. 3 ("Decl. Rachel Butler"), App. 12, ECF No. 29-1 (stating that Texas "is required to reimburse the MCOs for the HIPF to ensure that the capitations rates paid to the MCOs are actuarially sound as required by [CMS]"). To the extent Defendants contend this is not true, they may submit appropriate evidence on this issue in the next stage of litigation.

providers or qualifying nonprofit MCOs, neither of which is subject to the fee." Defs.' Mot. 9, ECF No. 27.

Plaintiffs respond that they "do not possess countless viable ways to avoid paying the HIPF," and "the options suggested by Defendants . . . place[] Plaintiff States somewhere between Scylla and Charybdis." Pls.' Resp. 2, ECF No. 29. Plaintiffs argue that on the one hand, "[i]f Plaintiff States were to cease participation in Medicaid as a means of avoiding the HIPF, Plaintiff States would be coercively dispossessed of the policy choice (Medicaid) they believe to be in the best interest of its citizens." *Id*. at 4. Plaintiffs point out that "[a]lternatively, there are not enough non-profit MCOs to ensure adequate access to care for Medicaid clients." *Id*.

In *Texas v. United States*, the Fifth Circuit noted that "[a]lthough Texas could avoid financial loss by requiring applicants to pay the full costs of licenses, it could not avoid injury altogether," and "the possibility that a plaintiff could avoid injury by incurring other costs does not negate standing." *Texas*, 809 F.3d at 156–57. In contrast, if the plaintiffs "could . . . achieve[] their policy goal in myriad ways," their injury would be deemed self-inflicted. *Id*. at 159 (citing *Pennsylvania v. New Jersey*, 423 U.S. 942 (1975)). However, here, the Plaintiff States assert they "have no meaningful choice between continuing to use [MCOs]—and paying the [HIPF]—or reverting to the former model of paying providers for services," where the latter "is significantly less cost effective and often results in worse participant satisfaction than the [MCO] model." Am. Compl. ¶ 45, ECF No. 19. Thus, from the face of the Amended Complaint, it does not appear that Plaintiffs "manufacture[d] standing" by hand-picking some MCOs above others, since the necessary number of exempt or discounted MCOs does not even exist. *Texas*, 908 F.3d at 159.

In *NFIB v. Sebelius*, the Supreme Court reasoned that "[t]he threatened loss of over 10

percent of a State's overall budget is economic dragooning that leaves the States with no real option

but to acquiesce in the Medicaid expansion." *NFIB. v. Sebelius*, 132 S. Ct. 2566, 2605 (2012). Here,

Plaintiffs allege they are shouldering tens of millions of dollars, and jeopardizing state programs

constituting well above ten percent (10%) of the Plaintiffs States' budgets constitutes similar

economic dragooning.[2]   *See supra* Section I.A.–B.   In this case, like in *NFIB*, the Amended

Complaint pleads "the financial 'inducement' Congress has chosen is much more than relatively

mild encouragement.  It is a gun to the head."  *Id*. at 1604 (internal citations partially omitted); *see

also Zelman v. Simmons-Harris*, 536 U.S. 639, 707 (2002) (Souter, dissenting) ("The criterion is one

of genuinely free choice on the part of the private individuals who choose, and a Hobson's choice

is not a choice, whatever the reason for being Hobsonian.").  Accordingly, the Court finds that

because of Defendants' requirements, Plaintiffs similarly face a Hobson's choice, as Plaintiffs'

Amended Complaint has sufficiently demonstrated that the alleged injury is fairly traceable to

Defendants.

### iii.   Redressability

Neither party squarely addresses whether Plaintiffs' claims would be redressed by a

favorable ruling.  However, the Court finds that Plaintiffs easily demonstrate that their claims would

be redressed if this Court were to provide a favorable ruling.   "[T]aking the [Amended]

---

[2] Defendants aver that "Plaintiffs themselves predict that the HIPF will impact a mere fraction of [one] percent of their budgets." Defs.' Br. Supp.Mot. 23, ECF No. 27.  However, the inquiry in *NFIB* turned on the "threat of loss" to a state "adher[ing] to [its] chosen course," rather than the cost of complying with the federal government's demands.  As an example, the *NFIB* majority referenced the Court's prior holding in *South Dakota v. Dole,* where the threatened loss of funding for resisting, not the cost of compliance, constituted only half of one percent of the state's budget.  *NFIB*, 132 S. Ct. at 2604 (quoting 791 F.2d 628, 630 (1986)).  In *NFIB*, however, the Court pointed out that a State that "opts out" of the federal government's demands would lose all of its Medicaid funding, with such a loss of "over 10 percent of a State's overall budget" being "economic dragooning."  *NFIB*, 132 S. Ct. at 2604–05.

[C]omplaint's allegations as true," Plaintiff States have "alleged [] a sufficient injury in fact," namely, the regulatory scheme that "forces Texas to alter its . . . policies or incur significant costs," and that a favorable ruling would prevent Plaintiffs from incurring such cost in the future. *See Texas*, 2016 WL 3524242, at *5; *see generally* Am. Compl., ECF No. 19 (seeking in part, declaratory and injunctive relief, of which a favorable ruling would prevent the collection of HIPF payments in the future). Based on the foregoing, the Court finds that Plaintiff States have sufficiently alleged constitutional standing.

### b.    *Prudential Standing*

The Court also considers *sua sponte* whether Plaintiffs have sufficiently asserted prudential standing. The Supreme Court has "interpreted § 10(a) of the APA to impose a prudential standing requirement in addition to the requirement, imposed by Article III of the Constitution, that a plaintiff has suffered a sufficient injury in fact." *Nat'l Credit Union Admin v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 488 (1998). "For a plaintiff to have prudential standing under the APA, 'the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Id.* (citing *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152 (1970)). The Supreme Court has stated that the "zone of interests" test "denies a right of review if the plaintiff's interests are . . . marginally related to or inconsistent with the purposes implicit in the statute." *Clarke v. Secs. Indus. Assn'n*, 479 U.S. 388, 399 (1987). Therefore, the proper inquiry is whether "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected . . . by the statute." *Data Processing*, 397 U.S. at 153.

Section 9010 of the ACA provides that the annual HIPF "fee" or "tax" is on "health

insurance providers" only, per the section's title, or "covered entities" under the section's text. *See* Pls.' Resp. 9, ECF No. 29. However, § 9010(c) also provides that a "covered entity" can only be an "entity which provides health insurance for any United States health risk" and expressly includes "any governmental entity." Pub. L. 111-138, 134 Stat. 866.

Here, Plaintiffs seek, at a minimum, a declaration as to the fee or tax they have already paid, and must continue to pay, under ASOP 49 as enforced through the HIPF. Therefore, the Court finds "the States are seeking to protect their own proprietary interests," which they allege has been harmed by financial payments totaling tens of millions of dollars and "will be directly harmed by the [continuing] implementation" of the statutory scheme. *Texas v. United States*, 86 F. Supp.3d 591, 625 (S.D. Tex. 2015). Plaintiffs' claims come within the "zone of interests" to be protected by the relevant healthcare statutory provision at issue in this litigation. The Court finds that Plaintiffs, having already paid to MCOs tens of millions of dollars in order to retain their Medicaid and CHIP funding, readily demonstrate that they meet prudential standing requirements.

### 2.   Subject-Matter Jurisdiction Related to the HIPF

Defendants argue that "[t]he Court lacks jurisdiction to grant any relief related to the HIPF." Defs.' Mot. 11, ECF No. 27 (capitalization omitted). More specifically, Defendants argue that: (1) as to Counts Seven and Ten, "the Court cannot grant states a refund of the HIPF"; (2) as to Counts One through Six and Count Nine, the Court "lacks authority to bar collection of the HIPF" from MCOs; and (3) as to Counts One through Six, Plaintiffs' challenges to the actuarial-soundness requirements under 42 C.F.R. § 438.6(c)(1)(i)(C) are time-barred. *Id*. at 11–13. The Court addresses each of Defendants' arguments in turn.

### a.   *Counts Seven and Ten: Whether the Court Can Grant States a Refund*

18

*of the HIPF[3]*

In Counts Seven and Ten, Defendants argue that "Plaintiffs lack standing to seek a refund for HIPF fees already paid by MCOs."[4]  *Id*. at 11.  Defendants admit that 28 U.S.C. § 1346(a)(1) offers a limited waiver of sovereign immunity for any tax "alleged to have been erroneously or illegally assessed or collected," but argue that "Plaintiffs fit within none of these exceptions."  *Id*. Defendants contend that "[t]o the extent that third-party challenges are permitted beyond what is expressly listed in the Code, the Supreme Court has limited such challenges to persons who paid the tax directly to the IRS."  *Id*. at 11–12.  Defendants argue that because "the HIPF is assessed against and paid by certain insurers, not the States, . . . [the] limited waiver of sovereign immunity therefore does not extend to Plaintiffs" and  "Plaintiffs have no constitutional right to challenge a tax they did not pay."  *Id*. at 12.

Plaintiffs respond that they "may seek a refund of the HIPF though it is initially assessed upon MCOs," as those "wrongfully taxed may seek a refund."  Pls.' Resp. 9, ECF No. 29 (quoting 28 U.S.C. § 1346(a)(1)).  Plaintiffs cite *United States v. Williams* for the proposition that the statute "permit[s] 'any civil action' to recover 'any internal-revenue tax alleged to have been erroneously

---

[3] Elsewhere in this Order, the Court clarifies that it need not conclusively decide at this time whether the HIPF is a "fee" or a "tax."  *See infra* Section III.A.2.b.  However, as to this claim, based on Plaintiffs' pleadings, their claims seeking a tax refund necessarily contemplate the HIPF solely as a tax.  *See*, *e.g.*, Pls.' Resp. 9, ECF No. 29 (citing precedent construing internal-revenue tax provisions and asserting, "The wrongfully taxed may seek a refund.  And Plaintiff States may seek a refund of the HIPF though it is initially assessed upon MCOs.").

[4] Count Ten appears to only be a claim for declaratory relief in the event the Court concludes that Plaintiffs may *not* receive a tax refund under § 9010(f) of the ACA.  Am. Compl. 26–27, ECF No. 19. However, Defendants' briefing as to the present Motion construes Count Ten, in part, to assert a claim for a refund.  *See*, *e.g.*, Defs.' Br. Supp. Mot. 11, ECF No. 27 ("The Court cannot grant states a refund of the HIPF (Counts VII and X).") (capitalization omitted).  In an abundance of caution, the Court similarly analyzes Count Ten.

or illegally assessed or collected' or 'in any manner wrongfully collected.'" *Id*. (quoting *United States v. Williams*, 514 U.S. 527, 532 (1995)).  Plaintiffs argue that "[t]he commonsense approach adopted in *Williams* supports Plaintiff States here, as they are ultimately paying the HIPF."  Pls.' Resp. 10, ECF No. 29 (internal citation omitted).

In *United States v. Williams*, the Supreme Court considered whether a respondent who paid a tax under protest to remove a lien on her property had standing to pursue a refund under 28 U.S.C. § 1346(a)(1), even though the tax she paid was actually assessed against her ex-spouse.  514 U.S. at 529.  Section 1346(a) provides in relevant part:

> The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:
>
> (1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws.

28 U.S.C. § 1346(a).  The Supreme Court noted that the language of § 1346(a) "does not say that only the person assessed may sue."  *Williams*, 514 U.S. at 531.  It reasoned that this broad statutory language "mirrors the broad common-law remedy the statute displaced: actions of assumpsit for money had and received, once brought against the tax collector personally rather than against the United States."  *Id*. at 532.

The Supreme Court also examined the meaning of a "taxpayer" under 26 U.S.C. § 6511, under which only a "taxpayer" may sue for a refund.  26 U.S.C. § 6511(a) provides, in relevant part:

> (a) Period of limitation on filing claim
>
> Claim for credit or refund of an overpayment of any tax imposed by this title in respect of which tax the taxpayer is required to file a return shall be filed by *the taxpayer* within 3 years from the time the return was filed or 2 years from the time

the tax was paid, whichever of such periods expires the later, or if no return was filed by the taxpayer, within 2 years from the time the tax was paid.

26 U.S.C. § 6511(a) (emphasis added).

The *Williams* majority observed that the "provision's plain terms provide only a deadline for filing for administrative relief, not a limit on who may file. To read the term 'taxpayer' as implicitly limiting administrative relief to the party assessed is inconsistent with other provisions of the refund scheme, which expressly contemplate refunds to parties other than the one assessed." *Williams*, 514 U.S. at 534. The Supreme Court reasoned that § 7701(a)(13), which defines "taxpayer," states that "[w]hen used in [the Internal Revenue Code], where not otherwise distinctly expressed or manifestly incompatible with the intent thereof, . . . [t]he term 'taxpayer' means any person *subject to any internal revenue tax*.'" *Id.* (emphasis added). The Supreme Court ultimately held that under the statutory scheme, the respondent was able to seek a refund, as she was "the taxpayer" who filed for a return within the requisite time from which "the tax was paid." *Id.*; *see also* 26 U.S.C. § 6511(a). Therefore, the Supreme Court held that "in authorizing the Secretary to award a credit or refund '[i]n the case of any overpayment,' 26 U.S.C. § 6402(a) describes the recipient not as the 'taxpayer,' but as 'the person who made the overpayment.'" *Id.*

Here, to the extent Plaintiffs plead ASOP 49, as enforced through the actuarially soundness requirement and the HIPF, is a tax pursuant to the statutory text, they were neither directly subject to the HIPF, nor actually paid the relevant tax on behalf of the taxpayer assessed. Rather, Plaintiffs allege that they paid the full amount *to* the taxpayer against whom the tax was assessed. *See*, *e.g.*, Am. Compl. ¶ 37, ECF No. 19. Therefore, the Court finds that Defendants' Motion is **GRANTED** as to the statutory claim for refund in Count Seven. Defendants' Motion is **GRANTED in part** as to Count Ten, to the extent that the Plaintiffs seek a refund.

21

Also under Count Ten, in the alternative, Plaintiffs move the Court to hold that § 9010(f) of the ACA violates the Tenth Amendment for "enabling the federal government to impose an unconstitutional tax on the States while foreclosing the return of such funds." Am. Compl. ¶¶ 78–80. The Court will analyze this argument below. *See infra* Section III.B.2.

> b.    *Whether the Court Has Authority to Bar Collection of the HIPF from MCOs*

In Counts One through Six and Count Nine, Plaintiffs seek a declaration under 28 U.S.C. §§ 2201–02 and 5 U.S.C. § 706 that would effectively bar the collection of the HIPF from MCOs. Plaintiffs assert that the HIPF is invalid because the procedures developed to implement the HIPF were improper under the APA. Plaintiffs argue that "whether the HIPF is a 'tax' or 'fee' for purposes of" the DJA, AIA, or APA, "turns upon the language of Congress." Pls.' Resp. 8, ECF No. 29. Plaintiffs argue that "[h]ere, the wording used by Congress in the ACA means that remedies under the DJA and APA apply to Plaintiff States' claims herein." *Id*. Plaintiffs point out that originally, "Congress described the HIPF as an annual 'fee,'" and then "later stated the HIPF shall be treated as an excise tax." *Id*. (citing Pub. L. 111-148, 124 Stat. 865). However, Plaintiffs argue that "even if the HIPF were a 'tax' for purposes of other statutes . . . Plaintiff States still have a remedy because the 'tax' is not textually committed to them." *Id*.

Defendants argue that "[t]o the extent that the States seek to directly restrain the collection of the HIPF from MCOs, this Court plainly lacks jurisdiction to do so" under the Anti-Injunction Act ("AIA") and DJA. Defs.' Br. Supp. Mot. 13, ECF No. 27. Defendants point out that "[t]he Supreme Court has concluded that the DJA and AIA 'could scarcely be more explicit' in barring suits seeking equitable relief restraining the collection of federal taxes." *Id*. (quoting *Bob Jones Univ. v. Simon*, 416 U.S. 725, 732 n.7 (1974)). Defendants contend that "[t]he AIA . . . bars suits

to restrain collection of the HIPF, and the jurisdictional limitations for tax refund suits bar Plaintiffs' request for a tax refund." Defs.' Reply 4, ECF No. 32.

Whether the parties refer to the HIPF as a "fee" or a "tax," it is on: (1) "health insurance providers" under § 9010 of the ACA; or (2) "covered entities," which exclude government entities. Pub. L. 111-148, § 9010(c)(1)–(2).  More specifically, to the extent the parties refer to the HIPF as a "fee," neither the DJA's prohibition concerning "federal taxes," nor the AIA's prohibition on parties bringing claims "for the purpose of restraining the assessment or collection of any tax," applies to a "fee."  *See* 28 U.S.C. §§ 2201, 7421(a).  Conversely, to the extent the parties refer to the HIPF as a "tax" for purposes of seeking a refund, the tax exemptions within the DJA and AIA are inapplicable because the Court has already determined that Plaintiffs are not taxpayers bringing a suit to restrain the assessment or collection of a tax on them.  *See supra* Section III.A.2.a.  Thus, the Court need not conclusively decide whether the HIPF is a "fee" or a "tax" at this stage in the litigation.  To the extent Plaintiffs raise their claims through pleading the HIPF is either a "tax" or a "fee," the Court holds that the Court has subject-matter jurisdiction and that Plaintiffs have stated a claim.  *See supra* Part III.A; *see infra* Part III.B.  To the extent Plaintiffs raise their claims through characterizing the HIPF solely as a "tax" to seek a refund, the Court has dismissed those claims as not allowed by the statutory text.  *See id.*  Defendants' Motion to Dismiss is **DENIED** as to their argument that the Court lacks subject-matter jurisdiction under the AIA and DJA.  The Court will, of course, continually evaluate its subject-matter jurisdiction.

### B.    Whether Plaintiffs' Amended Complaint States a Claim Under Rule 12(b)(6)

Defendants argue that in addition to subject-matter jurisdiction, Plaintiffs' Amended Complaint fails on the merits as well and should be dismissed in its entirety.  Defs.' Br. Supp. Mot.

23

3–4, ECF No. 27.  Specifically, Defendants appear to challenge whether Plaintiffs have claims under Counts One through Eight and Count Ten.  *See generally id.*   The Court addresses each of Defendants' 12(b)(6) arguments in turn.

> 1.   Counts One Through Five: Whether Plaintiffs' Challenges to the Actuarial-Soundness Requirements Under 42 C.F.R. § 438.6 (c)(1)(i)(C) Are Time-Barred

In Counts One through Five, Plaintiffs challenge 42 C.F.R. § 438.6(c)(1)(i)(C) under the DJA and APA.  Defendants argue that "[w]here, as here, no other statute provides a limitations period, a plaintiff has six years to bring a civil action against the United States, and because the regulation went into effect in 2002, the limitations period therefore lapsed in 2008."  Defs.' Br. Supp. Mot. 13–14, ECF No. 27.  Defendants argue that "[t]he fact that the HIPF was enacted in 2010 makes no difference" because Plaintiffs "have operated under section 438.6's actuarial-soundness requirements, including the requirement that all managed-care contracts must be certified by an actuary following the practice standards set forth by the Actuarial Standards Board" since 2002.  Defs.' Br. Supp. Mot. 14, ECR No. 27.

Plaintiffs respond that ASOP 49, promulgated in March 2015, "was a first of its kind—a post-ACA, targeted ASOP regarding capitation rates in managed care for Medicaid."  Pls.' Resp. 11, ECF No. 29.  Plaintiffs argue that ASOP 49 uniquely "requires the addition of the HIPF to the capitation rates assessed to Plaintiff States.   And until ASOP 49 existed, there was no formula, publication, or notice requiring that the HIPF, in its entirety, must be added as an 'adjustment' to a contracting state's capitation rate."  *Id.*

> a.   *Whether the Enactment of ASOP 49, as Enforced Through the HIPF, Constitutes the Accrual of Defendants' Regulation to Begin the Statute of Limitations Period*

"[T]he United States, as sovereign, is immune from suit save as it consents to be sued . . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Mitchell*, 445 U.S. 535, 538 (1980) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)).   A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4 (1969).   Plaintiffs do not allege that any of the statutes and regulations they attack directly provide their own waiver of sovereign immunity.   Thus, Plaintiffs' APA challenge is "governed by the general statute of limitations provision of 28 U.S.C. § 2401(a), which provides that every civil action against the United States is barred unless brought within six years of accrual."   *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1286 (5th Cir. 1997).

Here, the parties do not dispute that the ACA, which includes the HIPF, was passed in 2010, and implements the ASOP, which was announced by the ASB in 2015.   *See* Am. Compl. ¶¶ 18, 31, ECF No. 19; *see also* Defs.' Br. Supp. Mot. 4–5, 7, ECF No. 27.   In contrast to ASOP 1, announced in 2002, which includes tax rates that "could" factor into an actuary's "sound professional judgment," ASOP 49 mandates that "the actuary *should* include an adjustment for any taxes, assessments, or fees that the MCOs are required to pay out of the capitation rates" and thereby removes such discretion.   *See* Pls.' Resp. 12, ECF No. 29; *see also* Defs.' Br. Supp. Mot. 14 n. 7, ECF No. 27 (emphasis added).

In *Texas v. United States*, the court noted that "[a]s the District of Columbia Circuit observed, in allowing an attack on FCC rules three years after their promulgation" and publication:

> As applied to rules and regulations, the statutory time limit restricting judicial review of [agency] action is applicable only to cut off review directly from the order promulgating a rule.   It does not foreclose subsequent examination of a rule where properly brought before this court for review of further [agency] action applying it.

25

> For unlike ordinary adjudicatory orders, administrative rules and regulations are capable of continuing application . . . .

749 F.2d 1144, 1146 (5th Cir. 1985) (quoting *Network Project v. FCC*, 511 F.2d 786, 789 n.1 (D.C. Cir. 1975)).  In *Texas*, the court noted that the defendants "ha[d] cited no case indicating that such a restrictive standard applies to judicial review of an agency rule when later sought to be applied to a particular situation.  Indeed, the cases suggest the opposite, especially when the contention is that the rule lacks statutory authorization." *Texas*, 749 F.2d at 1146 (citing *Nat'l Res. Def. Council*, 666 F.2d at 602; *Ill. Cent. Gulf R.R.*, 720 F.2d 958, 961 (7th Cir. 1983)).  The court held that "[w]hen an agency applies a previously adopted rule in a particular case, the [limitations period] does not bar later judicial review of the substantial statutory authority for their enactment or of their applicability to a particular situation." *Texas*, 749 F.2d at 1146 (citing *Nat'l Res. Def. Council*, 666 F.2d at 602).

Therefore, here, like in *Texas*, Plaintiffs properly seek "judicial review of an agency rule when later sought to be applied to a particular situations." *Texas*, 749 F.2d at 1146.  Plaintiffs allege Defendants have acted, or applied the ASOP to the HIPF, by requiring the MCO payments be actuarially sound as defined by the Academy. *See generally* Am. Compl., ECF No. 19.  Therefore, preventing judicial review would "effectively deny" Plaintiffs "an opportunity to question its validity." *Id*.  Accordingly, the Court finds that the application of ASOP 49, beginning in 2015, is sufficiently distinct to begin the statute of limitations period no earlier than the HIPF's promulgation in 2010.  Defendants' Motion to Dismiss is **DENIED** as to Plaintiffs' Counts One through Five, to the extent Defendants challenge the timeliness of Plaintiffs' claims.

      2.      <u>Plaintiffs' Constitutional Claims</u>

            *a.*     *Plaintiff's Spending Clause Claims*

                  i.     <u>Counts Four and Eight: Whether the Actuarial-Soundness</u>

<u>Requirement is Coercive</u>

In Counts Four and Eight, Plaintiffs' claims arise under Article I, Section 8 of the United States Constitution, otherwise known as the Spending Clause. Plaintiffs argue that "[a]s applied to the States, the HIPF violates the Spending Clause because its non-payment threatens to withhold Medicaid funds." Pls.' Resp. 15, ECF No. 29. More specifically, Plaintiffs contend that because "Medicaid spending accounts for a substantial percentage of Plaintiff States' total budgets," and the federal government "may deny funds that comprise a substantial percentage of Plaintiff States' budgets if they refuse to pay the HIPF," the ACA results in a proverbial "gun to the head." *Id*. (quoting *NFIB*, 132 S. Ct. at 2604).

Defendants argue that "[t]he actuarial-soundness requirement is precisely the type of restriction on the use of federal funds that *NFIB* recognized as valid, as it offers federal funding for managed-care contracts with rates that are actuarially sound and withholds funding for those that are not." *Id*. at 17. Defendants contend that the requirement "in no way coerces Plaintiffs, as the States themselves recognize the reasonableness of actuarial standards" in many of their own separate contracts. *Id*. Defendants conclude that "[b]ecause the actuarial-soundness requirement merely reflects Congress's judgment about which types of managed-care contracts deserve dollars from the federal fisc—a judgment virtually identical to Plaintiff States' own policies—it falls well within the Spending Clauses's strictures." *Id*.

The Spending Clause grants Congress the power "to pay the Debts and provide for the . . . general Welfare of the United States." U.S. Const. Art. 1, § 8. The Supreme Court has "long recognized that Congress may use this power to grant federal funds to the State, and may condition such a grant upon the States' 'taking certain actions that Congress could not require them to take.'"

27

*NFIB*, 132 S. Ct. at 2601 (quoting *Coll. Savings Bank*, 527 U.S. at 686). "Such measures 'encourage a State to regulate in a particular way, [and] influenc[e] a State's policy choices.'" *NFIB*, 132 S. Ct. at 2601–02 (quoting *New York*, 505 U.S. at 166). "The conditions imposed by Congress ensure that the funds are used by the States to 'provide for the . . . general Welfare' in the manner Congress intended." *NFIB*, 132 S. Ct. at 2602.

"At the same time, [the Supreme Court] ha[s] recognized limits on Congress's power under the Spending Clause to secure state compliance with federal objectives." *Id*. For example, the Supreme Court 'ha[s] repeatedly characterized . . . Spending Clause legislation as 'much in the nature of a contract.'" *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). "The legitimacy of Congress's exercise of the spending power 'thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *NFIB*, 132 S. Ct. at 2602 (quoting *Pennhurst*, 451 U.S. at 17). "Respecting this limitation is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *NFIB*, 132 S. Ct. at 2602. Such a system "rests on what might at first seem a counter-intuitive insight, that 'freedom is enhanced by the creation of two governments, not one.'" *Bond v. United States*, 564 U.S. 211, 220–21 (2011) (quoting *Alden v. Maine*, 527 U.S. 706, 758 (1999)). Therefore, "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York*, 505 U.S. at 162.

The Supreme Court "strike[s] down federal legislation that commandeers a State's legislative or administrative apparatus for federal purposes." *NFIB*, 132 S. Ct. at 2602 (citing *Printz*, 521 U.S. at 933) (striking down federal legislation compelling the action of state law actors, reasoning, "[T]he

Constitution protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day."). "Congress may use its spending power to create incentives for States to act in accordance with federal policies. But when 'pressure turns into compulsion,' the legislation runs contrary to our system of federalism." *NFIB*, 132 S. Ct. at 2602 (quoting *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937)). "That is true whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *NFIB*, 132 S. Ct. at 2602.

In *NFIB v. Sebelius*, the Supreme Court examined the ACA's expansion of Medicaid, which required states to either dramatically expand Medicaid coverage to all individuals under 133% of the poverty line or lose all federal Medicaid funds. 123 S. Ct. at 2604. The Supreme Court held that the Medicaid expansion was "in reality a new program," not a "mere alteration of existing Medicaid," and that the Spending Clause did not allow Congress to require that states participate as a condition of participating in the existing Medicaid program. *Id*. at 2605. As Defendants admit, "[t]he [*NFIB*] Court found that the outsized threat of losing all of a state's federal Medicaid matching funds and the dramatic change demanded of the state made the Medicaid expansion unlike any exercise of the Spending Clause the [Supreme] Court had addressed before." Defs.' Br. Supp. Mot. 15, ECF No. 27 (citing *id*. at 2605–06).

Similarly, the Court finds that at this stage in the litigation, Plaintiffs have sufficiently pleaded that "the outsized threat of losing all of a state's federal Medicaid matching funds and the dramatic change demanded of the state" sufficiently made the HIPF's imposition on the Plaintiff States through the actuarially sound requirement "a new program" for states. *See id.*; *see also* Am.

Compl. 22, 25–26, ECF No. 19.  More specifically, Plaintiffs have sufficiently pleaded that they are effectively forced to pay the HIPF in order to continue their participation in Medicaid, as the number of nonprofit MCOs available to serve its citizens to avoid the HIPF simply does not exist.  *See* Am. Compl. ¶ 22, ECF No. 19; *see supra* Section III.A.1.a.ii (finding that Plaintiffs had standing due to the "economic dragooning" of the threatened loss of over 10 percent of each Plaintiff States' budget).  Therefore, Defendants' Motion to Dismiss as to Plaintiffs' challenge in Counts Four and Eight that the actuarial-soundness requirement is coercive is **DENIED**.

## ii.  Whether the HIPF is Sufficiently Related to Medicaid

Defendants argue that the HIPF "does not require the States to participate in any new program, nor does it even impose a condition on the receipt of federal Medicaid funds—a necessary element of a Spending Clause claim."  Defs.' Br. Supp. Mot. 16, ECF No. 27.  Defendants further contend that "[n]o federal court, to Defendants' knowledge, has ever suggested that the Spending Clause's restrictions on Congress's authority to condition federal funds extend to Congress's taxing power."  *Id.* at 16.  Defendants further assert that "the States may, depending on the MCOs' historical profits from their Medicaid contracts, be able to use their bargaining power to minimize or eliminate rate increases."  *Id.* at 16.  Plaintiffs respond that "[b]ecause the actuarial soundness requirement (and ASOP 49) condition Plaintiff States' receipt of federal funds for Medicaid on their payment of the HIPF, that condition must relate to Medicaid to be a legitimate exercise of Congress's spending power."  Pls.' Resp. 17, ECF No. 29.  However, argue Plaintiffs, because the purpose "of the HIPF is to generate revenue for health insurance subsidies for those that do *not* qualify for Medicaid," the "HIPF is insufficiently related to Medicaid to be a legitimate exercise of Congress's spending power."  *Id.*; *see also* Am. Compl. ¶ 18, ECF No. 19 (stating that "the purpose

of the fee was to generate revenue from a windfall Congress expected insurers to receive by increasing enrollment" in the ACA).

The Court has already decided it need not conclusively decide whether the HIPF is a "fee" or a "tax" at this juncture, as "either way, Plaintiffs have established that the Court has subject-matter jurisdiction as to their claims." *See supra* Section III.A.2.b.  Therefore, the Court analyzes whether Plaintiffs have stated a Spending Clause claim.

In *Massachusetts v. United States*, the Supreme Court reaffirmed the long-held principle that the "Government may impose appropriate conditions on the use of federal property or privileges and may require that state instrumentalities comply with conditions that are reasonably related to the federal interest in particular national projects or programs."  435 U.S. 444, 461 (1978); *see also Dole*, 483 U.S. at 207 ("[C]onditions on federal grants might be illegitimate if they are unrelated 'to the federal interest in particular national programs or programs") (citing *id.*).  In *Dole*, the Supreme Court held that the "condition imposed by Congress [related to minimum legal drinking ages] is directly related to one of the main purposes for which highway funds are expended—safe interstate travel." *Dole*, 483 U.S. at 208.

Here, the Court finds that Plaintiffs have stated a claim that the HIPF is not "directly related," let alone "reasonably related," to the Medicaid program, as the purpose of the HIPF is to generate revenue due to expected enrollment in ACA insurance programs, rather than to generate revenue related to the federal interest in advancing Medicaid services.  Pls.' Resp. 17, ECF No. 29; *see also* Am. Compl. ¶ 18, ECF No. 19.  Therefore, at this preliminary stage, Defendants' Motion to Dismiss is **DENIED**.

> iii.    Whether the Medicaid Statute Clearly Notifies States of Actuarial-Soundness Requirements

In Count One, Plaintiffs claim the HIPF fails the "plain statement rule" by giving them insufficient notice that federal funding for Medicaid is conditioned on the Plaintiffs' required HIPF payments to MCOs.  Defendants argue this is untrue because "purchasers of health insurance can be assumed to know that their premiums are affected by costs to the insurance industry."  Defs.' Mot. 18, ECF No. 27.  Defendants also argue that "Congress never promised the Medicaid program would remain unchanged; to the contrary, it has reserved the right to 'alter, amend, or repeal' the Medicaid program."  *Id.* at 18 (quoting 42 U.S.C. § 1304).  Defendants add that "presumably the Plaintiffs . . . would not want to enter into contracts with managed-care plans whose rates were not actuarially sound, as that could endanger the quality of care or access to services for Medicaid beneficiaries."  *Id.* at 18–19.  Defendants conclude that "[t]he suggestion that States could not anticipate changes to the regulatory costs borne by MCOs—participants in a long highly regulated industry—is simply disingenuous.  Nor can Plaintiffs claim that they did not know of the HIPF or any of its potential effects since it was enacted."  Defs.' Reply 8, ECF No. 32.

Plaintiffs respond that "[n]either the Medicaid Act nor the ACA say that the receipt of federal Medicaid funds for managed care is conditioned on the States paying the HIPF."  Pls.' Resp. 18, ECF No. 29.  Plaintiffs add that "[m]ore importantly, the payment of the HIPF by Plaintiff States was not part of the ACA and, until ASOP 49 clarified the parameters of actuarial soundness regarding the HIPF, Plaintiff States did not know that they would incur the full burden of the HIPF."  *Id.*  Plaintiffs conclude that "[b]ecause Congress did not provide clear notice—and in fact excluded 'governmental entit[ies]' from its coverage—the HIPF is unconstitutional as applied to Plaintiff States."  *Id.* at 19.

Under the plain statement rule, "Congress must express clearly its intent to impose

conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 24 (1981). "[T]hough Congress' power to legislate under the spending power is broad, it does not include surprising participating States with post-acceptance or 'retroactive' conditions." *NFIB*, 132 S. Ct. at 2606 (quoting *id*. at 25). As the Court previously noted, "'legislation enacted pursuant to the spending power is much in the nature of a contract,' and therefore, to be bound by 'federally imposed conditions,' recipients of federal funds must accept them 'voluntarily and knowingly.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17). "The crucial inquiry . . . is not whether a State would knowingly undertake that obligation, but whether Congress spoke so clearly that we can fairly say that the State could make an informed choice." *Pennhurst*, 451 U.S. at 25. "Congress may not simply 'conscript state [agencies] into the national bureaucratic army . . . .'" *NFIB*, 132 S. Ct. at 2607 (quoting *FERC v. Mississippi*, 456 U.S. 742, 775 (1982) (O'Connor, J., concurring in judgment in part and dissenting in part)).

The parties do not dispute that "[n]either the Medicaid Act nor the ACA say that the receipt of federal Medicaid funds for managed care is conditioned on the States paying the HIPF." Pls.' Resp. 18, ECF No. 29; *see also* Defs.' Br. Supp. Mot. 18, ECF No. 27. Defendants point out, though, that Congress has reserved the right, in the Medicaid Act, to "alter, amend, or repeal" the Medicaid program. Defs.' Br. Supp. Mot. 18, ECF No. 27 (quoting 42 U.S.C. § 1304). Plaintiffs respond that "the HIPF was not part of the Medicaid statute, and the Medicaid statute was never amended to address the HIPF." Pls.' Resp. 18, ECF No. 29. Plaintiffs argue that they "'could hardly anticipate that Congress's reservation of the right to alter or amend the Medicaid program included the power to transform it so dramatically' by upsetting the regular workings of Medicaid,

33

for the better part of 50 years, by conditioning the receipt of federal Medicaid funds on the States

paying to subsidize federal health insurance programs." *Id*. (quoting *NFIB*, 132 S. Ct. at 2606).

The Court agrees that at this stage of the litigation, Plaintiffs have alleged that Congress has

not clearly expressed its intent to condition the grant of federal Medicaid funds on the states paying

the HIPF, such that States have had an opportunity to "knowingly decide" whether or not to accept

these funds. *Pennhurst*, 451 U.S. at 24. To the extent actuarial soundness requirements or the

Medicaid Act's blanket provision that allowing for at-will alterations has existed for some time, the

HIPF's pass through requirement materialized with the ASOP 49, as enforced through the HIPF.

Plaintiffs have alleged this requirement unlawfully "surpris[ed] participating States with post-

acceptance or 'retroactive' conditions." *NFIB*, 132 S. Ct. at 2606. Therefore, at this stage,

Defendants' Motion to Dismiss is **DENIED** as to Count One.

> b.   *Counts Six and Ten: Whether the HIPF Violates the Tenth Amendment or Intergovernmental Tax Immunity Because it Falls Directly on Private Parties*

In Count Six, Plaintiffs seek a declaratory judgment under 28 U.S.C. §§ 2201–02 and 5

U.S.C. § 706 that the HIPF unconstitutionally taxes a sovereign. Am. Compl. 23–24, ECF No. 19.

In addition, in their alternative argument under Count Ten, Plaintiffs argue that § 9010 violates the

Tenth Amendment for "enabling the federal government to impose an unconstitutional tax on the

States while foreclosing the return of such funds." *Id*. at 12. The Court considers these claims

together, as the parties have in their respective pleadings. *See* Defs.' Br. Supp. Mot. 19, ECF No.

27; *see also* Pls.' Resp. 19, ECF No. 29.

Defendants argue that "Plaintiffs' tax-immunity claim is foreclosed by nearly three-quarters

of a century of Supreme Court precedent rejecting the so-called theory of tax immunity." Defs.' Br.

Supp. Mot. 19–20, ECF No. 27.  Defendants explain that "the HIPF—a nondiscriminatory tax that applies across the board to 'any entity which provides health insurance,' ACA § 9010(c)(1)—is constitutional even if every cent of it is passed on to the States."  *Id*.  Defendants conclude that "Plaintiffs' intergovernmental tax immunity claim is a non-starter," because their "theory of tax immunity would completely eclipse Congress's power to tax private entities because *any* tax imposed on private parties risks impacting states' coffers."  *Id*.

Plaintiffs argue that "a federal tax which is not discriminatory as to the subject matter may nevertheless so affect the State, merely because it is a State that is being taxed, as to interfere unduly with the State's performance of its sovereign functions of government."[5]  *New York v. United States*, 326 U.S. 572, 594–95 (1946) (Stone, C.J., concurring).  Plaintiffs allege that "a direct tax on the States is impermissible when it infringes on State sovereignty," and "[s]tates have no immunity from taxation when immunity would 'accomplish a withdrawal from the taxing power of the nation a subject of taxation of a nature which has been traditionally within that power from the beginning.'" Pls.' Resp. 20, ECF No. 29 (quoting *New York*, 326 U.S. at 588).  Plaintiffs conclude that "[t]he imposition of the HIPF on Plaintiff States has, in turn, required them to tax their citizens (or make spending cuts to State programs) to pay it, making Plaintiff States bear part of the blame for the costs of the federal program.  Allowing Defendants to hijack State treasuries in this manner is no less an affront to State sovereignty than allowing Defendants to commandeer State legislative processes, or State executive officials."  *Id*.  Plaintiffs also argue that "[n]o federal tax remotely similar to the HIPF has traditionally been imposed on States' Medicaid health plans. . . . And the novelty of the

---

[5] Therefore, Plaintiffs appear to concede that the alleged tax is "nondiscriminatory," rather than "discriminatory."  Defendants appear to construe Plaintiffs' pleadings similarly.  *See*, *e.g*., Defs.' Reply 8, ECF No. 32.

ACA precludes the HIPF from being cogently analogized to any prior tax." *Id*. at 21.

"In *McCulloch v. Maryland*, the Supreme Court held that states are prohibited from directly taxing the United States government [sic], its activities, and its property. Nor may a state impose a tax whose legal incidence falls upon the United States." *Whitley v. Griffin*, 737 F. Supp. 345, 349 (E.D.N.C. 1990) (citing 17 U.S. 316 (1819) (internal citation omitted)); *see also United States v. Cty. of Fresno*, 429 U.S. 452, 459 (1977). In analyzing this issue, "the court must look beyond the bare face of the taxing statute and consider all relevant circumstances." *Whitley*, 737 F. Supp. at 350 (citing *United States v. City of Detroit*, 355 U.S. 466, 469 (1958)).

In recent decades, "the doctrine of intergovernmental tax immunity started a long path in decline . . . ." *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 174 (1989) (quoting *Baker*, 485 U.S. 505, 520 (1988)); *see also Cal. State Bd. of Equalization v. Sierra Summit, Inc.*, 490 U.S. 844, 848 (1989) (quoting the same). For instance, in *Baker*, the Supreme Court noted that its prior holdings "completely foreclosed any claim that the nondiscriminatory imposition of costs on private entities that pass them on to State or the Federal Government unconstitutionally burdens state or federal functions." 485 U.S. 505, 521 (1988) (citing *Alabama v. King & Boozer*, 314 U.S. 1, 8–9 (1941)). The Supreme Court stated that such precedent "has consistently reaffirmed the principle that a nondiscriminatory tax collected from private parties contracting with another government is constitutional even though part or all of the financial burden falls on the other government." *Id*. (citing *Washington v. United States*, 460 U.S. 536, 540 (1983); *United States v. New Mexico*, 455 U.S. 720, 734 (1982); *Cty. of Fresno*, 429 U.S. 452, 460–62 (1977); *City of Detroit*, 355 U.S. 466, 469 (1958)).

The Supreme Court has clarified that "[a] tax is considered to be *directly* on the Federal

Government only 'when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities.'" *United States v. Delaware*, 958 F.2d 555, 569 (3d Cir. 1992) (emphasis added) (quoting *Baker*, 485 U.S. at 523). Therefore, "States may not impose taxes directly on the Federal Government, nor may they impose taxes the legal incidence of which falls on the Federal Government." *Memphis Bank & Trust Co. v. Garner*, 459 U.S. 392 (1983) (quoting *Cty. of Fresno*, 429 U.S. at 459). In other words, despite the "decline of the intergovernmental tax immunity doctrine" in recent decades, the doctrine continues to apply to taxes, or the legal incidence of taxes, that fall directly on a government, as such basic "[c]onstitutional principles do not depend upon the rise or fall of particular doctrines." *Baker*, 485 U.S. at 532 (O'Connor, J., concurring). Accordingly, courts, including the Supreme Court, continue to consider whether the doctrine applies in limited factual circumstances. *See*, *e.g.*, *Jefferson Cty. v. Acker*, 527 U.S. 423, 448–49 (1999) (Breyer, J., concurring in part and dissenting in part) ("If Jefferson County's license fee amounts to a tax imposed directly upon a federal official's performance of his official duties, it runs afoul of the intergovernmental tax immunity doctrine.") (collecting cases).

Notably, "the Supreme Court has held that the *economic* incidence of a tax does not necessarily determine the *legal* incidence of the tax." *Delaware*, 958 F.2d at 561 (emphasis added) (citing *Washington*, 460 U.S. at 540; *New Mexico*, 455 U.S. at 734). "On the other hand, the legal incidence does not necessarily fall on the person or entity that the state holds legally responsible for paying the tax." *Id.* (citing *United States v. State Tax Comm'n of Miss.*, 421 U.S. at 607; *First Agric. Nat'l Bank v. State Tax Comm'n*, 392 U.S. 339, 347 (1968)). "[B]oth economic incidence and formal liability are normally relevant in determining legal incidence. Also relevant as a general

matter are the intent of the taxing authority, and the rights and obligations involved in the transaction being taxed." *Delaware*, 958 F.2d at 561 (citing *State Tax Comm'n of Miss.*, 421 U.S. at 608; *First Agric. Nat'l Bank*, 392 U.S. at 347; *United States v. City of Leavenworth*, 443 F. Supp. 274, 282 (D. Kan. 1977)).

In *First Agricultural National Bank*, the Supreme Court held it was "indisputable that a sales tax which by its terms must be passed on to the purchaser imposes the legal incidence of the tax on the purchaser." 392 U.S. at 347 (citing *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 99 (1941)). In *State Tax Commission of Mississippi*, the Supreme Court similarly held that a markup on liquor sales by the State Tax Commission to military bases in Mississippi was effectively a sales tax collected by the seller and remitted to the state, because "where a State requires that its sales tax be passed on to the purchaser and be collected by the vendor from him, this establishes as a matter of law that the legal incidence of the tax falls upon the purchaser." 421 U.S. at 608. The Supreme Court reasoned that this was "plainly the requirement" of the relevant state regulation, which provided that all military facilities' direct orders of alcoholic beverages from distillers "shall bear the usual wholesale markup in price," such that the "price of such alcoholic beverages shall be paid by such organizations directly to the distiller." *Id.* at 609. The Supreme Court concluded, therefore, that "[t]he Tax Commission clearly intended—indeed, the scheme unavoidably requires—that the out-of-state distillers and suppliers pass on the markup to the military purchasers." *Id.* at 609.

Similarly, in *United States of Delaware*, the Third Circuit Court of Appeals considered whether a Delaware utility tax mandatorily passed on to consumers was unconstitutional as applied to sales of electricity to the Dover Air Force Base in Delaware. 958 F.2d at 562. There, the state

Public Service Commission was statutorily "directed, after consultation with such distributors and without a public hearing, to adjust the tariff of such distributor so that the tax is passed through pro rata to the distributor's customers and the distributor's earnings are neither increased nor decreased by such tax." *Id.* (quoting 30 Del. Code Ann. § 5502(c)). The court noted that the state "engage[d] in creative verbal gymnastics to suggest that the pass-through is somehow optional." *Id.* The court reasoned that the "Delaware legislature intended that consumers pay the tax," and therefore the utility tax was unconstitutional as applied to sales to the federal government." *Id.*

Here, similar to *State Tax Commission of Mississippi* and *Delaware*, the Court finds that Plaintiff has sufficiently pleaded at this stage that the legal incidence of the ACA, by enforcing ASOP 49 through the HIPF and actuarially sound requirement, falls on Plaintiff States. Defendants correctly emphasized that the Supreme Court has affirmed that "the principle that a nondiscriminatory tax collected from private parties contracting with another government is constitutional even though part or all of the financial burden falls on the other government." *See* Defs.' Br. Supp. Mot. 19–20, ECF No. 27; *see also Baker*, 485 U.S. at 521 (noting that the Supreme Court previously "foreclosed any claim that the nondiscriminatory imposition of costs on private entities that pass them on to States."). However, the issue here is that Plaintiffs have alleged Congress, not the private MCOs themselves, have mandated that the Plaintiff States pay the full HIPF to the MCOS, which then pay the federal government, such that the full amount of the HIPF is effectively imposed on the Plaintiff States. *State Tax Comm'n of Miss.*, 421 U.S. at 608. Indeed, Plaintiffs allege CMS worked directly with Texas in 2015 to confirm the precise amount Texas owed to the MCOs. *See* Am. Compl. ¶ 40, ECF No. 19. In other words, the statutory "scheme" of the HIPF, through the actuarial soundness requirements, which incorporate the ASOP, "unavoidably

requires" that the States pay the MCOs the full amount of the HIPF to be paid to the federal government.  *Id*. at 609.

Also here, as in *Delaware*, Defendants appear to "engage[] in creative verbal gymnastics to suggest that the pass-through is somehow optional" as to the Plaintiff States.  *See Delaware*, 958 F.2d at 562; *see also* Defs.' Br. Supp. Mot. 16, ECF No. 27 (hypothesizing that "the States may, depending on the MCOs' historical profits from their Medicaid contracts, be able to use their bargaining power to minimize or eliminate rate increases" but not HIPF payments).  However, based on Plaintiffs' pleadings, ASOP 49's mandate on Plaintiff States, as required by the actuarially soundness requirement and the HIPF, plainly "cannot be read . . . as discretionary," and this argument seems to concede states must pay the HIPF but can achieve savings elsewhere.[6]  *Delaware*, 958 F.2d at 562; *see also* Pls.' Resp. 1, ECF No. 29 ("Here, the HIPF passes through Plaintiff States' Medicaid [MCOs] to Plaintiff States because of the requirements of an agency regulation (42 C.F.R. § 438.6) and [ASOP 49] . . . .").  Whether Plaintiffs could hypothetically contract differently to minimize rate increases in the future is irrelevant to determining the constitutionality of the HIPF itself.  *See Baker*, 485 U.S. at 518 ("Congress cannot employ unconstitutional means to reach a constitutional end.").

Accordingly, the Court finds that Plaintiffs have pleaded a violation of the intergovernmental tax immunity doctrine, and Count Six is accordingly **DENIED**.  To the extent Plaintiffs similarly plead that the alleged direct tax imposed through § 9010(f) of the ACA violates the Tenth Amendment, the Court finds for the same reasons that § 9010 may not be constitutionally applied

---

[6] The difference between (1) ASOP 1's statement that actuarially soundness "could" factor into an actuary's judgment, and (2) ASOP 49's statement that it "should" factor into an actuary's judgment and ASOP 49's impact on the legal incidence, will be considered in the evidentiary stage of the litigation.

to deny a refund.  Accordingly, Plaintiffs' alternative argument under Count Ten is also **DENIED**.

        *c.*     *Count Five: Whether the Actuarial-Soundness Requirement*
                   *is an Unconstitutional Delegation of Legislative Power*

In Count Five, Plaintiffs seek, in part, a declaratory judgment under 28 U.S.C. §§ 2201–02 and 5 U.S.C. § 706 that Plaintiff States being forced to pay the HIPF is an unconstitutional delegation of Congress's legislative power to a private entity in contravention of Article 1, Section 1 of the United States Constitution.  Am. Compl. 22–23, ECF No. 19.  Defendants contend that "[t]he Supreme Court's decision in *Currin v. Wallace*, 306 U.S. 1 (1939), controls this case."  Defs.' Br. Supp. Mot. 21, ECF No. 27.  There, "the [Supreme] Court considered a delegation challenge to the Tobacco Inspection Act, which permitted the Secretary of Agriculture to act only subject to certification by two-thirds of tobacco growers voting at a prescribed referendum."  *Id.* (internal citations omitted).  Defendants argue that in *Currin*, "the Court noted that '[t]he Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards.'"  *Id.*  Defendants note that "[f]urthermore, the Supreme Court has applied the delegation doctrine only where Congress has delegated authority to interested private parties," as the doctrine "is animated by the fear that industry groups might 'regulate the affairs of an unwilling minority.'"  *Id.* (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)).  Defendants note that "[t]he ASB has no financial interest in the outcome of capitation-rate negotiations."  Defs.' Br. Supp. Mot. 21–22, ECF No. 27.

Plaintiffs respond that its "improper delegation claim is best understood against the backdrop of the separation of powers."  Pls.' Resp. 22, ECF No. 29.  Plaintiffs aver that "Congress cannot delegate power to make the law or change the law," and "[w]hile not every historic or future

application of 42 C.F.R. § 438.6 contravenes the statutory text, it works here, especially in light of ASOP 49, to rewrite the statute and impose the HIPF on a non-'covered entity'—the States." *Id.* Here, Plaintiffs assert the Academy has rewritten the ACA by ensuring the Plaintiff States pay the HIPF when Congress expressly excluded the Plaintiff States from having to pay it. Pub. L. 111-148, § 9010(c)(1)–(2). Plaintiffs also argue that "it is significant that the unconstitutional delegation here is to a private entity," because "[f]ederal lawmakers cannot delegate regulatory authority to a private entity. To do so would be 'legislative delegation in its most obnoxious form.'" *Id.* (citing *Ass'n of Am. R.R.s. v. Dep't of Transp.*, 721 F.3d 666, 670 (D.C. Cir. 2013), *rev'd on other grounds*, 1235 S. Ct. 1225 (2015)). Plaintiffs also argue that *Currin* is "questionable precedent" and moreover, in that case, "Congress did not delegate to a private entity the authority to craft or define the regulations." *Id.* at 23 (quoting *Ass'n of Am. R.R.s*, 135 S. Ct. at 1254 (Thomas, J., concurring)). Plaintiffs conclude that "Congress delegated to ASB—a single, private, membership-based organization—the authority to define what is 'actuarially sound' for purposes of Medicaid and craft the standards for determining whether States' Medicaid programs comply with federal law." *Id.*

In *Association of American Railroads*, the railroad association sued the Department of Transportation, among other agencies, challenging a statute requiring the Federal Railroad Administration and federally chartered Amtrak to jointly develop standards to evaluate Amtrak's performance. *See generally id.* The Supreme Court held that Amtrak was a governmental entity rather than an autonomous private entity for purposes of determining the relevant standards because Congress mandates certain aspects of its day to day operations, the Secretary of Transportation holds all of Amtrak's preferred stock and most of its common stock, the political branches exercise "substantial, statutorily mandated supervision over Amtrak's priorities and operations," and "[a]

42

majority of its Board is appointed by the President and confirmed by the Senate and is understood

by the Executive to be removable by the President at will." *Id*. at 1231–33. The Supreme Court

summarized that "Amtrak was created by the Government, is controlled by the government, and

operates for the government's benefit." *Id*. at 1232.

In his concurrence, in which he "entirely agree[d] . . that Amtrak is 'a federal actor or

instrumentality'" for constitutional purposes, Justice Alito noted that "the formal reason why the

Court does not enforce the nondelegation doctrine with more vigilance is that the other branches of

government have vested powers of their own that can be used in ways that resemble lawmaking."

*Id*. at 1237 (citing *Arlington v. FCC*, 133 S. Ct. 1863, 1873 (2013)). Justice Alito noted that "[w]hen

it comes to private entities, however, there is not even a fig leaf of constitutional justification"

because private entities are vested with neither legislative nor executive powers. *Id*. at 1237. "By

any measure, handing off regulatory power to a private entity is 'legislative delegation in its most

obnoxious form.'" *Id*. at 1238 (quoting *Carter*, 298 U.S. at 311).

In their Amended Complaint, Plaintiffs allege that "[t]o be deemed 'actuarially sound' for

purposes of Medicaid or CHIP, federal regulations require an actuary's certification that, under the

standards established by the [Academy], capitation rates are sufficient to cover the insurance

providers' expected costs and insurance risks for the coming year." Am. Compl. ¶ 26, ECF No. 19

(citing 42 C.F.R. § 438.6). Plaintiffs point out that "[t]he American Academy of Actuaries is a

private, membership-based professional organization." *Id*. ¶ 27. Furthermore, "[t]o set practice

standards for actuaries, the American Academy of Actuaries has created and works with an

independent, private organization known as the [ASB]." *Id*. ¶ 29. Plaintiffs assert that "[i]n March

2015, the ASB adopted ASOP 49, which "requires capitation rates to recover from States the amount

43

of all taxes managed care organizations are required to pay." *Id*. ¶ 31.  Plaintiffs allege that "[w]ithout such certification of an actuary, a managed care organization agreement will not be eligible for participation in Medicaid and CHIP." *Id*. ¶ 35.

Under the principles established in *American Association of Railroads*, the Court finds that Plaintiffs have sufficiently stated a claim that Congress delegated rulemaking authority to an independent, private organization, in direct contravention of Article I, Section 1 of the United States Constitution.  Defendants' Motion is **DENIED** as to Count Five as to Plaintiffs' constitutional claim. Plaintiffs also bring a statutory claim under Count Five, which the Court will address below. *See infra* Section III.B.3.a.

3.   Plaintiffs' Statutory Claims

a.   *Counts Two and Three: Whether HHS's Decision to Rely on ASOP 49 was Subject to Notice-and-Comment Rulemaking and Was Not Arbitrary or Capricious*

In Count Two, Plaintiffs seek declaratory relief under 5 U.S.C. § 706 that "the delegation by [HHS] . . . of ultimate decision-making authority to the [ASB] on whether States must pay their Medicaid and CHIP [MCOs] the [HIPF] is arbitrary and capricious and not otherwise in accordance with law." Am. Compl. ¶ 52, ECF No. 19.   In Count Three, Plaintiffs allege that HHS "failed to properly engage in notice-and-comment rulemaking by delegating final authority and discretion to the [ASB] without observance of procedure required by law," with the HIPF imposed upon the States functioning as a "rule" under the APA. *Id*. ¶¶ 55, 57.

i.   Count Three: Whether HHS's Decision to Rely on ASOP 49 Was Subject to Notice-and-Comment Rulemaking

In Count Three, Plaintiffs allege that HHS "failed to properly engage in notice-and-comment rulemaking by delegating final authority and discretion to the Actuarial Standards Board without

observance of procedure required by law." *Id.* ¶ 57.  Defendants point out that HHS's decision "to refer to the ASOP, 42 C.F.R. § 438(c)(i)(C), *did* go through notice-and-comment rulemaking." Defs.' Br. Supp. Mot. 23, ECF No. 27.  Defendants argue that "[t]o the extent Plaintiffs are trying to challenge the ASB's decision, those are not 'rules' that require notice-and-comment procedures because they are not 'agency statement[s].'" *Id.* at 23–24 (quoting 5 U.S.C. § 551(4)).

In *Perez v. Mortgage Bankers Association*, the Supreme Court outlined the three-step procedure that 5 U.S.C. § 533 of the APA prescribes for notice and comment rulemaking.  "First, the agency must issue a 'general notice of proposed rule making,' ordinarily by publication in the Federal Register." *Id.* at 1203 (quoting 5 U.S.C. § 533(b)).  "Second, if 'notice [is] required,' the agency must 'give interested persons an opportunity to participate in the rule making through submission on written data, views, or arguments.'" *Perez*, 135 S. Ct. at 1203 (quoting 5 U.S.C. 5 U.S.C. § 533(c)).  At that stage, "[a]n agency must consider and respond to significant comments received during the period for public comment." *Perez*, 135 S. Ct. at 1203 (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *Thompson v. Clark*, 741 F.2d 401, 408 (D.C. Cir. 1984)).  "Third, when the agency promulgates the final rule, it must include in the rule's test 'a concise general statement of [its] basis and purpose.'" *Perez*, 135 S. Ct. at 1203 (quoting 5 U.S.C. 5 U.S.C. § 533 (c)).

Here, however, Plaintiffs appear to be challenging HHS's continued delegation to the ASB in light of the ASOP's impact on the HIPF.  "When an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment." *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 629 (5th Cir. 2001) (quoting *Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d

1030, 1084 (D.C. Cir. 1999)).   In other words, "the APA requires an agency to provide an opportunity for notice and comment before substantially altering a well established regulatory interpretation." *Shell Offshore Inc.*, 238 F.3d at 629.

The Court has already found that Plaintiffs have sufficiently stated that ASOP 49, as enforced through the actuarial soundness requirement and the HIPF, results in a substantial alteration of the HIPF's text. *See supra*, *e.g.*, Section III.A.1.a.i; III.B.2.a.i.   Therefore, the Court finds that Plaintiffs sufficiently alleged, at this stage, that HHS has significantly revised its interpretation of the HIPF, as it integrates the ASOP 49, without providing the requisite notice-and-comment period. Therefore, Defendants' Motion to Dismiss Count Three is **DENIED**.

ii.   Counts Two and Five: Whether Implementation of the HIPF is Entitled to *Chevron* Deference, and Whether HHS's Decision to Rely on ASOP 49 Was Arbitrary and Capricious

In Count Two, Plaintiffs seek declaratory relief under 5 U.S.C. § 706 that "the delegation by [HHS] . . . of ultimate decision-making authority to the [ASB] on whether States must pay their Medicaid and CHIP [MCOs] the [HIPF] is arbitrary and capricious and not otherwise in accordance with law." Am. Compl. ¶ 52, ECF No. 19.   Defendants argue that to the extent "Plaintiffs also allege that requiring that managed care rates comply with the ASOP was arbitrary and capricious," their claim "fails because Plaintiffs offer no more than a 'conclusory statement' that this decision was arbitrary and capricious.'" Defs.' Br. Supp. Mot. 24, ECF No. 27 (citing *Iqbal*, 556 U.S. at 678).

Plaintiffs argue that "Defendants' decision to run the consequences of the HIPF, an unprecedented multi-billion dollar tax, through a pre-ACA rule promulgated in 2002, instead of

46

addressing it separately, is arbitrary and capricious."[7]  Pls.' Resp. 24–25, ECF No. 29.  Plaintiffs

further allege that "while Defendants may prefer to employ a one-size-fits-all 'actuarial soundness'

rule to all Medicaid plans, that preference cannot override the multiple legal and constitutional

problems with the result."  *Id*. at 25.  Plaintiffs conclude that "this is especially so where the

operational result of Defendants' status quo work, as it does here, to *alter the text of Congress* by

shifting the full liability for the HIPF from MCOs to Plaintiff States."  *Id*. (emphasis added).

Plaintiff States conclude that they should not be "required to anticipate that a pre-ACA regulation

(42 C.F.R. § 438.6), coupled with a post-ACA ASOP, would effectively shift the HIPF burden to

the States—something different from what Congress expressly said."  *Id*. at 18.

The parties dispute whether *Chevron* applies, and for purposes of resolving this Motion, the

Court assumes its does.  *See, e.g.*, Defs.' Br. Supp. Mot. 22, ECF No. 27; Pl.'s Resp. 25, ECF No.

29; *see also Chevron U.S.A. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984).  To determine whether

agency action was arbitrary or capricious, a court must consider "whether the decision was based

on a consideration of the relevant factors and whether there has been a clear error of judgment."

*Tex. Comm. on Nat. Res. v. Wan Winkle,* 197 F. Supp. 2d 586, 596 (N.D. Tex. 2002) (Means, J.)

(citing *Sierra Club v. Dombeck*, 161 F. Supp. 2d 1052, 1064 (D. Ariz. 2001); *Marsh v. Or. Nat. Res.*

*Council*, 490 U.S. 360, 378 (1989)).  "The burden of proving that an agency decision was arbitrary

or capricious generally rests with the party seeking to overturn the agency decision."  *Tex. Comm*.,

197 F. Supp. 2d at 596.  '"If the decision reached by the agency 'represents a reasonable

---

[7] Plaintiffs do not appear to plead in this claim that the HIPF is conclusively a "tax." While generally referring to their DJA and APA claims elsewhere, Plaintiffs state, "That the HIPF should be *treated* as an excise tax for administrative purposes doesn't change the fact that it is a fee." Pls.' Resp. 8, ECF No. 29. As the Court has already stated, the Court need not decide at this early stage where the HIPF is a "fee" or a "tax." *See supra* Section III.A.2.b.

accommodation of conflicting policies that were committed to the agency's care by statute, we should not disturb it unless it appears that the accommodation is not one that Congress would have sanctioned.'" *Id.* (quoting *Chevron*, 467 U.S. at 844; *United States v. Shimer*, 367 U.S. 374, 383 (1961)). "In applying this standard, courts generally look at 'whether the decision was based on a consideration of relevant factors, whether there has been a clear error of judgment and whether there is a rational basis for the conclusions approved by the administrative body.'" *Tex. Comm.*, 197 F. Supp. at 596 (citing *Mobil Oil v. Dep't of Energy*, 610 F.2d 796 (Em. App. 1979).

Here, by asserting that HHS has "alter[ed] the text of Congress by shifting the full liability for the HIPF from MCOs to Plaintiff States," the Court finds that Plaintiffs have sufficiently alleged at this stage that HHS has acted arbitrarily or capriciously, such that the decision to rely on ASOP 49 in enforcing the HIPF may not be an "accommodation . . . that Congress would have sanctioned" or a "reasonable" decision by the Secretary of HHS. *Tex. Comm.*, 197 F. Supp. at 596; *Chevron*, 467 U.S. at 844. Accordingly, Defendants' Motion to Dismiss is **DENIED** as to Count Two. Because the Court finds that at this preliminary stage, that if *Chevron* were to apply, that Plaintiffs have stated a claim, the Court need not analyze at this stage whether implementation of the HIPF is subject to *Chevron* deference. Therefore, the Court **DEFERS** ruling on Count Five as to Plaintiff's statutory claim until trial. *See* Fed. R. Civ. P. 12(i).

## IV.   CONCLUSION

Based on the foregoing, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (ECF No. 26) is **GRANTED in part and DENIED in part**. In summary, Defendants' Motion is: (1) **DENIED** as to Count One; (2) **DENIED** as to Count Two; (3) **DENIED** as to Count Three; (4) **DENIED** as to Count Four; (5) **DEFERRED in part** and **DENIED in part** as to Count Five; (6)

**DENIED** as to Count Six; (7) **GRANTED** as to Count Seven; (8) **DENIED** as to Count Eight; (9)

**DENIED** as to Count Nine; and (10) **GRANTED in part and DENIED in part** as to Count Ten.

    **SO ORDERED** on this **4th day** of **August, 2016**.


Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

49