## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## WICHITA FALLS DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 7:15-cv-00151-O** |
| | § | |
| **UNITED STATES OF AMERICA, et al.,** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION AND ORDER

This case is about the lawfulness of a tax in the Patient Protection and Affordable Care Act ("ACA") and of a regulation that the United States Department of Health and Human Services ("HHS") uses to implement it. The ACA imposed a tax on medical providers but exempted the states from paying it. Notwithstanding Congress's direction in the ACA, the HHS regulation effectively requires the states to pay this tax. Plaintiffs now challenge both the tax and the regulation. Because Plaintiffs have standing to challenge both, the Court must decide the legality of each.

The Court concludes that the challenged ACA tax is lawful, offending neither the structure nor substance of the Constitution. But the HHS regulation violates the non-delegation doctrine, delegating to a private entity the authority to decide who must pay this tax. Pursuant to that unlawful delegation, the private entity decreed that the states must pay this tax, contrary to Congress's express directive. HHS's unlawful delegation enabled a private entity to effectively rewrite the ACA, wrongfully forcing Plaintiffs to pay this tax. It is therefore the regulation—not the tax—that harms Plaintiffs. For the reasons that follow, the Court will **GRANT in part** Plaintiffs' claims challenging the regulation and declare the offending regulation "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction,

1

authority, or limitations, or short of statutory right . . . ." 5 U.S.C. § 706(2)(B)–(C). The Court will **DENY** Plaintiffs' claims challenging the tax.[1]

Accordingly, having considered the motions, related briefing, and applicable law, the Court finds that Plaintiffs' Motion for Summary Judgment (ECF No. 53) should be and is hereby **GRANTED in part and DENIED in part**; and Defendants' Motion for Summary Judgment (ECF No. 62) should be and is hereby **GRANTED in part and DENIED in part**.[2]

## I.   BACKGROUND

Plaintiffs (alternatively, "Plaintiff States") are the States of Texas, Indiana, Kansas, Louisiana, Nebraska, and Wisconsin. Am. Compl. 1, ECF No. 19. Defendants are the United States

---

[1] Before the Court are Plaintiffs' Motion for Summary Judgment and Brief and Appendix in Support (ECF Nos. 53–54), filed January 6, 2017; Defendants' Motion for Summary Judgment and Response in Opposition to Plaintiffs' Motion for Summary Judgment and Brief and Appendix in Support (ECF Nos. 62–63), filed June 5, 2017; Plaintiffs' Reply in Support of their Motion for Summary Judgment and Response in Opposition to Defendants' Motion for Summary Judgment (ECF No. 66), filed June 23, 2017; and Defendants' Reply in Support of their Motion for Summary Judgment (ECF No. 67), filed July 13, 2017. Defendants filed an additional Response to Plaintiffs' Motion for Summary Judgment (ECF No. 64) that appears identical to the Brief in Support of Defendants' Motion for Summary Judgment (ECF No. 63).

Also before the Court are Defendants' Motion to Strike Plaintiffs' Expert Designations and Brief in Support (ECF Nos. 68–69), filed July 13, 2017; Plaintiffs' Motion to Strike Defendants' Experts Golden and Truffer and Brief in Support (ECF Nos. 70–71), filed July 13, 2017; Plaintiffs' Response in Opposition to Defendants' Motion to Strike (ECF No. 72), filed August 3, 2017; Defendants' Response in Opposition to Plaintiffs' Motion to Strike (ECF No. 73), filed August 3, 2017; Plaintiffs' Reply in Support of their Motion to Strike (ECF No. 74), filed August 9, 2017; and Defendants' Reply in Support of their Motion to Strike (ECF No. 75), filed August 17, 2017.

On October 25, 2017, the lead counsel for Plaintiffs and Defendants appeared at a hearing on their motions and presented oral arguments. Elec. Min. Entry, ECF No. 81. On November 1, 2017, the Court ordered supplemental briefing on the timeliness of Plaintiffs' Administrative Procedure Act claims. Nov. 1, 2017 Order, ECF No. 82. The parties filed supplemental briefs. Before the Court are Plaintiffs' Supplemental Brief in Support of their Motion for Summary Judgment (ECF No. 83), filed November 13, 2017; Defendants' Response to Plaintiffs' Supplemental Brief in Support of their Motion (ECF No. 84), filed November 22, 2017; and Plaintiffs' Supplemental Reply in Support of their Motion (ECF No. 86), filed November 27, 2017.

[2] The Court finds that Defendants' Motion to Strike Plaintiffs' Expert Designations (ECF No. 68) should be and is hereby **DENIED** because Plaintiffs' challenged experts are qualified under Rule 702. *See* Fed. R. Ev. 702. The Court finds that Plaintiffs' Motion to Strike Defendants' Experts (ECF No. 70) should be and is hereby **DENIED** because Defendants' failure to comply with Rule 26(a) was harmless. *See* Fed. R. Civ. P. 26(a).

of America (the "Government"); the United States Department of Health and Human Services; Alex Azar, in his official capacity as Secretary of HHS[3]; the United States Internal Revenue Service (the "IRS"); and David Kautter, in his official capacity as Acting Commissioner of the IRS.[4] *Id.* at 1–2. Plaintiffs allege that Defendants, in violation of the ACA, the Administrative Procedure Act (the "APA"), and the United States Constitution, require them to pay the ACA's Health Insurance Providers Fee (the "HIPF") to the managed care organizations (the "MCOs") who contract with them to service their Medicaid recipients. *Id.* at 3–19.

In the ACA, Congress expressly exempted states from paying the HIPF. ACA § 9010(c)(2)(B) (2010); *see* 26 C.F.R. § 57.2(b)(2)(ii)(B). This effectively changed in March of 2015, when the Actuarial Standards Board (the "ASB")—a private organization that sets practice standards for private actuaries certified by the American Academy of Actuaries (the "AAA")—enacted Actuarial Standard of Practice Number 49 ("ASOP 49").[5] ASOP 49 forbids AAA actuaries from certifying any Medicaid contract between a state and an MCO *unless* the contract *requires* the state to pay the HIPF to the MCO. *See* ASOP 49 § 3.2.12(d).[6] Without this AAA certification, the Centers for Medicare & Medicaid Services ("CMS")—a component of HHS—will not approve

---

[3] Plaintiffs initially sued Sylvia Burwell in her official capacity as Secretary of HHS. *See* Compl., ECF No. 1. On January 24, 2018, the United States Senate confirmed Alex Azar as Secretary of HHS. Daniella Diaz, *Senate Confirms HHS Secretary Nominee Alex Azar*, CNN POLITICS (Jan. 24, 2018, 3:01 PM), https://www.cnn.com/2018/01/24/politics/alex-azar-confirmation-department-of-health-and-human-services/index.html.

[4] Plaintiffs initially sued John Koskinen in his official capacity as Commissioner of the IRS. *See* Compl., ECF No. 1. Commissioner Koskinen left the office at the completion of his term on November 12, 2017, and pursuant to a Presidential designation, Acting Commissioner David Kautter assumed the office as an interim replacement. Alexis Leonidis, *White House Names Treasury's David Kautter as Interim IRS Head*, BLOOMBERG POLITICS (Oct. 26, 2017, 8:36 AM), https://www.bloomberg.com/news/articles/2017-10-26/white-house-names-treasury-s-david-kautter-as-interim-irs-head.

[5] ACTUARIAL STANDARDS BOARD, *Actuarial Standard of Practice No. 49: Medicaid Managed Care Capitation Rate Development and Certification* (Mar. 2015), http://www.actuarialstandardsboard.org/wp-content/ uploads/2015/03/asop049_179.pdf.

[6] AAA actuaries must keep all ASOPs or face professional discipline. Pls.' App. 197, 1102, ECF No. 54-1.

the MCO contract. *See* 42 C.F.R. § 438.6(c)(1)(i)(A)–(C) (2002) [hereinafter "the Certification

Rule"].[7] If CMS does not approve the contract, the state becomes ineligible for Medicaid funding.

*See* 42 U.S.C. § 1396b(m)(2)(iii). The end result is that by delegating this certification power to

the ASB, HHS effectively requires states to pay the HIPF—even though Congress exempted them

from doing so—or risk losing Medicaid funds.[8]

The ACA, the HIPF, and the Certification Rule interact with several public health

programs. The first of these programs actually began in 1965, when Congress enacted, and

President Lyndon Johnson signed into law, the Medicaid program. *See* Social Security

Amendments Act of 1965, Pub. L. 89-97, 79 Stat. 286 (1965). Medicaid subsidizes states to

provide healthcare to low-income families; children; related caretakers of dependent children;

pregnant women; people aged 65 years and older; and adults and children with disabilities. *See*

42 U.S.C. §§ 1396–1396w. To receive Medicaid subsidies, states must provide coverage to a

federally mandated category of individuals according to a federally approved state plan. *See*

42 U.S.C. § 1396a; 42 C.F.R. §§ 430.10–430.12. Plaintiffs participate in the program, providing

Medicaid services and receiving Medicaid subsidies. *See* 79 Fed. Reg. 3385. Plaintiffs provide

these services at substantial cost. *See, e.g.*, Pls.' App. 1168–74, ECF No. 54-1. For example, in

2015 Texas spent 28.6% of its budget on Medicaid, serving 4.06 million Texans—around one in

seven members of its population.[9] The other Plaintiff States likewise provide Medicaid to millions

---

[7] The Certification Rule is now codified at 42 C.F.R. §§ 438.2–438.4.
[8] The states also contract with MCOs to deliver Child Health Insurance Program ("CHIP") services, and another HHS regulation requires an AAA actuary to certify CHIP MCO contracts in accordance with the Certification Rule. *See* 42 C.F.R. § 457.1203. States must therefore pay the HIPF in their CHIP MCO contracts as well, or risk losing CHIP funding. Because Medicaid and CHIP operate virtually identically in respect to this litigation, all references to Medicaid shall also include CHIP.
[9] TEXAS HEALTH AND HUMAN SERVS. COMM'N, TEXAS MEDICAID AND CHIP IN PERSPECTIVE: 11TH ED., 1–5 (Feb. 2017), *available at* https://hhs.texas.gov/sites/default/files//documents/laws-regulations/reports-presentations/2017/medicaid-chip-perspective-11th-edition/11th-edition-complete.pdf.

of their citizens at the cost of a considerable portion of their annual budgets. *See* Pls.' Br. Supp. Summ. J. 8 n.23–29, ECF No. 54 (citing data) [hereinafter "Pls.' Br."].[10]

When Plaintiffs first began implementing the Medicaid program, they primarily relied on fee-for-service providers ("FFSPs") to deliver Medicaid services. *See* Pls.' App. 120, 133, 291, 485, 1008, 1162–63, ECF No. 54-1. Over time, however, Plaintiffs discovered that managed care organizations were more efficient and less expensive. *See, e.g.*, *id.* at 120. In a managed care arrangement, the state enters into a contract with an MCO, wherein the MCO agrees to deliver healthcare services to citizens of the state, and in exchange, the state pays the MCO a fixed monthly fee per covered individual, known as a "capitation rate." *Id.* at 1168.

In order to realize the benefits and savings of managed care, Plaintiffs began a long-term transition from FFSPs to MCOs. *See id.* at 120, 133, 291, 485, 1008, 1162–63. Texas began this transition in 1993. *Id.* at 1006. By the end of 2005, 40% of Texas's Medicaid beneficiaries received services through MCOs, and by 2012, that percentage reached 80%. *Id.* at 1007. When Plaintiffs filed this suit in 2015, Texas MCOs served around 87% of Texas's Medicaid population. *Id.* Texas anticipates that this year MCOs will serve 93% of its Medicaid population. *Id.* at 1007–08. Each Plaintiff now provides a substantial portion of their Medicaid services through MCOs. *See id.* at 120, 133, 291, 485, 1008, 1162–63.[11] Plaintiffs have saved hundreds of millions of dollars by transitioning to MCOs. *See id.* at 121, 133–34, 291–92, 493–94, 1010, 1163. In January 2015,

---

[10] In 1997, Congress enacted, and President Bill Clinton signed into law, the CHIP program. *See* Balanced Budget Act of 1997, Pub. L. 105-33, 111 Stat. 251. CHIP subsidizes states to provide healthcare to certain uninsured children and pregnant women. *See* 42 U.S.C. § 1397aa. Plaintiffs participate in CHIP, providing CHIP services and receiving CHIP subsidies. *See* 79 Fed. Reg. 3385. Plaintiffs provide CHIP services to hundreds of thousands of children and pregnant women at substantial cost to each of their annual budgets. *See* Pls.' Mot. Supp. Summ. J. 8 n.21–29, ECF No. 54 (citing data).

[11] Plaintiffs primarily use MCOs to deliver CHIP services as well. *See, e.g.*, Pls.' App. 133, 291, 1009, ECF No. 54-1.

HHS announced in a press release—titled "Better Care. Smarter Spending. Healthier People: Why It Matters"—that it too would transition to MCOs. *Id.* at 13–14.

In 1981, Congress passed, and President Ronald Reagan signed into law, legislation requiring MCO capitation rates to be "actuarially sound." Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, 95 Stat. 357, 814 (1981) (codified at 42 U.S.C. § 1396b(m)(2)(A) (1981)).[12] HHS did not interpret the meaning of "actuarially sound" until 2002, when it promulgated the Certification Rule. This rule defined "actuarially sound" in the following way:

> (i) *Actuarially sound capitation rates* means capitation rates that—
> (A) Have been developed in accordance with generally accepted actuarial principles and practices;
> (B) Are appropriate for the populations to be covered, and the services to be furnished under the contract; and
> (C) Have been certified, as meeting the requirements of this paragraph (c), by actuaries who meet the qualification standards established by the American Academy of Actuaries and follow the practice standards established by the Actuarial Standards Board.

*See* 42 C.F.R. § 438.6(c)(i)(A)–(C) (2002) (emphasis in original). Thus, under the Certification Rule, "actuarially sound capitation rates" are capitation rates certified by an AAA actuary who, following the ASB's practice standards, determines that the rate has "been developed in accordance with generally accepted actuarial principles and practices." *Id.*

The AAA is a private, membership-based professional organization that exists to set qualification, practice, and professional standards for credentialed actuaries.[13] The AAA sets these standards through the ASB, another independent, private organization.[14] The ASB establishes and

---

[12] Congress also authorized the HHS Secretary to promulgate rules and regulations to implement the actuarial-soundness requirement. *See* 42 U.S.C. § 1302(a).

[13] *About Us*, AMERICAN ACADEMY OF ACTUARIES, http://www.actuary.org/content/about-us.

[14] *How Does The Academy Maintain Standards of Professionalism for Actuaries?*, AMERICAN ACADEMY OF ACTUARIES, http://www.actuary.org/content/how-does-academy-maintain-standards-professionalism-actuaries.

improves standards of actuarial practice by enacting Actuarial Standards of Practice ("ASOPs") to identify what AAA actuaries should consider, document, and disclose when performing an actuarial assignment.[15] In 2005, the AAA defined "actuarially sound" capitation rates as including *inter alia* state taxes—but not federal taxes.[16] In 2013, the ASB enacted ASOP 1, explaining that "the phrase 'actuarial soundness' has different meanings in different contexts . . . ."[17]

In 2010, Congress passed, and President Barack Obama signed into law, the ACA. The Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119–1025 (2010). The ACA requires health insurance providers who are "covered entities" to pay the HIPF to the IRS. *See* ACA § 9010. A covered entity must pay a portion of the HIPF proportionate to the provider's share of net premiums for the previous year. *See id.* The first HIPF payments came due on September 30, 2014. Pls.' App. 96, ECF No. 54-1. The total amount of the fee for all covered entities combined was $8 billion in 2014 and increased to $14.3 billion in 2018. *See* 26 C.F.R. § 57.4(a)(3). Advocates for enacting the HIPF argued that the ACA would increase enrollment for MCOs, that this increase would significantly raise profits, and that the MCOs would pay the HIPF out of their increased profits. *See* Pls.' App. 19, ECF No. 54-1.[18]

The ACA explicitly excludes states from the definition of "covered entities," thereby exempting them from paying the HIPF. ACA § 9010(c)(2)(B). Because the ACA protects states from paying the HIPF, Plaintiffs did not initially pay the HIPF in their capitation rates when the

---

[15] *About ASB*, ACTUARIAL STANDARDS BOARD, http://www.actuarialstandardsboard.org/about-asb/.

[16] AMERICAN ACADEMY OF ACTUARIES, *Health Practice Council Practice Note: Actuarial Certification of Rates for Medicaid Managed Care Programs* (Aug. 2005), http://www.actuary.org/files/publications/Practice_Note_Actuarial_Certification_Rates_for_Medicaid_Managed_Care_Programs_aug2005.pdf.

[17] ACTUARIAL STANDARDS BOARD, *Actuarial Standard of Practice No. 1: Introductory Actuarial Standard of Practice* (Mar. 2013), http://www.actuarialstandardsboard.org/wp-content/uploads/2013/10/asop001_170.pdf.

[18] Certain MCOs are exempt from the HIPF, including non-profit MCOs that receive more than 80 percent of their gross revenues from federal government programs targeting low-income, elderly, or disabled populations. *See* 26 C.F.R. § 57.2(b)(2)(iii).

7

IRS first began collecting the HIPF from MCOs in 2014. *See* Pls.' App. 1168–70, ECF No. 54-1 ("For fiscal year 2014, Texas did not include [the HIPF] in its appropriations . . . Texas did not reimburse MCOs for the 2014 HIPF until fiscal year 2015."). In 2014, private actuaries—following the AAA's 2005 definition of "actuarially sound" and the ASB's 2013 definition in ASOP 1—certified those MCO contracts, and HHS approved them. In October of 2014, HHS issued a guidance document stating its belief that the states should include the HIPF in their MCO capitation rates.[19] But HHS did not say that the Certification Rule required states to pay the HIPF. *See* 2014 MCO Guide (explaining that states have "flexibility" to pay the HIPF through retroactive adjustments to their capitation rates, provided the initial and subsequent capitation rates are "actuarially sound").

Then in March 2015, the ASB enacted ASOP 49, which stated:

> The actuary should include an adjustment for any taxes, assessments, or fees that the MCOs are required to payout [sic] of the capitation rates. If the tax, assessment, or fee is not deductible as an expense for corporate tax purposes, the actuary should apply an adjustment to reflect the costs of the tax.

ASOP 49 § 3.2.12(d). Since the HIPF is a non-deductible tax,[20] ASOP 49 effectively required states to pay MCOs the full amount of the HIPF in their capitation rates, because an AAA actuary could no longer certify the capitation rate as actuarially sound unless it did so. In September 2015, HHS issued a guidance document embracing ASOP 49 and declaring that the Certification Rule required AAA actuaries to certify that state capitation rates met ASOP 49's requirements.[21]

---

[19] U.S. DEP'T OF HEALTH AND HUMAN SERVS., CTRS. FOR MEDICARE & MEDICAID SERVS., MEDICAID AND CHIP FAQS: HEALTH INSURANCE PROVIDERS FEE FOR MEDICAID MANAGED CARE PLANS (Oct. 2014) [hereinafter "2014 MCO Guide"], *available at* https://www.medicaid.gov/federal-policy-guidance/downloads/faq-10-06-2014.pdf.

[20] ACA § 9010(f); 26 C.F.R. § 57.8.

[21] U.S. DEP'T OF HEALTH AND HUMAN SERVS., CTRS. FOR MEDICARE & MEDICAID SERVS., 2016 MEDICAID MANAGED CARE RATE DEVELOPMENT GUIDE (Sept. 2015) [hereinafter "2015 MCO Guide"], *available at* https://www.medicaid.gov/medicaid/managed-care/downloads/2016-medicaid-rate-guide.pdf.

After the ASB enacted ASOP 49, the states capitulated, included the HIPF in their capitation rates, and budgeted for the HIPF. *See* Pls.' App. 137, 1164, 1170, ECF No. 54-1. In 2015, Texas appropriated $79,685,024.00 to pay the HIPF for fiscal year 2014, $16,906,502.00 for fiscal year 2015, and $244,219,902.00 for fiscal years 2016 and 2017. *Id.* at 1170–72. Over the next decade, the federal government will collect between $13 and $14.9 billion in HIPF revenue from the combined payments of all fifty states.[22]

On October 22, 2015, Plaintiffs filed suit, attacking the lawfulness of the HIPF itself, as well as the Certification Rule that enabled the ASB to impose the HIPF on the states through ASOP 49. Compl, ECF No. 1.[23] Plaintiffs seek various injunctive and declaratory remedies to relieve them from the burden of paying the HIPF. *See* Am. Compl. 27–29, ECF No. 19.[24]

## II.    LEGAL STANDARD

### A.    Federal Rule of Civil Procedure 56(a)

The Court may grant summary judgment where the pleadings and evidence show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant must inform the Court of the basis of its motion and demonstrate from the

---

[22] *See* John D. Meerschaert and Mathieu Doucet, *PPACA Health Insurer Fee: Estimated Impact on State Medicaid Programs and Medicaid Health Plans*. MILLIMAN CLIENT REPORT, Jan. 31, 2012, at 2–3, *available at* https://kaiserhealthnews.files.wordpress.com/2012/02/ppaca-health-insurer-fee-estimated-impact-on-medicaid.pdf.

[23] In accordance with Plaintiffs' Amended Complaint and summary judgment briefing, the Court interprets the HIPF's "implementing rule" to be 42 C.F.R. § 438.6 (2002) (recodified at 42 C.F.R. §§ 438.2–438.4).

[24] The Court granted Defendants' motion to dismiss Plaintiffs' claim for a HIPF refund but allowed the remaining claims to proceed. Aug. 4, 2016 Order 48–49, ECF No. 34.

record that no genuine dispute as to any material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When reviewing the evidence on a motion for summary judgment, the Court must decide all reasonable doubts and inferences in the light most favorable to the non-movant. *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). The court cannot make a credibility determination in light of conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255. If there appears to be some support for disputed allegations, such that "reasonable minds could differ as to the import of the evidence," the Court must deny the motion. *Id.* at 250.

## III.    ANALYSIS

Plaintiffs move for summary judgment, claiming that: (1) the statutory provision enacting the HIPF violates Article I's Spending Clause and the Tenth Amendment [the "HIPF claims"]; and (2) the Certification Rule violates Article I's Vesting Clause, the APA, and the ACA [the "Certification Rule claims"]. *See* Pls.' Br. 21–42, ECF No. 54. Defendants also move for summary judgment on all counts, claiming that: (1) Plaintiffs lacks Article III standing; (2) sovereign immunity bars Plaintiffs' Certification Rule claims; (3) the Anti-Injunction Act (the "AIA") bars Plaintiffs' HIPF claims; (4) the HIPF is valid under Article I's Taxing Clause; and (5) the Certification Rule is valid under *Chevron*. *See* Defs.' Br. Supp. Mot. Summ. J. 9–50, ECF No. 63 [hereinafter "Defs.' Br."]. The Court will address each of these arguments in turn, beginning with the preliminary question whether there is subject matter jurisdiction to consider any of Plaintiffs' claims.

### A.    Subject Matter Jurisdiction

Article III confines the federal judicial power to "cases" and "controversies." U.S. CONST. art. III, § 2. The case or controversy requirement ensures that the federal judiciary respects "the

proper—and properly limited—role of the courts in a democratic society." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (quotation marks omitted). The Court must first assess jurisdiction, for "without proper jurisdiction, a court cannot proceed at all . . . ." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 84 (1998). The party invoking federal jurisdiction must demonstrate that a constitutional case or controversy exists as to each claim asserted. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Defendants argue that: (1) there is no Article III case or controversy here because Plaintiffs either have no injury, manufactured the injury, or request remedies that will not redress the injury; (2) the AIA bars Plaintiffs' HIPF claims because their requested remedies would enjoin the collection of federal taxes; and (3) sovereign immunity bars Plaintiffs' Certification Rule claims because Plaintiffs brought them outside the APA's six-year statute of limitations. Defs.' Br. 9–21, ECF No. 63.

### 1.    Article III Standing

The Court will first consider whether Plaintiffs have Article III standing. To establish Article III standing, a plaintiff must show: (1) an injury in fact that is (2) fairly traceable to the defendant's challenged conduct, and that (3) a favorable judicial decision will likely redress the injury. *Lujan*, 504 U.S. at 560–61. A plaintiff must support each standing element "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 53 n.2 (2006). To determine whether Plaintiffs have standing here, the Court will evaluate the State of Texas and its claims.

### a.    Injury in Fact

A plaintiff must show that it has suffered an "injury in fact," which is "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560). For an injury to be "concrete" it must "actually exist," meaning it is "real" and "not abstract." *Spokeo*, 136 S. Ct. at 1548. For an injury to be "particularized" it must "affect the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548. Defendants argue that the Certification Rule did not injure Plaintiffs because it imposed no monetary cost and preserved an economically sustainable MCO market. *See* Defs.' Br. 14–16, ECF No. 63. Plaintiffs argue that the Certification Rule—in conjunction with ASOP 49—injured them by requiring them to pay the HIPF in violation of the ACA. *See* Pls.' Br. 12–14, ECF No. 54.

ASOP 49 requires Texas to pay the HIPF in its MCO capitation rates in order to obtain a private actuarial certification, ASOP 49 § 3.2.12(d), and the Certification Rule prevents CMS from approving any MCO contract without this certification. *See* 42 C.F.R. § 438.6(c)(1)(i)(A)–(C) (2002); *see also* Defs.' App. 155, ECF No. 63-1 ("[T]he state actuary *must* certify the rates or rate ranges . . . *After ensuring . . . that it contains the rate certification* . . . the [CMS Regional Office] forwards the contract package to [CMS]." (emphasis added)). The Certification Rule therefore gives Texas two choices: include the HIPF in its capitation rates or lose Medicaid funds. *See* 42 U.S.C. § 1396b(m)(2)(iii).[25] In response to this Hobson's choice, Texas appropriated millions of dollars to pay the HIPF. *See* Pls.' App. 1170–72, ECF No. 54-1 This injury is real and affects Texas as an individual state. Texas has shown an injury-in-fact.

---

[25] On December 18, 2015, Congress enacted a one-year moratorium on collecting the HIPF in 2017. Consolidated Appropriations Act, 2016, Pub. L. No. 114-133, 129 Stat. 2242, 3037–38 (2015). This moratorium is no longer in effect.

"Once injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from" the injurious action. *Texas v. United States*, 809 F.3d 134, 155–56 (5th Cir. 2015), *as revised* (Nov. 25, 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam) (quotation marks omitted). The benefits of an injury only negate standing in unique circumstances where "[t]he costs and benefits [arise] out of the same transaction." *Id.* at 156 (citing *Henderson v. Stalder*, 287 F.3d 374, 379–81 (5th Cir. 2002) (holding that taxpayers could not demonstrate a monetary injury-in-fact where the state produced a pro-life license plate and required users of the license plate pay an additional fee that covered its costs)). Without this "tight[ ] nexus," the Court will not consider whether the benefits resulting from an injury negate standing. *See id.* (citing *Henderson*, 287 F.3d at 379–81).

Defendants argue that unless Texas includes the HIPF in its MCO capitation rates, its MCO contracts will be—in an objective sense—actuarially unsound and financially unsustainable. *See* Defs.' Br. 15, ECF No. 63.[26] Even if this were true, the potential benefit of contracting with MCOs at some distant point in the future—because the MCOs did not bear the burden of the HIPF and consequently did not go out of business—does not arise "out of the same transaction" as Texas's 2015 HIPF payments. *Cf. Texas*, 809 F.3d at 156; *Henderson*, 287 F.3d at 379–81. The Court finds that any future benefit to paying the HIPF does not negate Texas's injury-in-fact.

b.      *Fairly Traceable to Defendants' Challenged Conduct*

---

[26] Notwithstanding this contention, Defendants simultaneously maintain that Plaintiffs could soften the burden of the HIPF by bargaining with the MCOs, i.e., by pressuring the MCOs either to lower their capitation rates outright or to become non-profits to reduce costs and thereby reduce rates. *See* Defs.' Br. 12, 14, ECF No. 63. Defendants cannot have it both ways. Either an economically sound MCO market requires Plaintiffs to pay the full amount of the HIPF, or Plaintiffs can bargain with and thereby convince MCOs to pass on less of the HIPF in their capitation rates. In any case, the fact remains that Congress declared that the states should not pay the HIPF. As such, forcing Plaintiffs to pay the HIPF in violation of this Congressional command is an injury-in-fact.

A plaintiff's injury must also be "fairly traceable" to the challenged action. *Lujan*, 504 U.S. at 561. Plaintiffs here challenge the Certification Rule (42 C.F.R. § 438.6(c)(1)(i)(A)–(C) (2002)) and the HIPF (ACA § 9010(f)). Defendants argue that Plaintiffs' claimed injury is not fairly traceable to the HIPF because Plaintiffs can avoid the HIPF entirely by transitioning back to FFSPs, HIPF-exempt non-profit MCOs, or some combination of the two. Defs.' Br. 9–14, ECF No. 63. Plaintiffs contend that HIPF-exempt MCOs alone cannot provide adequate Medicaid coverage to everyone in the state, and that transitioning back to FFSPs would be costly and harmful to them and their Medicaid recipients. Pls.' Br. 12–19, ECF No. 54.

"[T]he possibility that a plaintiff could avoid injury by incurring other costs does not negate standing." *Texas*, 809 F.3d at 156–57. In *Texas*, the plaintiff states challenged the federal government's DAPA[27] program that gave lawful presence to 4.3 million illegal aliens. *Id.* at 148. Because DAPA would have required the plaintiff states to incur significant costs by issuing driver's licenses to DAPA beneficiaries, the Fifth Circuit held that the plaintiff states suffered an injury-in-fact. *Id.* at 155. The Government argued that these costs were not "fairly traceable" to DAPA because "the state[s] could avoid injury by not issuing licenses to illegal aliens or by not subsidizing its licenses." *Id.* at 156. The Fifth Circuit emphatically rejected this argument. It noted that while Texas could avoid financial loss by requiring applicants to pay the full cost of the licenses, "it could not avoid injury altogether." *Id.* The threat of paying the cost of the licenses would coerce the Texas into changing its laws—which is itself a harm. *See id.* Holding that Article III does not require a state government to change its laws to avoid an injury, the Fifth Circuit explained:

> Indeed, treating the availability of changing state law as a bar to standing would deprive states of judicial recourse for many *bona fide* harms. For instance, under that theory, federal preemption of state law could never be an injury, because a

---

[27] Deferred Action for Parents of Americans and Lawful Permanent Residents. *Texas*, 809 F.3d at 146.

> state could always change its law to avoid preemption. But courts have often
> held that states have standing based on preemption. And states could offset
> almost any financial loss by raising taxes or fees. The existence of that
> alternative does not mean they lack standing.

*Id.* at 156–57 (footnotes omitted).

Defendants employ the same impermissible argument here. They contend that Plaintiffs could avoid the HIPF entirely by transitioning to FFSPs and HIPF-exempt MCOs. Defs.' Br. 9–14, ECF No. 63. But such a transition would require Texas to alter its Medicaid contracts, restructure its Medicaid appropriations, and reshape its Medicaid policies. *Texas* holds that Article III's case or controversy requirement does not oblige a plaintiff state to make such changes. *Cf.* 809 F.3d at 156–57.

Defendants also claim that Plaintiffs have manufactured their injury because every year after Congress passed the ACA, Plaintiffs increasingly moved away from FFSPs toward MCOs. Defs.' Br. 11–13, ECF No. 63.[28] While it is true that Texas is increasing its reliance on MCOs, it is doing so as part of a long-term transition that predates the ACA and the 2002 Certification Rule. In 1993, in order to realize the superior benefits of managed care, Texas began to transition from FFSPs to MCOs. *See* Pls.' App. 1006–08, ECF No. 54-1. Now Texas provides somewhere between 80% and 93% of its Medicaid services through MCOs. *See id.* at 1007–08.[29] Defendants have not shown that Texas transitioned to MCOs to manufacture an injury.[30]

---

[28] Defendants here essentially argue that Plaintiffs failed to mitigate the harm. Failure to mitigate is an affirmative defense that the defendant must plead in his answer. *E.E.O.C. v. Serv. Temps Inc.*, 679 F.3d 323, 334 n.30 (5th Cir. 2012). Defendants have not done so here. *See* Ans. 16–17, ECF No. 43.

[29] Moreover, HIPF payments did not come due until September 30, 2014, and the ASB did not enact ASOP 49 until 2015. During this five-year period, the Certification Rule did not require Texas to account for the HIPF in its capitation rates. Accordingly, from 2010 to 2015, Texas continued its transition toward managed care without the expectation that doing so would require it to pay the HIPF.

[30] While advancing this theory, Defendants at one point mischaracterized the evidence and erroneously claimed that Louisiana began transitioning to MCOs in 2016, Defs.' Br. 12, ECF No. 63, when Louisiana's transition to MCOs actually began in 2012. Pls.' App. 300, ECF No. 54-1.

Defendants also argue—erroneously—that under *Texas*, "an injury is self-inflicted and insufficient to confer standing where, as here, a federal policy leaves the option to 'achieve[ ] their policy goal in myriad ways.'" Defs.' Br. 13 n.8, ECF No. 63 (quoting *Texas*, 809 F.3d at 159). Defendants reach this conclusion by quoting a portion of the *Texas* opinion comparing the harm caused by DAPA to the manufactured harm in *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976). *See id.* In *Pennsylvania*, the plaintiff states challenged the defendant states' laws increasing taxes on nonresident income. 426 U.S. at 661–64. Because the plaintiffs gave their residents credits for taxes paid to other states, the defendants' tax increases also increased the plaintiffs' tax credits, causing the plaintiffs to lose revenue. *Id.* The Supreme Court held that this injury was self-inflicted because the plaintiff states established their tax credits knowing that the credits could fluctuate based on the tax decisions of other states. *See id.* at 664. "[T]he plaintiff states in *Pennsylvania v. New Jersey* could have achieved their policy goal in myriad ways, such as basing their tax credits on residents' out-of-state incomes instead of on taxes actually paid to other states." *Texas*, 809 F.3d at 159. In other words, "the pressure that Pennsylvania faced to change its laws was self-inflicted." *Id.* at 157 n.63. *Texas* did not hold that plaintiff states, who have done nothing to inflict harm on themselves, must change their laws to avoid a harm if there are "myriad ways" to do so.[31]

Not only does *Texas* not require a state to change its laws to avoid a harm, Plaintiffs have shown that they are unable to do so here. First, Texas cannot rely exclusively on HIPF-exempt non-profit MCOs because Texas already contracts with all of the HIPF-exempt MCOs in the state and those MCOs are incapable of servicing the entire state alone. *See* Pls.' App. 1043–44, ECF No. 54-1 ("[U]ltimately non-profit coverage of every county's population is not feasible."). And even if it were possible for Texas to rely entirely on the few HIPF-exempt MCOs operating in

---

[31] Such an exception would swallow the rule, because in practically every area of legislation, states have "myriad ways" to change their laws without compromising their overarching policy goals.

Texas, doing so would be risky. Because the healthcare market is in a state of flux, *see* Pls.' App. 122, ECF No. 54-1, there is a danger that some of those MCOs might leave the market, which would cause many people to lose Medicaid services entirely.

Nor can Texas avoid their injury by transitioning back to FFPSs. Plaintiffs have saved hundreds of millions of dollars by moving to MCOs. *See* Pls.' App. 121, 133–34, 291–92, 493–94, 1010, 1163, ECF No. 54-1. Texas reduced its healthcare costs by six percent in the year 2013 alone. *See id.* at 1010. Returning to FFPSs would therefore substantially increase healthcare and administrative costs for Texas. *See id.* It would injure Texas's citizens, as managed care now provides better healthcare services to its Medicaid recipients. *See id.* And it would take time. As Plaintiffs' counsel observed at the summary judgment hearing, it took Texas more than two decades to switch to MCOs, and switching back to rely exclusively on FFSPs would take years. *See* October 25, 2017 Hr'g Tr. 10:14–22, ECF No. 85.[32] During this transition, the Certification Rule—in conjunction with ASOP 49—would still require Texas to pay the HIPF.

With these facts in mind, Texas has even bleaker options here than it did in the *Texas* case. In *Texas*, the Government claimed that the plaintiff states could avoid an injury by changing their laws to stop subsidizing driver's licenses. *Texas*, 809 F.3d at 156. Here, the Government claims that Plaintiff States could avoid paying millions of dollars to cover the HIPF by changing their laws to pay millions of dollars to transition over many years back to an outdated healthcare model.[33] Texas will pay a significant monetary price no matter what choice it makes.

For these reasons, Defendants' citation to *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) is inapposite. In *Clapper*, respondents asserted that they suffered ongoing injuries fairly

---

[32] Louisiana fully transitioned to MCOs within six years. Pls.' App. 291, ECF No. 54-1. The length of transition back to FFSPs for each Plaintiff would likely depend on a host of factors and circumstances.
[33] Recognizing the superiority of managed care, even the Government is transitioning from FFSPs to MCOs. Pls.' App. 13–14, ECF No. 54.

traceable to a surveillance statute because the threat of surveillance required them to take "costly and burdensome measures to protect the confidentiality of their communications." 568 U.S. at 415. The Supreme Court rejected this argument and held that a plaintiff "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.* at 416. As the analysis above demonstrates, this case is readily distinguishable. Here, the harm of paying the HIPF is neither future nor hypothetical; it is certain and has already happened. And Plaintiff States have not inflicted the harm on themselves.

Finally, Defendants argue that Plaintiffs' theory of standing has no principled limit because it would allow states to sue the federal government for any tax that resulted in a downstream increase in the cost of Medicaid. Defs.' Br. 10, ECF No. 63. The Court is unpersuaded by this argument, as the Fifth Circuit considered and rejected an almost identical argument in *Texas*. 809 F.3d at 161–62 ("The United States submits that Texas's theory of standing is flawed because it has no principled limit. In the government's view, if Texas can challenge DAPA, it could also sue to block . . . any federal policy that adversely affects the state . . . ."). The Court's finding of standing in this case announces no new interpretations of, or exceptions to, the Supreme Court's standing doctrines, and as such, it does not undermine Article III's case or controversy requirement in any way.

There is therefore no genuine dispute of material fact that the HIPF—as imposed on the states through the Certification Rule and ASOP 49—injures the Plaintiffs, and that to avoid this injury Plaintiffs would have to change their laws and incur additional costs—both of which constitute additional, independent injuries. Because the Court finds that Plaintiffs' injury is not manufactured, Plaintiffs' injury is fairly traceable to Defendants' challenged conduct: the HIPF and the Certification Rule.

18

### c. *Redressable by Favorable Judicial Decision*

Plaintiffs must show that a favorable judicial decision will likely redress their injury. *Lujan*, 504 U.S. at 561. To redress an injury, the judicial remedy must "personally . . . benefit [the plaintiff] in a tangible way . . . ." *Warth v. Seldin*, 422 U.S. 490, 508 (1975). Defendants have injured Plaintiffs by legally coercing them into paying the HIPF—a tax from which Plaintiffs are statutorily exempt. *See supra* Part III.A.1.a–b. To redress this injury, Plaintiffs ask the Court to invalidate the HIPF and the Certification Rule. Am. Compl. 27–29, ECF No. 19. The Court will next consider whether these requested remedies, if granted, will likely redress Plaintiffs' injury.

First, if the Court invalidates the HIPF, the Government will no longer be able to collect the HIPF from MCOs. Plaintiffs would then be free to stop accounting for the HIPF in their MCO capitation rates, and private actuaries could certify those rates excluding the HIPF as actuarially sound under ASOP 49. *See* ASOP 49 § 3.2.12(d) (requiring capitation rates to include all non-deductible taxes). Private actuaries may ultimately withhold their certification, and CMS its final approval, for reasons unrelated to the HIPF. But the Certification Rule would no longer *require* Plaintiffs to pay the HIPF—as the ACA envisions—in order for Plaintiffs to obtain Medicaid funds. The Court finds that this remedy would redress Plaintiffs' injury.

Second, if the Court invalidates 42 C.F.R. § 438.6(c)(1)(i)(A)–(C) (2002)—the Certification Rule's interpretation of "actuarially sound" capitation rates—the law would no longer require Plaintiffs to pay the HIPF in their capitation rates in order to obtain CMS approval.[34] This remedy, like the one before it, would relieve Plaintiffs' legal obligation to pay the HIPF in order to receive Medicaid funds. This would also redress Plaintiffs' injury. Defendants argue that, even

---

[34] Invalidating the Certification Rule's definition of "actuarially sound" would also invalidate any guidance documents interpreting the Certification Rule, such as the 2014 and 2015 MCO Guides. *See supra* notes 19, 21.

without the Certification Rule, the statutory mandate that capitation rates be "actuarially sound" would still require Plaintiff States to include the HIPF in their rates. *See* Defs.' Br. 26, ECF No. 63. But the HIPF did not exist when Congress enacted the "actuarially sound" requirement in 1981, and when it enacted the ACA in 2010, Congress—presumably aware of the "actuarially sound" requirement—plainly exempted the states from paying this tax. *See* 42 U.S.C. § 1396b(m)(2)(A).

Finally, if the Court only invalidates 42 C.F.R. § 438.6(c)(1)(i)(C) (2002)—the portion of the Certification Rule requiring a private actuarial certification of MCO capitation rates—the law would give Plaintiffs freedom to negotiate to exclude the HIPF from their rates and give CMS freedom to approve those rates. Like the other remedies, the Court finds that this too would redress Plaintiffs' injury.

It might be objected that if the Court only invalidates 42 C.F.R. § 438.6(c)(1)(i)(C) (2002), there remains a possibility that CMS will conclude, on a case-by-case basis, that capitation rates excluding the HIPF have not "been developed in accordance with generally accepted actuarial principles and practices," as required by 42 C.F.R. § 438.6(c)(1)(i)(A) (2002). Indeed, HHS has stated in multiple guidance letters that it prefers for states to include the HIPF in their capitation rates. First, in 2014, HHS issued a guidance letter encouraging states to do so. *See* 2014 MCO Guide; *supra* note 19. Then in 2015, HHS issued another guidance letter, referencing its 2014 letter and reiterating its view that states should pay the HIPF. *See* 2015 MCO Guide; *supra* note 21. Moreover, CMS now uses ASOP 49 to make internal determinations on whether MCO capitation rates are actuarially sound. *See* Defs.' App. 156, ECF No. 63-1. If HHS prefers for states to pay the HIPF in their capitation rates, and CMS uses ASOP 49 to evaluate capitation rates, it is possible that CMS will ultimately disapprove future capitation rates that do not include the HIPF.

Notwithstanding this possibility, the Court nonetheless finds that invalidating 42 C.F.R. § 438.6(c)(1)(i)(C) (2002) would redress Plaintiffs' injury. The law explicitly exempts states from paying the HIPF, ACA § 9010(c)(2)(B) (2010), and the Court must "presume that agencies will follow the law." *Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1082 (9th Cir. 2010). The Court presumes, therefore, that CMS will not—in defiance of Congressional intention—condition Medicaid funds on whether Plaintiffs include the HIPF in their capitation rates.[35] CMS may continue to use ASOP 49 to make internal decisions whether capitation rates are "actuarially sound," but it cannot—and presumably will not—use ASOP 49 to ignore the ACA's statutory exemption and require Plaintiffs to pay the HIPF. Whether CMS will in due course approve every capitation rate excluding the HIPF is unclear from the facts before the Court—that it may do so in some or all cases is enough to establish redressability.

Plaintiffs also fall within the "procedural right" exception to the redressability requirement. Under this exception, "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7 (1992). For example, a person "living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld . . . ." *Id.* Similarly here, if the Court only invalidates 42 C.F.R. § 438.6(c)(1)(i)(C) (2002), Plaintiffs cannot establish with certainty that CMS will ultimately approve their capitation rates excluding the HIPF. But Plaintiffs assert a procedural right: their statutory exemption from paying the HIPF. ACA § 9010(c)(2)(B)

---

[35] Defendants have not rebutted this presumption with evidence showing that CMS is committed to disapproving any capitation rates excluding the HIPF as *ipso facto* contrary to "generally accepted actuarial principles and practices." 42 C.F.R. § 438.6(c)(1)(i)(A) (2002). Indeed, when the first HIPF payments came due in 2014, CMS approved such rates.

(2010); *see* 26 C.F.R. § 57.2(b)(2)(ii)(B). By challenging the Certification Rule's certification requirement, "plaintiffs are seeking to enforce a procedural requirement"—their HIPF exemption—"the disregard of which could impair a separate concrete interest of theirs"—namely, their interest in not paying the HIPF, changing their laws to budget for the HIPF, or raising taxes to fund the HIPF. *Cf. Lujan*, 504 U.S. at 572. Accordingly, even if the Court's invalidation of 42 C.F.R. § 438.6(c)(1)(i)(C) (2002) would not satisfy "normal standards for redressability," it would redress Plaintiffs' injury under *Lujan*.

There is therefore no genuine dispute of material fact that a favorable judicial decision invalidating either the HIPF or the Certification Rule would redress Plaintiffs' injury. The Court finds that Plaintiffs have shown redressability.

### d.    *Prudential Standing*

The Court also considers *sua sponte* whether Plaintiffs have satisfied prudential standing. The Supreme Court "interpreted § 10(a) of the APA to impose a prudential standing requirement in addition to the requirement, imposed by Article III of the Constitution, that a plaintiff has suffered an injury in fact." *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488 (1998). "For a plaintiff to have prudential standing under the APA, 'the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Id.* (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152 (1970)) (alterations in original). The "zone of interests" test applies "[i]n cases where the plaintiff is not itself the subject of the contested regulatory action," and it only "denies a right of review if the plaintiff's interests are . . . marginally related to or inconsistent with the purposes implicit in the statute . . . ." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399 (1987). This test is "not meant to be especially demanding" and the Court applies it in keeping

with Congress's intent that agency action is presumptively reviewable. *Texas*, 809 F.3d at 162 (quoting *Clarke*, 479 U.S. at 399).

Plaintiffs bring several APA claims challenging the Certification Rule's interpretation of "actuarially sound," which enabled the ASB to impose the HIPF on Plaintiffs. Am. Compl. 19–27, ECF No. 19. Plaintiffs are the subject of this contested regulatory action. *Cf. Clarke*, 479 U.S. at 399. And Plaintiffs' asserted interest—exemption from paying the HIPF—is within the zone of interests Congress meant to protect or regulate by enacting the HIPF, because the ACA expressly exempts states from paying the HIPF, and the Certification Rule allowed the ASB to nullify that exemption. *Cf. Nat'l Credit Union Admin.*, 522 U.S. at 488. Accordingly, the Court finds that there is no genuine dispute of material fact that Plaintiffs have prudential standing under the APA.

Because Plaintiffs have shown Article III and prudential standing, the Court **DENIES** Defendants' Motion for Summary Judgment (ECF No. 62) as to standing.

### 2. Anti-Injunction Act

The Court will next consider whether the AIA bars Plaintiffs claims. Defendants argue that the AIA deprives the Court of jurisdiction because Plaintiffs seek to prevent collection of a tax. Defs.' Br. 16–22, ECF No. 63. The AIA states, "[N]o suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). The AIA divests the court of jurisdiction over any claim—including constitutional claims—brought by any person that would affect the IRS's ability to assess and collect anyone's taxes. *See Alexander v. Americans United Inc.*, 416 U.S. 752, 759 (1974). Regardless of the HIPF's label as a "fee," because the ACA treats the HIPF as a tax for purposes of the Internal Revenue Code (the "IRC"), ACA § 9010(f)(1), the AIA applies to Plaintiffs' claims. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*,

567 U.S. 519, 544–45 (2012) [hereinafter *NFIB*] (concluding that the AIA applies to an exaction that the enacting statute treats as a tax for purposes of the IRC).[36] Because Plaintiffs' HIPF claims would restrain the assessment and collection of a tax, the Court must determine whether its jurisdictional bar extends to Plaintiffs' HIPF claims.

Plaintiffs claim that the AIA is inapplicable because states are not "person[s]" under the statute. Pls.' Reply 13, ECF No. 66. To determine whether Congress intended states to be "person[s]" under the AIA, the Court must begin with the text of the statute and ascertain its plain meaning by considering its language and design as a whole. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). The Court first considers whether the statute defines its terms. *Cf. United States v. Santos*, 553 U.S. 507, 511 (2008) (considering first the statutory definitions). The AIA itself does not define "person." *See* 26 U.S.C. § 7421. However, the AIA is codified in the IRC, and the IRC's general definitional provision states, "The term 'person' shall be construed to mean and *include* an individual, a trust, estate, partnership, association, company or corporation." 26 U.S.C. § 7701(a)(1) (emphasis added). When a statutory definition "includes" enumerated examples, those examples are illustrative, not exhaustive. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012). Because the list of entities in § 7701(a)(1) is illustrative, the IRC's definition section could include states as "person[s]" under the AIA.

"When a term is undefined, we give it its ordinary meaning." *Santos*, 553 U.S. at 511. A legal "person" is typically an entity "recognized by law as having the rights and duties of human beings." BLACK'S LAW DICTIONARY 1178 (9th ed. 2004); *see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1686 (1971) (defining "person" as "a human being, a body of

---

[36] Plaintiffs previously argued that the HIPF is a fee, not a tax, and the Court deferred a ruling on the issue. Aug. 4, 2016 Order 22–23, ECF No. 34. Plaintiffs now agree with Defendants that the HIPF is a tax. Pls.' Br. 3, ECF No. 54.

24

persons, or a corporation, partnership, or other legal entity that is recognized by law as the subject of rights and duties."). Because the law often recognizes states as having the rights and duties of human beings, the Court finds that "person[s]" under the AIA include states. *See, e.g.*, *Estate of Wycoff v. Comm'r*, 506 F.2d 1144, 1151 (10th Cir. 1974) (holding that the term "person" in § 7701(a)(1) includes the states); *see generally South Carolina v. Regan*, 465 U.S. 367 (1984) (assuming that states are persons under the IRC for purposes of the AIA). It also harmonizes with Supreme Court decisions holding that states are "persons" under other IRC provisions that do not explicitly define "person" to include states. *See Sims v. United States*, 359 U.S. 108, 112 (1959) (holding that 26 U.S.C. § 6332(b)'s definition of "person" applied to the State of West Virginia); *Ohio v. Helvering*, 292 U.S. 360, 368 (1934) (holding that 26 U.S.C. § 205's definition of "person" applied to the State of Ohio), *overruled on other grounds by Garcia v. San Antonio Met. Transit Auth.*, 469 U.S. 528 (1985). Accordingly, the Court finds that Congress intended the AIA to apply to the states.

Plaintiffs argue, however, that under *South Carolina v. Regan* the AIA does not bar their suit because they have no adequate, alternative judicial remedy to contest the HIPF. Pls.' Reply 12–13, ECF No. 66.[37] In *Regan*, South Carolina sought injunctive relief to protect its bondholders from an allegedly unconstitutional federal tax on state bond interest. 465 U.S. at 371. The Supreme Court held that the AIA did not bar South Carolina's suit. *Id.* at 381. First, the Supreme Court recognized that "Congress intended the [AIA] to bar a suit only in situations in which Congress had provided the aggrieved party with an alternative legal avenue by which to contest the legality of a particular tax." *Id.* at 373. Second, "Congress did not intend the [AIA] to apply where an

---

[37] Plaintiffs do not claim the AIA's statutory exceptions or the *Williams Packing* exception. *See* Pls.' Reply 12–13, ECF No. 54; *see also* 26 U.S.C. § 7421(a) (citing statutory exceptions to the AIA); *Enochs v. Williams Packing & Navigation Co., Inc.*, 370 U.S. 1, 7 (1962) (describing an exception to the AIA).

aggrieved party would be required to depend on the mere possibility of persuading a third party to assert [its] claims." *Id.* at 381. Because the federal government assessed the disputed tax against the bondholders and imposed no direct tax liability on South Carolina, the state had no legal forum to challenge the tax and had to depend on the mere possibility of persuading its bondholders to assert its claims. *Id.* at 380–81. The Supreme Court held that the AIA did not apply under these circumstances. *Id.*

However, an "alternative remedy" exists—and the AIA applies—where a plaintiff can seek judicial review of the tax in an alternative forum. *See id.* at 374–82 (citing cases holding that the AIA applies where plaintiffs can bring a refund suit); *see also Debt Buyers' Ass'n v. Snow*, 481 F. Supp. 2d 1, 10 (D.D.C. 2006) ("In this case, an alternative legal remedy exists . . . [because the plaintiff] will have a legal forum in the form of penalty-refund litigation . . . ."); *Nat'l Fed. Republican Assemblies v. United States*, 148 F. Supp. 2d 1273, 1283 (S.D. Ala. 2001) (finding the AIA does not apply because the taxpayer "does not have a 'pay and sue' option and cannot challenge a deficiency assessment in Tax Court").

Plaintiffs argue that because the Court dismissed their claim for a HIPF refund, they have no alternative remedy and therefore fall under the *Regan* exception. Pls.' Reply 12, ECF No. 66. The Court agrees. Under the ACA, the sole avenue for challenging the HIPF is a "civil action[ ] for refund" by a covered MCO. ACA § 9010(f)(1). Plaintiffs cannot challenge the HIPF under the ACA because they are states, not MCOs. Plaintiffs therefore have no alternative judicial remedy beyond the present action. Apart from the *Regan* exception, Plaintiffs would be "required to depend on the mere possibility of persuading [the MCOs] to assert [their] claims." *Regan*, 365 U.S. at 381.

Defendants respond that Plaintiffs have an alternative remedy because (1) they could have challenged the Certification Rule when HHS enacted it in 2002 or (2) they could have petitioned HHS to amend the Certification Rule to exempt Plaintiffs from paying the HIPF. Defs.' Reply 8, ECF No. 67. Defendants' first argument fails because at the time HHS enacted the Certification Rule, the HIPF did not exist, and moreover, Plaintiffs could not have anticipated that a federal agency, HHS—much less a private organization, the ASB—would require them to pay a tax that Congress expressly exempted them from paying. Defendants' second argument fails because petitioning an agency to change its regulation is not an alternative form of judicial review. *Cf. Regan*, 465 U.S. at 374–82 (concluding that the AIA does not apply if the plaintiff has no alternative judicial forum wherein to seek relief). The *Regan* exception is borne in part out of a due process concern for the availability of judicial review. *See id.* at 375 (explaining that the AIA does not violate due process because taxpayers can ordinarily bring a refund suit, and that "our conclusion might well be different if the aggrieved party ha[s] no access to judicial review" (quotation marks omitted)).

Finally, even if the AIA did apply in this case, it would only bar Plaintiffs' HIPF claims, not their Certification Rule claims. Plaintiffs challenge the Certification Rule on the ground that it shifted the financial burden of the HIPF from the MCOs to the states by requiring states to include the HIPF in their MCO capitation rates. Plaintiffs accordingly seek declaratory relief that the Certification Rule violates the APA and the U.S. Constitution. Pls.' Am. Compl. 27, ECF No. 19. Plaintiffs do not assert these Certification Rule claims or seek this declaratory relief "for the purpose of restraining the assessment or collection of any tax," 26 U.S.C. § 7421(a), but rather to ensure that the proper entity pays the full amount of the disputed tax.

The Court finds no genuine dispute of material fact that the *Regan* exception applies to Plaintiffs' HIPF claims and that the AIA does not apply to Plaintiffs' Certification Rule claims. Accordingly, the AIA does not deprive the Court of jurisdiction over any of Plaintiffs' claims. The Court **DENIES** Defendants' Motion for Summary Judgment (ECF No. 62) as to the AIA.

3.    Statute of Limitations

The Court will next consider whether Plaintiffs' APA claims are time-barred and therefore barred by sovereign immunity. The APA waives sovereign immunity for persons legally wronged, adversely affected, or aggrieved by "agency action," who seek non-monetary relief. 5 U.S.C. § 702; *see Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61 (2004). Because the APA lacks a specific statutory limitations period, APA challenges are "governed by the general statute of limitations provision of 28 U.S.C. § 2401(a), which provides that every civil action against the United States is barred unless brought within six years of accrual." *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1286 (5th Cir. 1997). Sovereign immunity bars any APA suit against an agency after this six-year period. *Id.* at 1287. This limitations period ordinarily begins to run when the agency publishes the regulation in the Federal Register. *Id.* But if the agency "applies" the rule to the plaintiff through "final" agency action, that application of the rule creates a new cause of action under the APA and triggers a new six-year limitations period. *See id.* at 1287–88; *see also Texas v. United States*, 749 F.2d 1144, 1146 (5th Cir. 1985) ("[A]dministrative rules and regulations are capable of continuing application . . . ."). Within this new six-year limitations period the plaintiff may challenge the agency's statutory and constitutional authority for applying the rule. *Dunn-McCampbell*, 112 F.3d at 1287–88.

Defendants argue that Plaintiffs' Certification Rule claims are time-barred because HHS published the Certification Rule in the Federal Register in 2002, the six-year limitations period

lapsed in 2008, and Plaintiffs filed suit seven years later in 2015. *See* Defs.' Br. 39–43, ECF No. 63. In response, Plaintiffs identify several agency actions that they contend are "final" actions that apply the Certification Rule to Plaintiffs and trigger a new six-year period, including most pertinently:

1.  On July 17, 2015, CMS approved Texas's MCO contract including the HIPF in its capitation rates pursuant to ASOP 49 because CMS determined that the contract complied with the Certification Rule.

2.  In September 2015, HHS released a guidance document that stated, "Actuaries are *required* to follow all Actuarial Standards of Practice; *particularly* . . . ASOP 49 (Medicaid Managed Care Capitation Rate Development and Certification). ASOP 49 . . . is especially relevant because it focuses on . . . the requirements under 42 C.F.R. § 438.6 [the Certification Rule]."

Pls.' Suppl. Br. 3–6, ECF No. 83 (emphasis added).

Defendants argue that these facts are insufficient to trigger a new six-year limitations period. *See* Defs.' Resp. Suppl. Br. 6–8, ECF No. 84. Specifically, Defendants argue that under *Dunn-McCampbell*, a new six-year limitations period only begins if Plaintiffs petition HHS to alter or rescind the Certification Rule, and HHS either denies the petition or enforces the Certification Rule in response to the petition. *See id.* at 2–4, 8–11. Because Plaintiffs never petitioned HHS, Defendants argue that the aforementioned agency actions were neither "final" nor "directly" applied to Plaintiffs. *See id.* at 5–7.

But *Dunn-McCampbell* did not, as Defendants claim, hold that an agency must act on a plaintiff's petition for relief from a rule in order for that action to be "final" and to "directly" apply

to the plaintiff. Rather, *Dunn-McCampbell* held that *any* "application of a rule to a party" triggers a new six-year limitations period, so long as it is "final." *See* 112 F.3d at 1287–88. *Dunn-McCampbell* cited three examples of final agency action applying a rule directly to a party: *Wind River*, *Public Citizen*, and *Texas*. *See id.* at 1287. In the first two examples—*Wind River* and *Public Citizen*—the plaintiffs petitioned the agency for relief from the regulation, and the agency denied the petition. *See Wind River Mining Corp. v. United States*, 946 F.2d 710, 715–16 (9th Cir. 1991); *Public Citizen v. Nuclear Regulatory Com'n*, 901 F.2d 147, 152–53 (D.C. Cir. 1990). *Dunn-McCampbell* concluded that such denials were "final" and "direct" agency actions against the plaintiff that "create[d] a new cause of action under the APA." 112 F.3d at 1287. In the third example—*Texas*—the plaintiff did not petition the agency for relief from the regulation; instead, the agency, in lieu of a third-party petition, issued an order requiring the plaintiff to comply with the regulation. *See Texas v. United States*, 730 F.2d 409, 411–12 (1984). *Dunn-McCampbell* concluded that this, too, was a "direct" and "final" agency action against the plaintiff triggering a new six-year limitations period. 112 F.3d at 1287.

Applying *Wind River*, *Public Citizen*, and *Texas*, the Fifth Circuit held that if Dunn-McCampbell "w[as] able to point to such an application of the regulations here, *or* if [it] had petitioned the National Park Service to change the 9B regulations and been denied," it could sue within six years of the agency's application of the rule or denial of the petition. *Id.* at 1287–88 (emphasis added). In other words, as long as the agency took "final" action directly against the plaintiff, that agency action—not the plaintiff's petition—created a new six-year limitations period. *See Dunn-McCampbell*, 112 F.3d at 1287–88. Because Dunn-McCampbell could not point to a single final agency action applying the contested regulation directly to it, the court held that its claims were time-barred. *See id.*

Since *Dunn-McCampbell*, the Supreme Court has clarified that "final agency action" exists under two conditions: "'First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).[38] Agency action satisfies the first *Hawkes* prong if it is no longer "advisory in nature" but is instead "definitive [in] nature." *Id.* at 1813–14. Agency action satisfies the second *Hawkes* prong if it "gives rise to 'direct and appreciable legal consequences' . . . ." *Id.* at 1814 (quoting *Bennett*, 520 U.S. at 178).[39] Under *Hawkes*, an agency's internal decision to collect debt payments from a debtor is "final" action against the debtor—even if the debtor has not petitioned the agency to suspend collection and the agency has not informed the debtor of its decision. *See Salazar v. King*, 822 F.3d 61, 64–72, 82–84 (2d Cir. 2016) (citing *Bennett*, 520 U.S. at 177–78). Moreover, an agency guidance document that reflects a "settled agency position" that the entire agency intends to follow in its enforcement of its regulations, and that gives "marching orders" to a regulated entity, is "final" agency action against the regulated entity—even if the document contains boilerplate denying its legal effect. *See Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1020–23 (D.C. Cir. 2000).

---

[38] The Fifth Circuit decided *Dunn-McCampbell* prior to *Bennett* and *Hawkes* and therefore applied the Supreme Court's then four-factor test to determine finality from *Abbott Labs. v. Gardner*, 387 U.S. 136 (1967). *See Dunn-McCampbell*, 112 F.3d at 1288 (citing *Abbott Labs.*, 387 U.S. at 149–53). *Bennett* subsequently "distilled" these four factors into "two conditions": whether the agency action is consummate and legally consequential. *Hawkes*, 136 S. Ct. at 1813 (quoting *Bennett*, 520 U.S. at 177–78).
[39] The Court's ultimate determination of finality is "'flexible' and 'pragmatic.'" *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011) (quoting *Abbott Labs.*, 387 U.S. at 149–50).

The undisputed evidence shows that HHS took at least three "direct, final agency actions" against Plaintiffs, triggering several new six-year statute of limitations periods. *Cf. Dunn-McCampbell*, 112 F.3d at 1287–88.

First, in July 2015, after Texas capitulated to ASOP 49 by including the HIPF in its MCO capitation rates, CMS sent a letter to the Texas Medicaid Director approving Texas's MCO contract because CMS determined that Texas had complied with the Certification Rule. Pls.' App. 513–14, ECF No. 54-1. CMS's approval of this MCO contract was neither tentative, interlocutory, nor advisory, but a consummate act that marked the conclusion of CMS's review process. *Cf. Hawkes*, 136 S. Ct. at 1813–14. CMS's approval also resulted in direct and appreciable legal consequences for Texas, namely, certifying the state's compliance with the Certification Rule, thereby entitling the state to receive Medicaid subsidies. *Cf. id.* Defendants argue that this approval letter is not "direct" and "final" agency action because it does not mention the state's compliance with ASOP 49 in particular—only with the Certification Rule in general. Defs.' Br. 42, ECF No. 63. But Plaintiffs are not challenging ASOP 49. Plaintiffs are challenging the Certification Rule, and CMS's approval letter constituted a "direct" and "final" agency action applying the Certification Rule to Texas. *Cf. Dunn-McCampbell*, 112 F.3d at 1287–88.

Second, Plaintiffs capitulated to ASOP 49 and paid the HIPF in their 2015 capitation rates. Pls.' App. 137, 1164, 1170, ECF No. 54-1. The Government then collected the HIPF from Plaintiffs' MCOs with the knowledge and expectation that Plaintiffs were paying the HIPF in order to comply with the Certification Rule. *See* 2015 MCO Guide (informing states that, in order to obtain an actuarial certification under the Certification Rule, they must follow ASOP 49 and pay the HIPF in their capitation rates). Therefore, when the Government collected the HIPF from Plaintiffs' MCOs, it consummated its decision to apply the Certification Rule and ASOP 49

directly to Plaintiff States, requiring Plaintiffs to pay the HIPF in order to receive Medicaid subsidies. *Cf. Salazar*, 822 F.3d at 64–72, 82–84 (holding that an agency's internal decision to continue collecting loans generates "legal consequences" for the borrowers, because it leaves the borrowers with a continuing "legal obligation to make payments" and the agency with continuing legal authority to "garnish wages or direct tax refund offsets"). This "final" action collecting the HIPF stands in marked contrast to the total agency and plaintiff inaction in *Dunn-McCampbell*, where the agency did not apply its regulation to plaintiff's property and where the existence of the regulation merely "deterred" plaintiff from leasing its property. *See Dunn-McCampbell*, 112 F.3d at 1285–86. Here, the Government's collection of the HIPF is more like the collection of a debt in *Salazar* than the total agency inaction in *Dunn-McCampbell*. This is "final" action directly applying the Certification Rule to Plaintiffs. *Cf. Hawkes*, 136 S. Ct. at 1813–14; *Dunn-McCampbell*, 112 F.3d at 1287–88.

Third, in September 2015, HHS released a guidance document (the "Guide") "for use in setting [capitation] rates . . . for any managed care program subject to the actuarial soundness requirements in 42 C.F.R. § 438.6 [the Certification Rule]." 2015 MCO Guide. The Guide purported to give "more detailed" guidance than prior documents in order to evoke "more consistent and complete" compliance from the states. *Id.* The Guide declared that HHS "expect[s]" states to include the "the information outlined in this guide" in their capitation rate proposals to CMS "so that CMS can determine . . . if the capitation rates are appropriate . . . ." *Id.* The Guide further decreed, "Actuaries are *required* to follow all Actuarial Standards of Practice; *particularly* . . . ASOP 49 (Medicaid Managed Care Capitation Rate Development and Certification)." *Id.* (emphasis added). As if to put a fine point on its definitive, normative embrace of ASOP 49, HHS identified ASOP 49 as "especially relevant" because it established what states

and MCOs must include in their capitation rates in order for actuaries to approve them as "actuarially sound" under the Certification Rule. *Id.* Moreover, the Guide did not even contain a pretext of boilerplate language denying its legal effect on the states. *See id.* It therefore reflected HHS's "settled position" on the meaning of the Certification Rule and, pursuant to that rule, gave "marching orders" to Plaintiff States to include the HIPF in their MCO capitation rates. *Cf. Appalachian Power Co.*, 208 F.3d at 1020–23. The Guide was neither tentative, advisory, nor remote in its application—rather, it was consummate and definitive, creating direct and immediate legal consequences for Plaintiff States. *Cf. Hawkes*, 136 S. Ct. at 1813–14. Accordingly, it constituted "final" agency action applying the Certification Rule directly to Plaintiffs. *Cf. Dunn-McCampbell*, 112 F.3d at 1287–88.

There is no genuine dispute of material fact that Plaintiffs filed suit on October 22, 2015, less than six years after HHS took at least three different "final" agency actions directly applying the Certification Rule to Plaintiffs. Because Plaintiffs' Certification Rule claims are not time-barred, the Court **DENIES** Defendants' Motion for Summary Judgment (ECF No. 62) as to sovereign immunity.

### B.    Non-Delegation Claim (Count V)

Having found jurisdiction, the Court will now consider Plaintiffs' substantive claims, beginning with Plaintiffs' Certification Rule claims (Counts II, III, and V) before moving to Plaintiffs' HIPF claims (Counts I, IV, VI, VIII, IX, and X). In first addressing Plaintiffs' Certification Rule Claims, the Court will begin with Plaintiffs' constitutional claim that the Certification Rule violates the non-delegation doctrine (Count V), then consider Plaintiffs' statutory claims that the Certification Rule violates the APA (Counts II, III, and V).

Plaintiffs argue that the Certification Rule gives the ASB and its actuaries "a discretionary veto" over CMS's approval of Plaintiffs' Medicaid contracts and is therefore an unconstitutional delegation of legislative power to a private entity. *See* Pls.' Br. 35–37, ECF No. 54. Defendants respond that the Certification Rule only gives the ASB and its actuaries an advisory role that is not a legislative delegation, but rather a permissible enlistment of technical expertise. *See* Defs.' Br. 34–38, ECF No. 63.[40]

### 1.     History and Usage of the Non-Delegation Doctrine

Because litigants infrequently invoke the non-delegation doctrine, a review of its history is in order. This doctrine stems from the very first clause of the Constitution, which reads: "All legislative Powers . . . shall be vested in a Congress of the United States." U.S. CONST. art. I, § 1, cl. 1. "The Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935); *see Wayman v. Southard*, 10 Wheat. 1, 42–43 (1825) (Marshall, C.J.). An essential legislative function is the establishment of "standards of legal obligation." *Schechter Poultry*, 295 U.S. at 530; *see Dep't of Transp. v. Ass'n of Am. R.R.s*, 135 S. Ct. 1225, 1242 (2015) (Thomas, J., concurring) (describing an essential legislative function as "the formulation of generally applicable rules of private conduct"). This structural feature of the Constitution—vesting Congress alone with the unalienable power to make prospective and generally applicable rules of conduct—exists to protect democratic deliberation, executive accountability, and individual liberty. *See Ass'n of Am. R.R.s*, 135 S. Ct. at 1237 (Alito, J., concurring) ("Our Constitution, by careful design, prescribes a process for making law, and within that process there are many

---

[40] The APA requires this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity . . . ." 5 U.S.C. § 706(2)(B).

accountability checkpoints. It would dash the whole scheme if Congress could give its power away to an entity that is not constrained by those checkpoints.").

The vesting of legislative power in a distinct political body is a stumbling block to modern intellectuals and a stone rejected by the builders of the federal bureaucracy, but it has been and remains a cornerstone in the constitutional architecture of free government. The fountainheads of Western jurisprudence—the Hebrew, Greek, and Roman civilizations—understood "that a ruler must be subject to the law in exercising his power and may not govern by will alone," a principle which "presupposes at least two distinct operations, the making of law, and putting it into effect." *Ass'n of Am. Railroads*, 135 S. Ct. at 1242 (Thomas, J., concurring) (quotation marks omitted) (describing the Greco-Roman origins of Western rule of law); *see generally* RUSSELL KIRK, THE ROOTS OF AMERICAN ORDER (4th ed. 2003) (describing the Hebraic origins of Western rule of law). Building on this ancient principle, the English formally separated the legislative and executive powers, with Parliament zealously guarding the legislative power from kingly encroachments. *See Ass'n of Am. Railroads*, 135 S. Ct. at 1242–43. By the time of the American Revolution, both John Locke and William Blackstone concluded that this separation was not merely convenient in avoiding tyranny, but a necessary feature of any government ruled by laws and not men. *See id.* at 1243–44. These ideas found an abiding voice in the United States Constitution. As James Madison explained,

> [T]he legislative, executive, and judiciary departments ought to be separate and distinct . . . No political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty, than [the separation of powers] . . . The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, selfappointed, or elective, may justly be pronounced the very definition of tyranny.

THE FEDERALIST NO. 47. The vesting of legislative power in Congress alone, and its corollary doctrine of non-delegation, is enshrined in our charter because the framers, drawing from the deep wells of their Western heritage, recognized it as an axiom of just government. *Cf.* THE FEDERALIST NO. 51 ("It may be a reflection on human nature, that such devices should be necessary to control the abuses of government. But what is government itself, but the greatest of all reflections on human nature?").

When Congress creates law, it must often delegate a degree of policy judgment to an administrative agency constitutionally vested with executive power and tasked with executing the law. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474–75 (2001) (quoting *Mistretta v. United States*, 488 U.S. 361, 416 (1989) (Scalia, J., dissenting)). Executive agency rulemaking may therefore at times resemble lawmaking, but an agency's exercise of policy judgment in applying the law is in actuality an executive function. *See City of Arlington v. F.C.C.*, 569 U.S. 290, 305 n.4 (2013) ("Agencies make rules . . . and conduct adjudications . . . and have done so since the beginning of the Republic. These activities take 'legislative' and 'judicial' forms, but they are exercises of—indeed, under our constitutional structure they must be exercises of—the 'executive Power.'"). In order to enforce the non-delegation doctrine, courts must distinguish between unlawful delegations of legislative power and lawful delegations of policy judgment. *See Marshall Field & Co. v. Clark*, 143 U.S. 649, 693–94 (1892) ("The first cannot be done; to the latter no valid objection can be made."); *see also Panama Ref. Co. v. Ryan*, 293 U.S. 388, 421 (1935) (holding that courts must make this distinction "if our constitutional system is to be maintained"). Courts infrequently enforce the doctrine because it is inherently difficult to draw this distinction and identify an unlawful legislative delegation by Congress to an executive agency. *See Ass'n of Am. R.R.s*, 135 S. Ct. at 1237 (Alito, J., concurring).

"When it comes to [a legislative delegation to] private entities, however, there is not even a fig leaf of constitutional justification. Private entities are not vested with 'legislative Powers.' Nor are they vested with the 'executive Power,' which belongs to the President." *Id.* at 1237 (Alito, J., concurring) (citations omitted). Legislative delegation to a private entity is not only easier to identify, it is "unknown to our law, and is utterly inconsistent with the constitutional prerogatives and duties of Congress." *Schechter Poultry*, 295 U.S. at 537. It is "legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others . . . ." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). Only a government, deriving its powers from the consent of the governed, may justly establish legal rules of conduct for the nation. *Cf. id.* ("[I]n the very nature of things, one person may not be intrusted with the power to regulate the business of another . . . .").

While legislative delegations to executive agencies threaten liberty by undermining democratic accountability and short-circuiting bicameralism and presentment, *Ass'n of Am. R.R.s*, 135 S. Ct. at 1237 (Alito, J., concurring), legislative delegations to private entities are even more dangerous. They create a double layer of unaccountability, whereby legislative power—rightly exercised only by Congress—is passed by Congress to an unelected agency, and then by the agency to an unelected private entity. That private entity is not subject to term limits, appropriations, impeachment, or removal, and neither holds a commission nor takes an oath to uphold the Constitution. *See id.* at 1235 (Alito, J., concurring) ("Both the Oath and Commission Clauses confirm an important point: Those who exercise the power of Government are set apart from ordinary citizens. Because they exercise greater power, they are subject to special restraints. There should never be a question whether someone is an officer of the United States . . . .").

Indeed, private lawmakers may, by virtue of their *sui generis*, quasi-public office, evade traditional avenues of judicial review. If private lawmakers are constitutional entities, they may enjoy sovereign immunity as quasi-governmental actors. *Cf. Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995) (observing that Amtrak, as a quasi-public entity, does not enjoy sovereign immunity from suit because a federal statute explicitly waives it). If so, aggrieved parties will be unable to challenge the private lawmaker's actions under the APA, because the plain text of the statute waives sovereign immunity for suits against an "agency"—not a private lawmaker. *See* 5 U.S.C. § 702. Moreover, even if it were possible to bring an APA claim against a private lawmaker, those suits would be time-barred in six years. *See* 28 U.S.C. § 2401(a). After the initial six-year limitations period lapsed, only subsequent action *by an agency* ratifying the private lawmaker's decision would make that decision reviewable. *See Dunn-McCampbell*, 112 F.3d at 1287. After six years, private lawmakers could alter the rights and duties of their fellow private citizens with impunity. These legal insulations from judicial scrutiny would create a powerful incentive for agencies, under the guise of seeking private expertise, to delegate increasing amounts of decision-making authority to private entities who could escape the constitutional check of litigation.

Private lawmaking is also incompatible with a free society. *Cf. State of Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116, 122 (1928) (holding that the exercise of private legislative authority over another person deprives that person of liberty without due process of law). Legislative delegation to private entities enables and incentivizes self-interested persons not to legislate for the common good, but to seek personal gain by placing arbitrary conditions on the liberty of their adversaries. *See Carter Coal*, 298 U.S. at 311 ("[I]t is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may

39

be and often are adverse to the interests of others in the same business."); *see also Schechter Poultry*, 295 U.S. at 537 ("[W]ould it be seriously contended that Congress could delegate its legislative authority to trade or industrial associations or groups so as to empower them to enact the laws they deem to be wise and beneficent for the rehabilitation and expansion of their trade or industries? . . . The answer is obvious."). It is true that private lawmakers may be "familiar with the problems of the[ ] enterprises" that they are tasked to regulate, but not only does this fail as a constitutional justification, *see Schechter Poultry*, 295 U.S. at 537, it creates an even greater moral hazard—a fact that only heightens the urgency of judicial correction. *See Carter Coal*, 298 U.S. at 311.

### 2.    The Certification Rule's Legislative Delegation

The following undisputed evidence demonstrates that the Certification Rule is a delegation of legislative power to a private entity in violation of Article I's Vesting Clause. First, Medicaid requires that capitation rates be "actuarially sound." *See* 42 U.S.C. § 1396b(m)(2)(A)(iii), (xiii). The Certification Rule then interprets this statutory provision in the following way:

> (i) *Actuarially sound capitation rates* means capitation rates that—
> (A) Have been developed in accordance with generally accepted actuarial principles and practices;
> (B) Are appropriate for the populations to be covered, and the services to be furnished under the contract; *and*
> (C) Have been *certified, as meeting the requirements of this paragraph (c), by actuaries who* meet the qualification standards established by the American Academy of Actuaries and *follow the practice standards established by the Actuarial Standards Board*.

42 C.F.R. § 438.6(c)(1)(i)(A)–(C) (2002) (emphasis added).

The Certification Rule defines one ambiguous phrase, "actuarially sound," with another ambiguous phrase, "generally accepted actuarial principles and practices." *Id.* While it does not define "generally accepted actuarial principles and practices," it requires a private entity—an AAA

actuary, who follows the practice standards of the ASB—to certify that a capitation rate meets "generally accepted actuarial principles and practices." *Id.* The Certification Rule therefore only allows HHS to approve a capitation rate as "actuarially sound" under the statute if one of the ASB's actuaries certifies—in accordance with the ASB's private interpretation of the Certification Rule— that the capitation rate satisfies "generally accepted actuarial principles and practices." *Id.* It follows, then, that the Certification Rule empowers the ASB to establish a controlling interpretation and definition of a legal condition to receiving Medicaid subsidies (the "rulemaking power"), and to prevent HHS from approving any capitation rate that deviates from this private legal standard (the "veto power").

The Certification Rule thus delegated two distinct and essential legislative functions: the power to establish prospective, generally applicable rules of conduct, and the power to veto executive action that does not comply with those rules. *See Ass'n of Am. R.R.s*, 135 S. Ct. at 1242 (Thomas, J., concurring) (describing an essential legislative function as "the formulation of generally applicable rules of private conduct"); *I.N.S. v. Chadha*, 462 U.S. 919, 952–53 (1983) (describing the veto of executive action as "legislative in its character and effect"). Each delegation violates Article I's exclusive vesting of "all" legislative power in Congress. U.S. CONST. art. I, § 1, cl. 1; *see Whitman*, 531 U.S. at 472 ("This text permits no delegation of those powers . . . .").

If there is any doubt that in 2002 the Certification Rule delegated legislative power to the ASB, the subsequent history of the ASB defining "actuarially sound" to exclude the HIPF, HHS approving MCO contracts without the HIPF, and the ASB then re-defining "actuarially sound" to include the HIPF, dispel it. First, in 2005, the AAA defined "actuarially sound" capitation rates as including *inter alia* state taxes—but not federal taxes. Pls.' App. 98, ECF No. 54-1; *see supra* note 16. Then in 2013, the ASB published ASOP 1, which declared, "[T]he phrase 'actuarial soundness'

has different meanings in different contexts . . . ." *Id.* at 99; *see supra* note 17. Perhaps because the ASB did not clearly require that capitation rates include federal taxes, or maybe because the ACA expressly excluded states from paying the HIPF,[41] in 2014, HHS assured states that they would have "flexibility" to decide whether to include the HIPF in their capitation rates. *See* 2014 HIPF Guide. Plaintiffs did not pay the HIPF when it first came due in 2014, and HHS approved their contracts. *See* Pls.' App. 1168–70, ECF No. 54-1.

But in March 2015, the ASB's "Medicaid Rate Setting and Certification Task Force"[42] changed course and promulgated ASOP 49, which stated:

> The actuary should include an adjustment for any taxes, assessments, or fees that the MCOs are required to payout [sic] of the capitation rates. If the tax, assessment, or fee is not deductible as an expense for corporate tax purposes, the actuary should apply an adjustment to reflect the costs of the tax.

ASOP 49 § 3.2.12(d). Since the HIPF is a non-deductible tax,[43] ASOP 49 effectively declared that states must reimburse MCOs the full amount of the HIPF in their capitation rates in order for AAA actuaries to certify their rates under the Certification Rule. HHS then embraced these new ASB standards for compliance with the Certification Rule and affirmed in a guidance document that the states must comply with them. *See* 2015 MCO Guide. The undisputed evidence accordingly shows that ASB has dictated prospective, generally applicable rules of conduct for meeting a legal condition to Medicaid subsidies. Indeed, because the Certification Rule delegates to the ASB power to prevent CMS from approving any MCO contract that deviates from its standards, HHS is obliged to follow the ASB's enactments—even when the ASB effectively rewrites the ACA, forcing the states to pay a tax when Congress has expressly forbidden the federal government to

---

[41] ACA § 9010(c)(2)(B); 26 C.F.R. § 57.2(b)(2)(ii).
[42] The Court observes that the ASB felt it appropriate to muster, not an "Advisory Committee," but a "Task Force," to generate a document that in many respects has the appearance, structure, and tenor of a statutory or regulatory enactment. *See* Pls.' App. 225–57, ECF No. 54-1.
[43] ACA § 9010(f); 26 C.F.R. § 57.8.

collect it from them. HHS's delegation of legislative power to the ASB therefore requires HHS to obey the ASB even over the express commands of Congress—which, in the final analysis, is the only proper legislative body in this entire scheme.

Defendants argue that the Supreme Court rejected a similar non-delegation claim in *Currin v. Wallace*, 306 U.S. 1 (1939). Defs.' Br. 35–36, ECF No. 63. In *Currin*, the challenged statute empowered the Secretary of Agriculture to designate tobacco markets for regulation, but provided that the Secretary's regulation would only go into effect if two-thirds of the tobacco growers in that designated market voted to approve the designation. *Id.* at 6. The Supreme Court held that this was not a legislative delegation. *Id.* at 15–16. Rather, Congress had "merely placed a restriction upon its own regulation by withholding its operation as to a given market 'unless two-thirds of the growers voting favor it.' . . . This is not a case where a group of producers may make the law and force it upon a minority . . . ." *Id.* at 15 (citing *Carter Coal*, 298 U.S. at 310, 318). The Supreme Court reached the same conclusion in a factually similar case decided the same term. *See United States v. Rock Royal Co-op.*, 307 U.S. 533, 574–78 (1939) (holding that "a requirement of such approval [by a private vote] would not be an invalid delegation" because "Congress had the power to put [the Secretary's] Order into effect without the approval of anyone" (citing *Currin*, 306 U.S. at 15)).

These cases are distinguishable. In *Currin* and *Rock Royal*, the private voters could not exercise their veto authority unless the Secretary acted first. The laws empowered the Secretary of Agriculture to take certain regulatory actions and only empowered private entities to veto those actions once the Secretary took the initiative to do them. By contrast here, the Certification Rule grants the ASB, a private entity, interpretive power to establish prospective, generally applicable standards for establishing actuarially sound capitation rates, as well as power to prevent (through

43

their private actuaries) CMS from approving any capitation rate proposal that does not abide by their binding standards. Importantly, the ASB's legislative powers operate on the states and the MCOs before HHS takes any action—indeed, independent of any HHS action—because the ASB enacts its rules, and their actuaries decide whether to certify an MCO contract pursuant to those rules, before the states even submit their MCO contracts to CMS for approval. Therefore, this case does not involve, as in *Currin* or *Rock Royal*, Congress empowering HHS to initially declare an MCO contract "actuarially sound," and then empowering the ASB to subsequently veto the agency's determination. This is instead a case of legislative delegation, where HHS has empowered the ASB to unilaterally and prospectively "make the law and force it upon" others. *Currin*, 306 U.S. at 15.[44]

Defendants also argue that the Certification Rule is not a legislative delegation because "CMS maintains and exercises complete authority to review all such contracts and rates and the actuarial soundness thereof, and approves or denies contracts and rates on the basis of its own review." Defs.' Br. 34–38, ECF No. 63 (citing Defs.' App. 154–59, ECF No. 63-1). Defendants cite several persuasive authorities holding that an agency does not delegate legislative power when it considers the advice of a private party in making its decisions—provided the agency retains ultimate authority to reject that advice. *See id.* at 34–38 (citing *Fisher v. Berwick*, 503 F. App'x 210, 214 (4th Cir. 2013); *Pittston Co. v. United States*, 368 F.3d 385, 395 (4th Cir. 2004); *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1488 (9th Cir. 1992); *Cospito v. Heckler*, 742

---

[44] The delegation discussions in *Currin* and *Rock Royal* may no longer be good law. To the extent those cases hold that a mere veto of executive action does not amount to private lawmaking power, a subsequent and landmark decision by the Supreme Court calls this conclusion into question. *See Chadha*, 462 U.S. at 952–53 (holding that the veto of executive action is "legislative in its character and effect"); *see also Ass'n of Am. R.R.s*, 135 S. Ct. at 1253–54 (Thomas, J., concurring) (identifying *Currin* and *Rock Royal* as "questionable precedents" that are "directly contrary" to *Chadha*, "discredited," and "lack[ing] any force"). Regardless, here HHS delegated more than the mere *ex post* veto power that was at issue in those cases.

F.2d 72 (3d Cir. 1984)). It is true that CMS conducts its own review to determine whether MCO capitation rates are "actuarially sound," but the Certification Rule plainly requires that the ASB's actuaries first certify those rates in order for CMS to approve them. *See* 42 C.F.R. § 438.6(c)(1)(i)(C) ("*Actuarially sound capitation rates* means capitation rates that . . . [h]ave been certified . . . by actuaries who . . . follow the practice standards established by the Actuarial Standards Board." (emphasis in original)). Moreover, Defendants' own expert testified that CMS will not review an MCO contract unless and until an actuary has certified it:

> *[T]he state actuary must certify the rates or rate ranges . . . Next*, a state sends a contract or contract amendment to the appropriate CMS Regional Office ("RO"), and the CMS actuarial review process begins. *After ensuring . . . that it contains the rate certification* . . . the RO forwards the contract package to the Center for Medicaid and CHIP Services (CMCS).

Defs.' App. 154–59 (Truffer Decl.), ECF No. 63-1 (e) (emphasis added). CMS will subsequently "render[ ] its own actuarial opinion as to whether the rates are actuarially sound," but only after a private actuary has certified them as such. *See id.* at 159. Truffer's testimony thus adheres to the Certification Rule's text and confirms its plain meaning, proving that CMS will only consider and approve an MCO contract *after* it is certified. And there is no evidence that CMS can or does entertain any MCO contract that is not certified by an AAA actuary.

The undisputed evidence therefore establishes that the ASB's private definition of "actuarial soundness" is, by virtue of the Certification Rule's legislative delegation, the baseline legal standard and regulatory floor that all MCO contracts must first clear to obtain CMS approval—regardless whether CMS erects additional or higher legal barriers in its own review process. CMS may disapprove an MCO contract that contains a private certification, but Truffer's testimony and the text of the regulation establish that CMS may not consider or approve an MCO

contract without one. The ASB's rulemaking and veto powers are therefore binding on CMS and not merely advisory.

Defendants further argue that ASOP 49 is advisory because a different ASOP—ASOP 41—provides that an actuary may permissibly deviate from an ASOP if the actuary "provid[es] an appropriate statement" of his rationale. Defs.' Br. 37 n.26, ECF No. 63. This argument also fails. ASOP 41 allows individual actuaries to establish their own prospective, generally applicable rules for setting capitation rates and—by the grace of the ASB—to use these rules to certify a capitation rate. Far from negating or diminishing the Certification Rule's initial delegation, this appears to constitute yet another delegation, now from a private organization (the ASB) to a private individual (an actuary).[45]

Finally, Defendants argue that HHS did not delegate legislative authority through the Certification Rule because the ASB and its actuaries are not "interested private parties" tasked with regulating business competitors. Defs.' Br. 37–38, ECF No. 63. It is true that Plaintiffs have not pointed to any evidence that the ASB and its actuaries "have a financial interest in the outcome of capitation-rate negotiations." *Id.* But even if they are unbiased, this does not, as Defendants contend, purge the legislative delegation of constitutional infirmity. Article I's Vesting Clause is a structural provision that prohibits legislative delegation with or without proof of an additional constitutional harm.[46] The legislative delegation itself is the harm. *See Whitman*, 531 U.S. at 472. ("In a delegation challenge, the constitutional question is whether the statute has delegated

---

[45] Even if the ASB abjured its legislative power in ASOP 41 (it did not), this would not cure the unlawful delegation. *See Whitman*, 531 U.S. at 472 (2001) ("The very choice of which portion of the power to exercise . . . would *itself* be an exercise of the forbidden legislative authority." (emphasis in original)).

[46] In an ironic turn, Defendants downplay the continuing authority of *Schechter Poultry* and *Carter Coal* by labeling them "*Lochner*-era cases," but then insist that *Carter Coal*'s non-delegation doctrine only applies where a legislative delegation also resembles economic class legislation. *See* Defs.' Br. 37–38, ECF No. 63.

legislative power to the agency.") The Court agrees that the delegation here could have been worse in both degree and effect, as the Supreme Court has previously struck down more extreme delegations. *See, e.g.*, *Schechter Poultry*, 295 U.S. at 529, 542 (striking down a private legislative delegation to enact "codes of fair competition" for business competitors); *Carter Coal*, 298 U.S. at 310–11 (striking down a private legislative delegation to enact labor regulations for business competitors). But it is not the quantitative volume of legislative delegation that establishes a constitutional violation; rather, the Constitution prohibits any delegation of what is qualitatively legislative power. *See* U.S. CONST. art. I, § 1, cl. 1 ("*All* legislative Powers . . . shall be vested in a Congress of the United States." (emphasis added)); *see also Whitman*, 531 U.S. at 472 ("[Article I] permits no delegation of [legislative] powers . . . .").

The Certification Rule raises constitutional questions "of the gravest character, and the court ha[s] given to them the most anxious and deliberate consideration." *Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*, 36 U.S. 420, 536 (1837). Upon such consideration, it is evident that "the Supreme Court has never approved a regulatory scheme that so drastically empowers a private entity," *Ass'n of Am. Railroads v. U.S. Dep't of Transp.*, 721 F.3d 666, 671 (D.C. Cir. 2013) (Brown, J.), and the text of the Constitution expressly forbids this Court from doing so. The Court finds that there is no genuine dispute of material fact that the Certification Rule delegated legislative power to private entities in violation of Article I's Vesting Clause. *See* U.S. CONST. art. I, § 1, cl. 1. Accordingly, the Court **GRANTS** Plaintiffs' Motion for Summary Judgment (ECF No. 53) as to their non-delegation claim in Count V and declares that 42 C.F.R. § 438.6(c)(1)(i)(C) is set aside as "contrary to constitutional right, power, privilege, or immunity . . . ." 5 U.S.C. § 706(2)(B). The Court **DENIES** Defendants' Motion for Summary Judgment (ECF No. 62) as to the non-delegation claim in Counts V.

### C.      APA Claims (Counts II, III, and V)

Plaintiffs allege that the Certification Rule violates the APA because: (1) it enabled the ASB to enact ASOP 49, thereby imposing the HIPF on the states; (2) it imposed the HIPF on the states without notice and comment, and (3) its imposition of the HIPF was arbitrary and capricious. Pls.' Br. 37–42, ECF No. 54.[47] Defendants respond that: (1) the Certification Rule is permissible under *Chevron* because Congress intended "actuarially sound" capitation rates to include taxes like the HIPF, and that interpretation is reasonable; (2) the Certification Rule always required paying the HIPF and therefore ASOP 49 did not require notice and comment; and (3) the imposition of the HIPF was not arbitrary and capricious. Defs.' Br. 43–50, ECF No. 63.[48]

### 1.      APA Statutory Authority Requirement

The Court will first consider whether the Certification Rule is a permissible interpretation of Medicaid's "actuarial soundness" requirement. "When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter . . . ." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). However, if "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*; *see also, e.g.*, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("[A]t the second step the court must defer to the agency's interpretation if it is

---

[47] The Court construes Plaintiffs' challenge to "agency action" in Count V as a challenge to the Certification Rule. *See* Pls.' Am. Compl. 22–23, ECF No. 19.

[48] The APA requires this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . ." 5 U.S.C. § 706(2)(A), (C).

'reasonable.'"). "[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer . . . ." *Chevron*, 467 U.S. at 844.

Medicaid requires MCO capitation rates to be "actuarially sound." 42 U.S.C. § 1396b(m)(2)(A)(iii), (xiii). Congress, however, did not define "actuarially sound." *See id.* The words "actuarially sound" indicate that Congress intended capitation rates to be economically sustainable according to principles of actuarial science. However, Congress did not identify what actuarial principles ought to govern MCO capitation rates or how HHS ought to apply them to individual MCO contracts.[49] Because it is not clear from the text of the statute what costs the states and MCOs must include in their capitation rates in order for those rates to be sound according to principles of actuarial science, the Court finds that the phrase "actuarially sound" is ambiguous. Accordingly, the Court defers to the agency's interpretation of "actuarially sound" so long as its interpretation is reasonable. *Cf. Chevron*, 467 U.S. at 842–43.

The Certification Rule interprets "actuarially sound" in the following way:

> (i) *Actuarially sound capitation rates* means capitation rates that—
> (A) Have been developed in accordance with generally accepted actuarial principles and practices;

---

[49] The Supreme Court has twice identified such a textual ambiguity as an unconstitutional legislative delegation. For example, in *Schechter Poultry*, the Supreme Court held that a law empowering an agency to enact "codes of fair competition" delegated legislative power because it did not guide the agency's discretion with the common law of unfair competition or a similarly intelligible principle. *See* 295 U.S. at 528–42. And in *Panama Refining*, the Supreme Court held that a law empowering the President to interdict petroleum sales that exceeded state law quotas delegated legislative power because it did not guide the President's discretion with a Congressional policy. *See* 293 U.S. 414–30. Courts continue to grapple with this abiding constitutional doctrine. A concurring opinion in the recent "travel ban" litigation held that a statute empowering the President to suspend any entry of aliens "detrimental to the interests of the United States," without a saving construction, would be a legislative delegation because the statutory language would not guide the President's discretion. *See Int'l Refugee Assistance Project v. Trump*, No. 17-2231, 2018 WL 894413, at *33–38 (4th Cir. Feb. 15, 2018) (Gregory, C.J., concurring). *But see* Josh Blackman, *The Travel Ban, Article II, and the Nondelegation Doctrine*, (Feb. 22, 2018, 9:00 AM) LAWFARE BLOG, https://www.lawfareblog.com/travel-ban-article-ii-and-nondelegation-doctrine ("There is, without question, an intelligible principle for the president to apply: The entry of the aliens must be 'be detrimental to the interests of the United States.'"). The Court will not address this issue because Plaintiffs do not claim that the "actuarially sound" language is a delegation. *See* Am. Compl. 19–29, ECF No. 19.

> (B) Are appropriate for the populations to be covered, and the services to be furnished under the contract; and
> (C) Have been certified, as meeting the requirements of this paragraph (c), by actuaries who meet the qualification standards established by the American Academy of Actuaries and follow the practice standards established by the Actuarial Standards Board.

42 C.F.R. § 438.6(c)(1)(i)(A)–(C) (2002) (emphasis in original). The Court finds that HHS reasonably concluded that "actuarially sound" capitation rates are those rates that accord with actuarial principles that rise to the level of a professional consensus in the field of actuarial science. *See* 42 C.F.R. § 438.6(c)(1)(i)(A). The Court also finds HHS reasonably concluded that "sound" capitation rates are those rates that are "appropriate" for their respective populations. *See* 42 C.F.R. § 438.6(c)(1)(i)(B). Accordingly, the Court finds that HHS's interpretation of Medicaid in 42 C.F.R. § 438.6(c)(1)(i)(A)–(B) is entitled to *Chevron* deference.

But HHS acted unreasonably when it concluded that "actuarially sound" capitation rates *must* be certified by an AAA actuary who follows the ASB's practice standards. *See* 42 C.F.R. § 438.6(c)(1)(i)(C). Just as courts must presume that a statute is constitutional, it is unreasonable for an agency to interpret a statute in a way that imputes to Congress an intent to violate the Constitution. *Cf. Adkins v. Children's Hosp. of the D.C.*, 261 U.S. 525, 544 (1923) ("This court, by an unbroken line of decisions from Chief Justice Marshall to the present day, has steadily adhered to the rule that every possible presumption is in favor of the validity of an act of Congress until overcome beyond rational doubt."). Because HHS's interpretation of "actuarially sound" in 42 C.F.R. § 438.6(c)(1)(i)(C) imputes to Congress an intent to unconstitutionally delegate legislative power to a private entity, *see supra* Part III.B, the Court finds that HHS's interpretation is unreasonable and not entitled to *Chevron* deference.

Accordingly, the Court finds that there is no genuine dispute of material fact that 42 C.F.R. § 438.6(c)(1)(i)(C) (2002) is "in excess of statutory jurisdiction, authority, or limitations, or short

of statutory right . . . ." 5 U.S.C. § 706(2)(C). The Court **GRANTS** Plaintiffs' Motion for Summary Judgment (ECF No. 53) as to their statutory interpretation claim in Count V and declares that 42 C.F.R. § 438.6(c)(1)(i)(C) is set aside as "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . ." 5 U.S.C. § 706(2)(C). The Court **DENIES** Defendants' Motion for Summary Judgment (ECF No. 62) as to the statutory interpretation claim in Counts V.

2.  <u>APA Notice and Comment Requirement</u>

The Court will next consider whether the Certification Rule violated the APA's requirement of notice and comment. The APA requires notice and comment prior to the enactment of a "rule." *See* 5 U.S.C. § 553. The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ." 5 U.S.C. § 551(4). "The notice-and-comment requirements apply . . . only to so-called 'legislative' or 'substantive' rules; they do not apply to 'interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice.'" *Lincoln v. Vigil*, 508 U.S. 182, 196 (1993).

It is undisputed that HHS promulgated the Certification Rule through notice and comment. The Court therefore finds that the Certification Rule does not violate the APA's procedural requirements. Plaintiffs argue that the Certification Rule violates the APA because it enabled the ASB to enact ASOP 49, and HHS—without notice and comment—formally embraced ASOP 49 in their 2015 MCO Guide. *See* Pls.' Br. 37–40, ECF No. 54. In that case, however, the Guide would violate the APA—not the Certification Rule. Accordingly, the Court **DENIES** Plaintiffs' Motion for Summary Judgement (ECF No. 53) as to Count III and **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 62) as to Counts III.

3.    APA Arbitrary and Capricious Requirement

The Court will next consider whether the Certification Rule was arbitrary and capricious. The Court determines whether an agency action is arbitrary and capricious "solely on the basis of the agency's stated rationale at the time of its decision." *Luminant Generation Co. v. U.S. E.P.A.*, 675 F.3d 917, 925 (5th Cir. 2012). Plaintiffs concede that they "don't challenge whether [the Certification Rule] was reasonable in 2002." Pls.' Reply 25, ECF No. 66. Therefore, Plaintiffs have not shown that the Certification Rule was arbitrary and capricious. The Court **DENIES** Plaintiffs' Motion for Summary Judgment (ECF No. 53) as to Count II and **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 62) as to Counts II.

### D.    Spending Clause Claims (Counts I, IV, and VIII)

The Court will next consider Plaintiffs' HIPF claims (Counts I, IV, VI, VIII, IX, and X), beginning with Plaintiffs' claim that the HIPF violates the Spending Clause (Counts I, IV, and VIII). Plaintiffs argue that the HIPF violates the Constitution's Spending Clause because the HIPF: (1) is impermissibly coercive; (2) fails to provide clear notice as a condition of federal funding; and (3) is unrelated to Medicaid. Pls.' Br. 21–28, ECF No. 54. Defendants argue that the HIPF does not violate the Spending Clause because: (1) Congress enacted the HIPF as a tax, not as a welfare program or as a condition on Medicaid; (2) the ASB imposed the HIPF on the states pursuant to long-standing Medicaid requirements; and (3) the HIPF reasonably relates to Medicaid by generating revenue for ACA programs. Defs.' Br. 24–28, ECF No. 63.

"The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the . . . general Welfare of the United States . . . ." U.S. CONST. art.

I, § 8, cl. 1.[50] There is no dispute that the HIPF is a tax. The question remains whether the HIPF is also a coercive, surprising, or unrelated condition on spending in violation of the Spending Clause.

1.    <u>Impermissibly Coercive</u>

The Court will first consider whether the HIPF is a coercive condition on spending. Plaintiffs claim that the threat of losing all of their federal Medicaid funds if they do not pay the HIPF makes the HIPF a coercive condition on spending. Pls.' Br. 25, ECF No. 54. Defendants respond that the HIPF is not a condition on Medicaid funding, and that even if it is a condition, it is not coercive under *NFIB*, 567 U.S. 519, because it is a tax, not a new welfare program. Defs.' Br. 24–27, ECF No. 63.

Congress may grant federal funds to the states and condition such grants upon the states "taking certain actions that Congress could not [otherwise] require them to take." *NFIB*, 567 U.S. at 576 (quotation marks omitted). But the Constitution places limits on Congress's power to use spending conditions to secure state compliance with federal objectives. *Id.* Important among them is the requirement that the states accept spending conditions "voluntarily." *Id.* at 577 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). "Congress may use its spending power to create incentives for States to act in accordance with federal policies. But when 'pressure turns into compulsion,' the legislation runs contrary to our system of federalism." *Id.* at 577–78 (quoting *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937)). "Respecting this limitation is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *Id.* at 577.

---

[50] The Court will hereinafter refer to the General Welfare Clause as the Spending Clause.

In *NFIB*, the Supreme Court considered whether the ACA's requirement that states dramatically expand Medicaid coverage[51] or forfeit all federal Medicaid funds was an unconstitutionally coercive condition on spending. *Id.* at 581–85. The Supreme Court invalidated the penalty for noncompliance, finding that "[t]he threatened loss of over 10 percent of a State's overall budget is economic dragooning that leaves the States with no real option but to acquiesce" and was therefore impermissibly coercive. *Id.* at 581–82. The Medicaid expansion was so dramatic it was "in reality a new program . . . . [not] a mere alteration of existing Medicaid." *Id.* at 582–84. While Congress could have offered increased Medicaid funding in exchange for continued participation in the Medicaid program, the Spending Clause did not allow Congress to condition existing Medicaid funds on participation in a new welfare program. *See id.* at 582–85.

It is true that, unlike the Medicaid expansion in *NFIB*, the HIPF is a tax and not a new welfare program. But this distinction is not dispositive. Because of the Certification Rule's legislative delegation to the ASB, *see supra* Part III.B—and the ASB's promulgation of ASOP 49—the HIPF is now functionally operating as a condition on Medicaid funds. Just as in *NFIB*, the Government here threatens to withhold all of Plaintiffs' Medicaid subsidies if Plaintiffs do not comply with a new and onerous federal condition. *NFIB* involves different facts, but its holding controls this case.

The fundamental question posed by *NFIB* in this case is whether Plaintiff States "voluntarily" accepted the spending condition. 567 U.S. at 577 (quoting *Pennhurst*, 451 U.S. at 17). The Court finds that if Congress conditions existing Medicaid funds on whether states pay a

---

[51] Under the pre-ACA Medicaid program, states were required "to cover only certain discrete categories of needy individuals—pregnant women, children, needy families, the blind, the elderly, and the disabled." *NFIB*, 567 U.S. at 575 (citing 42 U.S.C. § 1396a(a)(10)). Under the post-ACA Medicaid expansion, states were required "to cover all individuals under the age of 65 with incomes below 133 percent of the federal poverty line." *Id.* (citing 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII)).

new and onerous federal tax that was not a part of the original Medicaid bargain—this condition would be coercive and violate the Spending Clause. This conclusion is consistent with the holding and underlying logic of *NFIB*, and a contrary finding would open the door to further constitutional violations. For if the Spending Clause allows the Government to impose new and onerous taxes as retroactive conditions on spending, Congress could evade the Tenth Amendment's intergovernmental tax immunity by enacting a "voluntary" tax on the states and attaching it as a spending condition. *See infra* Part III.E (discussing the Tenth Amendment's intergovernmental tax immunity). So long as Congress framed the tax as a "voluntary" alteration to a pre-existing spending deal, the states would have to accept it, and pray the Government did not alter it any further.[52]

The Court finds, however, that Congress enacted the HIPF as a tax—an ordinary, unadorned tax—not as a condition on Medicaid funds. Indeed, the ACA expressly excludes the states from paying the HIPF. ACA § 9010(c)(2)(B). It would be improper for the Court to declare that a statute violates the Spending Clause as a coercive condition on spending when Congress plainly fashioned the statute so that it would not be a condition on spending—indeed, so that the states would not pay it at all. Plaintiffs' grievance is with HHS's legislative delegation to the ASB—empowering the ASB to issue legislative decrees that transformed the HIPF into a spending condition—not with Congress's routine exercise of the taxing power. Accordingly, the Court finds that the HIPF is not a coercive condition on spending in violation of the Spending Clause. The Court **DENIES** Plaintiffs' Motion for Summary Judgement (ECF No. 53) as to Count IV and **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 62) as to Counts IV.

    2.  <u>Clear Notice</u>

---

[52] This deal would get worse all the time, as Congress would have an obvious incentive to manipulate this constitutional loophole and pilfer state coffers to fund ever-expanding federal priorities.

Plaintiffs also claim that the HIPF violates the Spending Clause because the Government did not give the states clear notice that it would condition federal Medicaid funds on paying the HIPF. *See* Pls.' Br. 26–28, ECF No. 54. Defendants respond that the requirement that states account for the HIPF in their capitation rates did not surprise Plaintiffs because it merely reflected a long-standing requirement in Medicaid that capitation rates be actuarially sound. Defs.' Br. 27–28, ECF No. 63.

"When Congress enacts legislation under its spending power, that legislation is 'in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.'" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 181–82 (2005) (quoting *Pennhurst*, 451 U.S. at 17).[53] As such, "'[t]here can . . . be no knowing acceptance [of the terms of the contract] if a State is unaware of the conditions imposed by the legislation on its receipt of funds.'" *Id.* at 182 (quoting *Pennhurst*, 451 U.S. at 17) (alterations in original). The text of a statute must enable a state official to "clearly understand" the conditions the state is agreeing to when it accepts federal funds. *Arlington Cent. Sch. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296–97 (2006) (holding that the statutory provision at issue did not even hint that acceptance of federal funds was conditioned on a State reimbursing prevailing parties for expert fees).

Defendants claim that Plaintiffs received clear notice that the HIPF would be a condition on spending because prior to the ACA, states were required to account for other taxes in their capitation rates. *See* Defs.' Br. 28, ECF No. 63; Defs.' Reply 11–15, ECF No. 67. But the ACA explicitly exempts Plaintiffs from paying the HIPF. ACA § 9010(c)(2)(B). Defendants have

---

[53] Because spending programs forge what is in principle, if not in law, a contractual relationship between the states and the federal government, certain common law rules of contract govern their constitutionality. *See Jackson*, 544 U.S. at 181–82; *see also* Steven C. Begakis, *Rediscovering Liberty of Contract: The Unnoticed Economic Right Contained in the Freedom of Speech*, 50 LOY. L.A. L. REV. 57, 64–66, 84–85 (2017) (discussing the objective reality of contractual relationships, which exist independent from—and thereby justify and demand—the positive law's protection of them).

pointed to no evidence that the Government ever required states to pay taxes in their capitation rates that the law expressly exempted the states from paying. Defendants correctly observe that Congress reserved the right to "alter" or "amend" the terms of the Medicaid program in the Medicaid statute, Defs.' Br. 26, ECF No. 67 (quoting 42 U.S.C. § 1304), but Plaintiffs could not have anticipated a requirement to pay the HIPF unless and until Congress amended the ACA to remove their statutory exemption.

This conclusion notwithstanding, the Spending Clause only requires that spending conditions give clear notice. *See Pennhurst*, 451 U.S. at 17. The HIPF is an ordinary tax and not a spending condition. *See supra* Part III.D.1. If the HIPF is not a spending condition, it cannot violate the Spending Clause's requirement that spending conditions give clear notice. Accordingly, the Court **DENIES** Plaintiffs' Motion for Summary Judgment (ECF No. 53) as to Count I and **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 62) as to Count I.

### 3.    Relatedness

Finally, Plaintiffs claim that the HIPF, as a condition of Medicaid funding, is unrelated to the purpose of the Medicaid program because Congress spends the HIPF funds on ACA subsidies for non-Medicaid recipients. Pls.' Br. 26, ECF No. 54. Defendants respond that the ACA does not direct the use of HIPF funds in this way. Defs.' Br. 27, ECF No. 54.

A condition on spending must reasonably relate to the purpose for which the funds are spent. *South Dakota v. Dole*, 483 U.S. 203, 207–08. In *Dole*, the Supreme Court held that Congress could condition highway funds on raising the minimum legal drinking age because regulating alcohol consumption was reasonably related to one of the main purposes of highway funding, namely safety in interstate travel. *Id.* at 208. Similarly here, Defendants have put forward evidence that the Government collects the HIPF into the general Treasury fund, Defs.' App. 10 (Golden

Decl.), ECF No. 63-1, which Congress uses to fund all Government programs—including Medicaid. Because Congress uses the HIPF, at least in part, to fund Medicaid, the imposition of the HIPF as a condition on Medicaid reasonably relates to the Medicaid program.

Moreover, the Court finds that the HIPF is only operating as a condition on Medicaid by virtue of the Certification Rule's legislative delegation, *supra* Part III.B, and is not in itself a spending condition that implicates the Spending Clause. *Supra* Part III.D.1. Because the law exempts states from paying the HIPF, there is no genuine dispute of material fact that the HIPF is a constitutional tax and not a coercive, surprising, or unrelated condition on spending. Accordingly, the Court **DENIES** Plaintiffs' Motion for Summary Judgment (ECF No. 53) as to Count VIII and **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 62) as to Count VIII.

### E.    Tenth Amendment Claim (Counts VI and X)

Plaintiffs claim that the HIPF, facially and as applied, violates the Tenth Amendment's intergovernmental tax immunity. Pls.' Am. Compl. 23–24, 26–27, ECF No. 19.[54] Plaintiffs argue that the HIPF discriminates against them as states and unduly interferes with their sovereign functions, even as the HIPF does not represent a traditional source of federal revenue. *See* Pls.' Br. 30–35, ECF No. 54. Defendants respond that the HIPF does not discriminate against a sovereign because its legal incidence falls on the MCOs, not the states. Defs.' Br. 29–34, ECF No. 63. Defendants also argue that Plaintiffs are precluded from arguing that the HIPF interferes with state sovereignty because Plaintiffs litigated and lost the issue on the merits in *Fla. ex rel. McCollum v. U.S. Dep't of Health & Human Servs.*, 716 F. Supp. 2d 1120 (N.D. Fla. 2010). *Id.* at 33–34. The

---

[54] The Court previously dismissed Count X to the extent it sought a HIPF refund, but otherwise deferred a ruling on Defendants' motion to dismiss Count X. Aug. 4, 2016 Order 21, ECF No. 34.

Court will consider Counts VI and X together, as the parties have done in their briefing. *See* Pls.' Br. 30–35, ECF No. 54; Defs.' Br. 29–34, ECF No. 63.

The Supreme Court first announced the doctrine of intergovernmental tax immunity in *McCulloch v. Maryland* where the Supreme Court held that the Supremacy Clause prohibited states from directly taxing the federal government. *See* 17 U.S. 316, 425–37 (1819). "Since *McCulloch*, [the Supreme Court] has adhered to the rule that States may not impose taxes directly on the Federal Government, nor may they impose taxes the legal incidence of which falls on the Federal Government." *United States v. Fresno Cty.,* 429 U.S. 452, 459 (1977). "A tax is considered to be directly on the Federal Government only 'when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities.'" *South Carolina v. Baker*, 485 U.S. 505, 523 (1988). The states may enact a tax on a private party, even if the economic burden falls entirely on the federal government, provided the tax "does not discriminate against the United States or those with whom it deals." *Id.* at 521, 523.

The Tenth Amendment reserves to the states a similar tax immunity. *See id.* at 518 n.11 ("[S]tate immunity arises from the constitutional structure . . . ."). "The rule with respect to state tax immunity is essentially the same" as federal tax immunity. *Id.* at 523. The only difference between federal and state tax immunity is that the federal government may collect certain taxes from the states directly—provided the tax does not discriminate against the states and those with whom they deal. *See id.* at 523, 523 n.14.[55] Thus, the central question in a state tax immunity cases is whether the tax "discriminates" against the sovereign—that is, whether the legal incidence of

---

[55] The Supreme Court in *Baker* briefly remarked that the federal government could collect "at least some" federal taxes directly from the states, but declined to elaborate what those taxes are. *See* 485 U.S. at 523, 523 n.14.

the tax falls solely upon the sovereign or the sovereign's functionaries, and not on any purely private entities. *See id.* at 517–23; *see also New York*, 326 U.S. at 587 (Stone, C.J., concurring) ("[T]he phrase 'non-discriminatory tax' . . . refer[s] to a tax laid on a like subject matter, without regard to the personality of the taxpayer . . . ."). An entity is not private if it "stand[s] in the [sovereign's] shoes," or is "so assimilated by the [sovereign] as to become one of its constituent parts." *United States v. New Mexico*, 455 U.S. 720, 736 (1982) (quotation marks omitted).

While the ASB—wielding delegated legislative power from HHS—effectively rewrote the ACA to require the states to pay the HIPF, *supra* Part III.B, the HIPF itself prohibits this very form of tax discrimination against a sovereign. Indeed, Congress discriminated in the opposite direction, levying the HIPF on private MCOs and explicitly exempting the states from paying it. ACA § 9010(c)(2)(B). Moreover, while MCOs work closely with the states, they are private businesses without government control or oversight. An MCO is not "so assimilated by the [state] as to become one of its constituent parts." *Cf. New Mexico*, 455 U.S. at 736 (noting that intergovernmental tax immunity does not apply to private contractors). Because Congress constructed the HIPF so that it would target the MCOs and not the states, the Court finds that the HIPF does not discriminate against the states in violation of state tax immunity.

It is possible that a non-discriminatory tax "may nevertheless so affect the State, merely because it is a State that is being taxed, as to interfere unduly with the State's performance of its sovereign functions of government." *New York*, 326 U.S. at 587 (Stone, C.J., concurring). Plaintiffs argue that the HIPF interferes with their sovereign functions because it forces the states to raise new taxes on their citizens to pay the HIPF, commandeering their legislators and executive officials to enact and enforce federal policy in violation of *Printz v. United States*, 521 U.S. 898, 925–33 (1997). *See* Pls.' Br. 34, ECF No. 54. Assuming *arguendo* that this argument is not

precluded, the Court finds it unavailing. There is indeed undisputed evidence in this case that the states had to reshape their annual budgets to account for the HIPF. *See, e.g.*, Pls.' App. 1169–71, ECF No. 54-1. But it was the ASB's imposition of the HIPF on Plaintiffs, not the HIPF itself, that precipitated Plaintiffs' legislative actions. *Supra* Part III.B. The Court finds that the HIPF, when properly applied only to the MCOs, imposes at most an incidental economic burden on Plaintiffs. Plaintiffs have not shown that this incidental burden unconstitutionally interferes with their sovereign functions.

Accordingly, the Court finds that there is no genuine dispute of material fact that the HIPF is constitutional under the Tenth Amendment. The Court **DENIES** Plaintiffs' Motion for Summary Judgment (ECF No. 53) as to Counts VI and X and **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 62) as to Counts VI and X.

### F.      Permanent Injunction Claim (Count IX)

Plaintiffs also request a permanent injunction to prevent Defendants from prospectively collecting the HIPF because the HIPF is unlawful. *See* Pls.' Am. Compl. 26, ECF No. 19. To receive a permanent injunction, the movant must show *inter alia* actual success on the merits. *Doe v. KPMG, L.L.P.*, 325 F. Supp. 2d 746, 751 (N.D. Tex. 2004) (citing *Harris Cty. v. CarMax Auto Superstores, Inc.*, 177 F.3d 306, 312 (5th Cir. 1999)). Here Plaintiffs have not established actual success in challenging the legality of the HIPF. *Supra* Part III.D–E. Accordingly, the Court may not permanently enjoin federal officials from collecting the HIPF. The Court **DENIES** Plaintiffs' Motion for Summary Judgment (ECF No. 53) as to Count IX and **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 62) as to Count IX.

### IV.      CONCLUSION

For the foregoing reasons, the Court finds that Plaintiffs' Motion for Summary Judgment (ECF No. 53) should be and is hereby **GRANTED in part and DENIED in part**, and that Defendants' Motion for Summary Judgment (ECF No. 62) should be and is hereby **GRANTED in part and DENIED in part**. Because 42 C.F.R. § 438.6(c)(1)(i)(C) (2002)[56] delegates legislative power in violation of the United States Constitution and the APA, the Court declares that it[57] is set aside as "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . ." 5 U.S.C. § 706(2)(B)–(C).

**SO ORDERED** on this **5th day** of **March, 2018**.



_Reed O'Connor_
**UNITED STATES DISTRICT JUDGE**

---

[56] "(i) *Actuarially sound capitation rates* means capitation rates that . . . (C) Have been certified, as meeting the requirements of this paragraph (c), by actuaries who meet the qualification standards established by the American Academy of Actuaries and follow the practice standards established by the Actuarial Standards Board." 42 C.F.R. § 438.6(c)(1)(i)(C) (2002) (emphasis in original).
[57] The offending provision is now codified at 42 C.F.R. §§ 438.2–438.4.